FILED
2015 Aug-27  AM 08:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

1

2                    UNITED STATES DISTRICT COURT

3                   NORTHERN DISTRICT OF ALABAMA

4                        SOUTHERN DIVISION

5

6    UNITED STATES OF AMERICA,        *
              Plaintiff,              *
7                                     * Case No. CR-15-MHH-0154-S
              v.                      *
8                                     *
     KIMBERLY H. BRANCH,              *    Birmingham, Alabama
9                                     *      August 13, 2015
              Defendant.             *         9:15 a.m.
10   *********************************

11

12         TRANSCRIPT OF TRIAL BY JURY, VOLUME IV OF V
           BEFORE THE HONORABLE MADELINE HUGHES HAIKALA
13               UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24   Court Reporter:          Chanetta L. Sinkfield, CCR, RMR
                              United States Federal Courthouse
                              1729 Fifth Avenue North
25                            Birmingham, AL 35203

1

2                              **APPEARANCES**


3

    FOR THE PLAINTIFF:       U.S. ATTORNEY'S OFFICE
4                            Assistant U.S. Attorney,
                             AMANDA SCHLAGER WICK
5                            JENNIFER SMITH MURNAHAN
                             1801 4th Avenue North
6                            Birmingham, AL 35203

7

8   FOR THE DEFENDANT:       WILLIAM H. BROOME, ESQ.
                             1110 Wilmer Avenue
9                            P.O. BOX 1952
                             Anniston, AL 36202
10

11

12

13

14

15

16

17

18

19

20

21

22

23
    Court Reporter:          Chanetta L. Sinkfield, CCR, RMR
24                           United States Federal Courthouse
                             1729 Fifth Avenue North
25                           Birmingham, AL 35203

1
2
                      **I N D E X**

3              August 13, 2015; VOLUME IV

4
                   *Direct Cross  Redirect Recross Further Redirect*
5
   **DEFENSE**
6  **WITNESS**

7  _____

   **KIMBERLY BRANCH**        699      724        734
8

9  **CLOSING ARGUMENTS P. 755**

10 **JURY QUESTION    P. 806**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    P R O C E E D I N G S

2

3                       (9:30 a.m.)

4            (Outside the presence of the jury.)

5            THE COURT:  Tammi is bringing you the draft

6    instructions on the law that I e-mailed last night.  I have

7    made a few revisions, but they are minor.  They're stylistic.

8                   (Jury in at 9:32 a.m.)

9            THE COURT:  Y'all ready to get started this morning?

10           ALL JURORS:  Yes, ma'am.

11           THE COURT:  All right.  We were in the middle of

12   some cross examination yesterday.

13        Ms. Branch, as you are walking toward the stand, I

14   will remind you that you are still under oath.

15           THE WITNESS:  Yes, Your Honor.

16           MS. WICK:  Thank you, Your Honor.

17                CONT'D CROSS EXAMINATION

18   BY MS. WICK:

19   Q    Ms. Branch, yesterday, I kind of jumped around all over

20   the place, and I am sorry for that.  I am trying to go in

21   topic order.  And I am not trying to trick you.  But if don't

22   understand my question, please don't hesitate to ask me to

23   rephrase it.

24        Yesterday, you were talking about the accounting

25   process and you were explaining the booking, and it was very

 1   helpful in terms of clarifying.  And I just wanted to make

 2   sure we had covered the tiers -- not the tiers, but the I want

 3   to say again, and you can correct me if I am wrong -- Cullman,

 4   the first step was booking?

 5   A    No.

 6   Q    I knew I was going to get this wrong -- accepted?

 7   A    Yes.

 8   Q    So the F & I guy accepted in Cullman, and the final stage

 9   in Cullman was called capped?

10   A    Correct.

11   Q    In Reynolds and Reynolds in Birmingham, the first stage

12   was the F & I manager would put it in as pending?

13   A    Usually the sales manager.

14   Q    The sales manager.  And the -- I think you said the sales

15   manager or an F & I person could book the deal, but that was

16   not final in Birmingham?

17   A    Correct.

18   Q    Okay.  They just sent it to accounting to notify them

19   that it was ready to be finalized, and that was called

20   finalizing in Birmingham in the accounting system?

21   A    Correct.  They didn't really send it to accounting, but

22   accounting could not finalize the deal unless it was booked.

23   So when they booked the deal, they would turn the deal into

24   accounting, and then accounting would be able to pull that

25   deal up and book it.  But if it was still in pending,

1    accounting would send it back, and say, okay, this deal is not

2    booked, so we cannot finalize it.

3    Q    Okay.  I totally understand that.  Okay.  So, for these

4    15 deals that we have been talking about, the ones that were

5    shifted from -- that were actually sold in Cullman but were

6    reported sold in Birmingham, those deals were capped in

7    Cullman you said?

8    A    Yes.

9    Q    Okay.  They could have been booked in pending status and

10   then booked by a finance manager in Birmingham without ever

11   having been finalized in Birmingham, right; because they were

12   two separate systems, weren't they?

13   A    Yes.

14   Q    Okay.  Can you only finalize one car once?

15   A    On one DMS, yes.

16   Q    Okay.  Let me talk with you briefly about the audit that

17   we have been talking about.  Government's Exhibit 25, that

18   everybody was looking at, that audit report from 2013, that

19   closing meeting was held on March 15th, 2013.  That was before

20   these 15 deals, wasn't it?

21   A    Yes.

22   Q    So these 15 deals that we've been talking about, they

23   weren't part of the scope of that audit that Mr. Creecy was

24   talking about?

25   A    No, ma'am.

1    *Q*    Okay.  Do you know -- were these 15 deals ever part of a

2    Nissan audit?

3    *A*    No, ma'am.

4    *Q*    For that audit, the one that we were talking about, prior

5    to these 15 deals -- the one that Mr. Creecy testified -- and

6    I think you said, I would have been the one to send the

7    accounting data, I would have been the one to pull the deal

8    jackets, do you know if there were any fake deal jackets

9    created for that audit?

10   *A*    I do not know.

11   *Q*    Did any of those deals that you pulled for that audit

12   have two sets of deal jackets?

13   *A*    I didn't pull the deal jackets.

14   *Q*    The ones that you made sure were pulled for Mr. Creecy?

15   *A*    Not that I remember, no.

16   *Q*    You didn't check to make sure there's not a duplicate,

17   there's not a double of these deal jackets before we pull them

18   for Nissan?

19   *A*    No, I didn't.

20   *Q*    You knew having those deal jackets was important to the

21   audit, right?

22   *A*    Yes, that was part of the scope of the audit, yes.

23   *Q*    And you knew that the purpose of that process, having

24   those deal jackets for when the auditor came, was to make sure

25   that you were doing things properly, right?

1    *A*    Yes.  I believe so.

2    *Q*    Yesterday you mentioned some internal auditors that came

3    on that would check what you did.  I think you said that was

4    like a bookkeeping audit for tax returns.  Did they audit for

5    Nissan -- well, did I mischaracterize what you said; is that

6    not right?

7    *A*    We have internal auditors, yes, that come in once a year.

8    *Q*    And I thought I understood you to say the purpose of that

9    was they check your bookkeeping to make sure that the debits

10   and credits and the books are balanced?

11   *A*    They basically just review the books.

12   *Q*    But they don't audit for Nissan incentives, do they?

13   *A*    I don't know if they -- I mean, I am sure they look at

14   all the schedules.

15   *Q*    Do you know if they are familiar with the audit world,

16   check the deal jackets?  Do they go through what the Nissan

17   auditors do when they come on site to do the Nissan incentive

18   audit?

19   *A*    They do pull deal jackets and request paperwork out of

20   the deals, so -- inside their audit.

21   *Q*    Would they be able to know if you gave them a fake

22   Birmingham deal jacket, that that car was sold in Cullman?

23   *A*    I don't know why they would -- no.

24   *Q*    They wouldn't be able to tell, right, because you would

25   hand them a Birmingham deal jacket, and it says the car was

1    sold in Birmingham, how would they know if the car was sold in

2    Cullman, if they didn't call every customer and say did you

3    buy this car?

4              MR. BROOME:  Judge, these are multiple questions.

5    If she would ask one question and let her answer the question.

6              THE COURT:  Good point.

7    BY MS. WICK:

8    Q    If you handed the auditors a Birmingham deal jacket, how

9    would they know that car wasn't sold in Birmingham?

10   A    I don't know.

11   Q    Could they?

12   A    I don't know.  I guess they could if they -- I have no

13   idea why they would request certain deal jackets at certain

14   points.  But yeah, I guess they wouldn't be able to tell.  I

15   don't know.

16   Q    They would or would not?

17   A    I would think they would not.

18   Q    Okay.  Do you remember -- was it part of your job as the

19   controller to calculate the net profit for the dealership?

20   A    Yes.

21   Q    Do you know what the net profit for the dealership was in

22   2013?

23   A    No, ma'am.

24   Q    Can you ballpark it?

25   A    No, ma'am.  I believe Randy stated something, one million

1    something, but I don't know if he is accurate or not.

2    Q    Do you know what the net profit was for 2014?

3    A    No, ma'am, I don't.

4    Q    Is it part of your job to calculate that for a tax return

5    and other paperwork?

6    A    I don't do the tax returns for the stores, so no.  I

7    mean, I'd calculate it on a monthly basis, but typically I

8    don't keep track of it on a yearly basis without -- if I

9    wanted to know, I could pull the financial statement, but

10   that's not something that stands out in my mind.

11   Q    I think you said -- and I don't want to get the number

12   wrong -- but I think you said it was something a little over a

13   million?

14   A    I think that's what he said, yes.

15   Q    And that was for the Serra Nissan -- that was just Serra

16   Nissan and Serra VW, right?

17   A    If I remember correctly, yeah, that's what he said.

18   Q    That was, I think, at least 20 or -- two percent of the

19   net of that was at least 20 or $30,000.  So your base salary

20   for 2013, not including the net that you got for Serra Visser

21   Nissan, was at least 120 or $130,000, wasn't it?

22   A    If the one point is right, yes.

23   Q    Let's not even use those numbers.  What did you make in

24   salary from Serra Nissan and Serra Visser Nissan in 2013?

25   A    Around $150,000.

1   Q     Do you remember what you made in 2014?

2   A     I believe it was about the same.

3   Q     So at your old dealership, that was a $50,000 increase

4   -- you said you made $100,000 when you left.  So that was 50

5   percent pay raise when you went to Serra Nissan, roughly?

6   A     Yes.  Roughly.

7   Q     Earlier you have said you weren't familiar with the sales

8   side.  Are you familiar with the recap sheet, with what that

9   is?

10  A     Yes.

11  Q     Stipulations?  Stips?

12  A     No.

13  Q     You don't know what stips are?

14  A     Stipulations?  No, I don't know what stipulations are or

15  would be in deal.

16  Q     Do you remember testifying in a hearing after the

17  government did a search warrant in October of 2013?

18  A     Yes, I do.

19  Q     Okay.  Do you remember being asked under oath what stips

20  are?

21  A     I understood you to say stipulations.

22  Q     I said stips, and then I said stipulations.

23  A     Oh, I am sorry.

24  Q     Okay.  So now you know what a stip is?

25  A     No, no, I understood you to say stipulations.

 1   Q    Okay.  So do you know what stips or stipulations are?

 2   A    Yes, I do know what stips are.

 3           MR. BROOME:  Your Honor, I think we're talking about

 4   two different things.  We have entered into stipulations here

 5   today, and I am sure that's not the same thing as stips are in

 6   a car dealer situation.

 7           MS. WICK:  Your Honor, I was asking about the sales

 8   process, the recap sheet.  I said stips or stipulations.  If

 9   the witness is now saying she understands what stips or

10   stipulations is, that's fine.

11           MR. BROOME:  We're still talking about two different

12   things.

13           THE COURT:  All right.  Ms. Wick, why don't you ask

14   your question again and make clear the foundation for the line

15   of questions.

16           MS. WICK:  Sure.

17   BY MS. WICK:

18   Q    Earlier, you said that you weren't familiar with a lot of

19   the sales process side.  I asked you if you were familiar with

20   the recap sheet, which is something they use on the sales

21   side.  You said, yes.  I asked if you were familiar with stips

22   or stipulations, talking about the sales process at the

23   dealership, and I thought you were saying, no, you weren't

24   familiar with stips or stipulations of the sales process at

25   the dealership.

1           I'm not talking about when we say stipulations to

2    facts here in court, but the stips or stipulations that is

3    used in the sales process at the dealership.  Do you

4    understand what those are?

5    A    I understand what stips are, but I have never heard them

6    called stipulations.  So, that was my confusion.

7    Q    Okay.  You didn't know that stips was short for

8    stipulations?

9    A    I had never heard that used in the terminology at the

10   dealership.  I just heard stips.

11   Q    Okay.  And that's fair.  I don't want there to be any

12   confusion about what the question was.

13           Are you familiar with what a "we owe" sheet is?

14   A    Yes.

15   Q    You still work at the Serra Nissan dealership as the

16   controller, right?

17   A    Yes, ma'am.

18   Q    And you have a pretty good relationship with the Vissers?

19   A    I don't really talk to them very often, but I wouldn't

20   say we have a bad relationship.

21   Q    Well, isn't the dealership paying for your legal fees in

22   this case?

23              MR. BROOME:  Judge, I would object to that question.

24              MS. WICK:  Your Honor, that goes directly to her

25   motivation for her answers and why she is here.

1             MR. BROOME:  Judge, I would object to that

2    characterization, also.

3             THE COURT:  Sustained.

4    BY MS. WICK:

5    Q    Ms. Branch, yesterday you talked about a woman named

6    Yolanda -- and I want to make sure -- she is the coster for

7    Cullman, but she is located in the Birmingham store?

8    A    Yes, ma'am.

9    Q    Okay.  Is she who would have capped the deals in Cullman

10   system in Birmingham?

11   A    She would have capped them in the Cullman DMS.  And yes,

12   she is located at the Birmingham office.

13   Q    So she has the ability out of the -- and I think you said

14   that you guys are located actually in the VW side, so in the

15   city of Birmingham -- but she has ability to go into

16   Cullman's, you said Dealertrack system and cap the Cullman

17   deals?

18   A    Yes.

19   Q    Okay.  Can you explain exactly what her responsibilities

20   are as a coster?

21   A    She would pull out the contract and send it to the bank,

22   post the deal into accounting, do any payoffs, write any

23   referral fees, pull up the warranties, and basically just go

24   through the whole deal.

25   Q    When you say pull out the warranties, would she have had

 1    to send those to -- and maybe we're talking -- I want to make

 2    sure I am not talking about the wrong thing.

 3            Are you talking about the warranty that starts with

 4    the car, or the extended warranty, the SEC+, that we talked

 5    about?

 6    A    SEC+.

 7    Q    So she would have to pull those out and send them to

 8    somebody?

 9    A    We usually had them sent over to someone else to make

10    sure they got submitted.  If they were new cars, they were

11    submitted -- they were submitted when the vehicles RDR'd.  But

12    if they were used cars, they would still have to be actually

13    manually entered into the system for Security+Plus.

14    Q    Was she responsible for dealing with bills of sale and

15    title applications?

16    A    The bill of sale being the deal and title app, she would

17    give to the title clerk.

18    Q    So who would be responsible for actually pulling out a

19    bill of sale and title application from the deals to do

20    whatever was next to those documents?

21    A    She would give that to the title clerk.

22    Q    So it would be the coster?

23    A    She would pull them out, yes.

24    Q    So she would pull them out and literally hand them to the

25    title clerk to use those to what -- to send them to the state

1    for a title or something?

2    A    The title app -- I believe, or the title.

3    Q    If she pulled out a Birmingham, Center Point bill of sale

4    title application out of a Cullman deal jacket, would she come

5    talk to you about that?

6    A    I don't know.  I don't know if she would notice.  I don't

7    know.

8    Q    It wasn't part of her job to notice if the bill of sale

9    or the title applications that Birmingham with the deal jacket

10   was that bright turquoise color?

11   A    I don't know that she would notice the difference in the

12   documents.

13   Q    So, nobody ever came to you or said anything to you in

14   the accounting office about 15 deals having bills of sale and

15   title applications that were Birmingham in Cullman deal

16   jackets?

17   A    No, they did not.

18   Q    Wouldn't they have had to access those deals pretty

19   regularly?  I mean, wouldn't they be constantly in there

20   looking through the paperwork?

21   A    Not typically after the deal is done, no.  Once the

22   billing clerk caps the deal, it gets filed.

23   Q    And then what happens to it?

24   A    It gets filed on the shelf.

25   Q    Does it just sit there untouched for years?

1    *A*    Unless for some reason we need something out of it.  But

2    typically, yes, it would just stay in the filing cabinet.

3    *Q*    I want to go back when we were talking about your

4    testimony in those previous hearings.  Do you remember being

5    asked how often in the daily operation of your business those

6    deal files are accessed on a regular basis for information?

7    Do you remember being asked that under oath?

8    *A*    I do.

9    *Q*    Do you remember saying that those deals were accessed

10   daily, regularly, constantly?

11   *A*    I was referring to all the deals.  So, on a daily basis,

12   at one point we're going to need one deal, two deals on a

13   daily basis.  I wasn't referring to every single deal.  If I

14   remember the question correctly.

15   *Q*    Would you like me to refresh your recollection with your

16   testimony?

17   *A*    Sure.

18   *Q*    You were asked:  To be clear, were dealer files taken

19   during the raid on Thursday night?

20   *A*    You said:  Yes, ma'am.

21   *Q*    You were asked:  Tell the Court how you know that to be a

22   fact.  In the accountant office, we keep two years worth of

23   deals because we access them so regularly.  You were asked:

24   In the daily operation of these businesses, are those deal

25   files accessed on a regular basis for information?  Yes,

1    ma'am.

2    A    I was referring to if 300 deals are missing from the

3    filing cabinet, customers are wanting to call about certain

4    things that they need out of those deals, not one particular

5    deal of 300 or 200 deals that -- I don't know how many there

6    were.  But at one point on a daily basis, someone is going to

7    call and want something out of one of those deals.

8    Q    Did anybody need anything out of these 15 deals, or these

9    were the 15 that sat untouched for two years?

10   A    I don't know if they needed anything out of them or not.

11   If they would have been, they would have been on the shelf.

12   Q    I want to talk with you briefly about your attestation.

13   If we could pull up Government's Exhibit 23.

14        Yesterday we were talking about the subpoena that was

15   issued to the dealership, to Serra Nissan for the 15 deals.

16   In fact, I think you said they were issued to the Birmingham

17   dealership.  And you understood that they were looking for

18   Birmingham deal jackets, and you couldn't find Birmingham deal

19   jackets.  I think you also said you didn't review this

20   document; is that right?

21   A    No, I did not read it completely.  Not that I remember.

22   Q    Can we call out the top part from certification and

23   acknowledgment down to the first set of signatures?

24        Ms. Branch, do you see where it says, "I declare under

25   penalty of perjury the foregoing is true and correct"?

1    A    I do see that.

2    Q    Okay.  Did you read that before you signed this?

3    A    I don't remember.

4    Q    Did you understand that signing this and having it

5    notarized was the equivalent of an affidavit under oath?

6    A    I was just asked to sign it by an attorney that -- I

7    just -- no, I did not read it in its entirety and realize

8    exactly -- he told me that I needed something about a

9    custodian or something like that.  And so I printed out and

10   signed it and had my title clerk notarize it.

11   Q    Did you review the content for accuracy at all?

12   A    Not that I remember.

13   Q    So did you contribute or tell the attorney anything to

14   put into this?

15   A    No, ma'am.

16   Q    Okay.  So you had absolutely nothing to do with the

17   drafting of this content?

18   A    Not that I recall.  I remember I think it was e-mailed to

19   me by the attorney to sign.

20   Q    Okay.  Yesterday when we were talking about when you

21   realized that the 15 deals requested in the subpoena were the

22   15 shifted car sales, you said it was some time prior to -- I

23   think you said something about the warranties, like when you

24   had to pay the warranty check, right?

25   A    Can you repeat that?

1    *Q*   I don't want to butcher what you said.  So, it would be

2    helpful if you could just tell me.

3          When you realized when the 15 deals that were asked

4    for in the subpoena to Serra Nissan, when did you realize that

5    those 15 deals were the 15 shifted sales?

6    *A*   I believe that was when we realized that they were

7    Cullman deals was the first -- of course, signed, and then

8    when I started to look up each stock number and saw that they

9    were all Cullman, and then I also, I had a list of those

10   deals.  So I looked at that list and realized that they were

11   the same deals.

12   *Q*   Okay.  And it's coming back to me now.  I think you said

13   it was right before you produced the documents to Mr. Baty to

14   give to the government, right?

15   *A*   I don't know how long it took for them to actually get

16   them copied and all of that.

17   *Q*   Okay.  Can we agree that it was before you signed this on

18   August 1st, 2014?

19   *A*   Yes.

20   *Q*   Okay.  So when you signed this under penalty of perjury,

21   you were aware that this subpoena asked for the Serra Nissan

22   deal jackets for these 15 shifted deals that you knew Jeff had

23   created?

24   *A*   No --

25               MR. BROOME:  Your Honor, I am going to object to

1    form of that question.  The subpoena has been admitted.  The

2    subpoena speaks for itself.

3              MS. WICK:  I can break that question down, if it

4    needs to be simpler, Your Honor.

5              THE COURT:  Why don't you try breaking it down.

6    BY MS. WICK:

7    Q    Ms. Branch, let me back up a minute.  Okay?  Because I

8    don't want it to be confusing.

9              You said you knew that this subpoena asked for the 15

10   deals that had been shifted, the Birmingham deal jackets,

11   prior to signing this on August 1st, 2014, right?

12   A    No, I knew that it was asking for the 15 deals, and the

13   only 15 deals that we had were the 15 Cullman deals.

14   Q    Your e-mail to Mr. Visser in June made it clear that you

15   knew Jeff had created 15 Birmingham deal jackets for these

16   deals, right?

17             MR. BROOME:  Judge, again, I object to the form of

18   that question.

19             THE COURT:  I am sorry.  What did you object to?

20             MR. BROOME:  She said, "you knew" -- if she could

21   just repeat the question.

22             THE COURT:  Okay.

23             MS. WICK:  Chanetta, can you read the question back

24   please?

25                   (The last question was read.)

1    *A*    No, I did not know that they were created.  My e-mail to

2    him stated that Birmingham jackets had been created by Jeff;

3    that at that point, I was using the conversation that I had

4    with Forest Housner that Jeff was to create Birmingham

5    jackets; that I was not positive at that point --

6    *Q*    Okay.

7    *A*    -- that they actually were.

8    *Q*    And I am sorry.

9    *A*    -- I was trying to reassure him, I guess.

10   *Q*    Okay.  Sorry, I couldn't find -- is it possible for us to

11   call up 24 with this?  Is that possible?  Together?  I don't

12   know if that's possible.  Let's just do 24.  Sorry.  And the

13   second page.  And the middle e-mail.

14          Ms. Branch, when you e-mailed Mr. Visser on June 3rd,

15   did you say, "I think Jeff also created a Birmingham deal

16   jacket"?  Or did you say, "Jeff also created a Birmingham deal

17   jacket for each of these deals so we would have it if they

18   ever request the deal to be pulled"?

19   *A*    No, I did not say, "I think," but I never actually saw

20   these jackets.  I just knew that they had supposedly been

21   made.

22   *Q*    Because you made four separate trips to bring him the

23   Cullman deals for him to duplicate them, didn't you?

24   *A*    I gave him the Cullman deals, but I never saw the actual

25   Birmingham deals.

1  *Q    So, you sent this e-mail months after making four trips*

2  *to bring him all those deals, and you were unclear if Jeff*

3  *made the jacket -- I mean, let me back up.  I don't want there*

4  *to be any confusion.*

5            MR. BROOME:  She asks her a question, and then she

6  never lets her answer the question.

7            MS. WICK:  I want to back up because I know defense

8  counsel wants us to be perfectly clear.

9            MR. BROOME:  I want everybody to be perfectly clear.

10            THE COURT:  Come up to the bench, please.

11  (The following proceedings were held at the bench, out of the

12  hearing of the jury.)

13            THE COURT:  Number one, we went through all this

14  testimony yesterday evening.  You did the same examination

15  with this same exhibit and asked the questions that you just

16  covered.  Okay?  So it's kind of beating a dead horse.

17            MS. WICK:  Okay.

18            THE COURT:  Second, let's get through this

19  questioning.  Okay?  I don't think there was anything wrong

20  with the last question that Ms. Wick asked that was not a

21  question that was asked yesterday.  And so, let's try to do

22  this.

23            MS. WICK:  I am sorry, Your Honor.  I'm questioning

24  her about the attestation and subpoena unfortunately is kind

25  of doubling back on that.  I will try to limit the redundancy,

 1    but -- and I know it's kind of breaking it down, but if every

 2    time there's an objection and I have to dumb it down to a

 3    level, I apologize for that.

 4             THE COURT:  Well --

 5             MR. BROOME:  Just ask her a question and let her

 6    answer it.

 7             THE COURT:  You need to stop the editorial comments.

 8    Okay?  Just go ahead and ask your question and get an answer,

 9    please.  Thank you.

10             (Conclusion of bench conference.)

11    BY MS. WICK:

12    Q    If we could pull out the top part.

13             Ms. Branch, when this subpoena was issued to Serra

14    Nissan for the Birmingham deal jackets, the subpoena asked for

15    the 15 shifted deals, didn't it?

16    A    It asked for the 15 deals, yes, that were shifted from

17    Cullman to Birmingham.

18    Q    Okay.  You signed this attestation August 1st, 2014,

19    after you had become aware that it asked for the 15 deals that

20    had been shifted, right?

21    A    The 15 deals, yes, that were shifted from Cullman to

22    Birmingham.

23    Q    Okay.  Do you see in the attestation where it refers to,

24    "I hereby certify and acknowledge that the documents, images,

25    and data produced herewith are true and accurate copies of

1    business records maintained at Serra Nissan, the records on

2    behalf of Serra Visser"?

3    A    I do see that.

4    Q    Okay.  That refers to the Cullman deal jackets that were

5    produced to the government, correct?

6    A    Yes, they were Cullman deal jackets.

7    Q    Okay.  Can we go to page 2 of that exhibit and call out

8    just the e-mail portion.  Just the top.  No, no, page 2 of 23.

9    I apologize that was my mistake.

10          Mr. Baty's e-mail says, "Subject:  June 16, 2014

11   subpoena to Serra Nissan."  Right?

12   A    Yes, ma'am.

13   Q    Okay.  He writes, "I did not include a certification from

14   Serra Nissan when I produced the 15 deals most recently

15   requested by the grand jury.  Here is Kim Branch's

16   certification for that.  If you need the original, she

17   retained it."

18          Where is there reference to those jackets being Serra

19   Visser Nissan Cullman jackets?

20   A    I don't see a reference to Serra Visser Nissan.

21   Q    So how does the attestation get Cullman into it, but if

22   you didn't tell somebody, these aren't the Birmingham deal

23   jackets, these are the Cullman jackets?

24   A    I believe I did tell Randy Visser that the subpoena was

25   asking for Serra Nissan deals because all that we had were the

CROSS - BRANCH

1    Serra Visser, the original Serra Visser Cullman deals.

2    Q    Okay.  Okay.  You mentioned that some documents were

3    taken off your desk during the search, and we have established

4    one of those documents was Government's Exhibit 24.  Who did

5    you tell at the dealership that the government had taken the

6    list of deals with the e-mails attached off of your desk?

7    A    I don't remember noticing if that was off my desk.

8    Q    At some point, did you ever notice it?

9    A    I believe when I saw the documents that the government

10   provided to us, I realized that it was -- there was a staple

11   in the copies that that was from my desk.

12   Q    You never told Forest Housner, they took the list of

13   deals off my desk during the search?

14   A    I told -- that I had a list on my desktop, like my

15   computer.

16   Q    Did the government take that?

17   A    I know that they came in and copied my hard drive on the

18   night of the raid.

19   Q    Did you tell somebody at the dealership that they took

20   the list of deals off your computer?

21   A    Yes, when I saw the dates -- I think, I referred to it

22   yesterday -- the dates given were not the dates sold.  I

23   realized those were somehow from the list, but I did not know

24   it was from the list from my desk.

25   Q    So if I am understanding you, your testimony is that when

1    you told somebody at the dealership that the government had

2    taken the list of 15 deals after the subpoena in June 2014

3    when you realized that the subpoena attachment referred to

4    your list?

5    A    I didn't know they actually took like a physical list.  I

6    actually told them that I had saved it on my desktop.

7    Q    Okay?

8    A    And that it matched up so clearly with my list that I

9    still had saved on my desktop, the same order -- the subpoena

10   was in the same order, the same dates, and everything.  So, I

11   did not know that it was from my desk.

12   Q    So?

13   A    So my desk -- there's actually an icon on my desktop at

14   my computer.

15   Q    I am with you.  Is it fair to say -- you are saying you

16   did not have conversations with anyone at the dealership about

17   government taking that list of deals either off your desk or

18   your computer until June 2014 when the subpoena came in?

19   A    Can you say that one more time?  I am sorry.

20   Q    I am really not trying to -- if I understood you, you

21   said, I didn't have conversations with anyone about the

22   government taking that list of deals off my computer or off my

23   desk until I realized that the dates that you used in your

24   subpoena were from my list of deals.

25   A    I would say that's correct.

1    *Q*    Okay.  When you had your conversations with Mr.

2    Housner -- okay.  Now I am back in March 2013, when you guys

3    decided to shift these deals.  Okay.

4           When you had your conversations with Mr. Housner, did

5    you ask him if what you were doing was legal?

6    *A*    No, ma'am.

7    *Q*    Did you ask him if Nissan would have a problem with it?

8    *A*    No, ma'am, I didn't believe he would ask me to do

9    anything that was wrong.

10   *Q*    Did he tell you -- I want to be clear.  My understanding

11   was -- you said, he told me to maintain the list, and he told

12   me to take the deal jackets to Jeff.  Did he tell you any

13   instructions on what to do in the accounting system for those

14   15 deals?

15   *A*    Are you referring to booking them in accounting, or what

16   are you referring to?

17   *Q*    Any instructions?  Did he give you any instructions

18   during that meeting of what you would have to do in accounting

19   for those 15 shifted sales?

20   *A*    He told me about the $500 and the $700 that we would be

21   paying Cullman.  So that would be an accounting, I guess,

22   function.

23   *Q*    And we went over that yesterday, so I don't want to

24   repeat it.

25           Other than the $500, $700, did he say anything about

 1   finalizing in Birmingham versus capping in Cullman, anything

 2   that would qualify as an instruction on how to handle the

 3   accounting for those 15 deals other than the $500 or $700?

 4   A    No, ma'am.

 5   Q    Okay.  You saw the Government's Exhibit 40, which is the

 6   fax, and you said to Mr. Broome, I never saw those

 7   instructions.  You saw them today.  Do you remember the big

 8   bold print, "This is important..." these deals be booked in

 9   Birmingham?  Do you remember that?

10   A    Yeah, I believe so.

11   Q    I know you didn't see it before now, I can call it up if

12   it would be helpful.  I am just talking about that all caps

13   language we were talking about?

14   A    Yeah, I remember it.

15   Q    Okay.  He said nothing to you that resembles that portion

16   of the instructions in Government's Exhibit 40?

17   A    No, he did not.

18          MS. WICK:  Your Honor, no further questions.

19          MR. BROOME:  Judge, I have to apologize to the Court

20   and for the jury.  I said yesterday, I wouldn't have any more

21   questions, but I do now.

22          THE COURT:  All right.

23          MR. BROOME:  I am sorry.

24                      REDIRECT EXAMINATION

25   BY MR. BROOME:

REDIRECT - BRANCH

1   Q     Kim, as far as you know, did those 15 Birmingham deal

2   jackets for the 15 switched deals ever exist?

3   A     No, I never saw those jackets.

4   Q     Did you trust Forest Housner?

5   A     Yes, sir.

6   Q     Was the Forest house we saw in here Tuesday the same man

7   that you knew before?

8   A     No, sir.

9   Q     What was different?

10  A     I could tell that he lost a lot of weight.

11  Q     What's a lot of weight to you?  I lost a pound or two,

12  but you can't tell it.

13  A     Probably about 20 pounds.  The way he spoke was

14  different.  I could tell that he wasn't processing things.  He

15  was a very intelligent man, very knowledgeable.  And I could

16  just tell that whatever was going on with him medically was --

17  it had affected him in a lot of different ways.

18  Q     Forgetting a business relationship with Forest Housner,

19  you liked the man, didn't you?

20  A     I did.  I did.

21  Q     You still do, don't you?

22  A     Yes, sir.

23  Q     Did you think Forest would ever tell you to do something

24  wrong?

25  A     No, sir.

1   Q    Had you seen the shifting and parts, maintenance

2   equipment, and accessories done before?

3   A    I had heard about it, yes.

4   Q    Before March of 2013?

5   A    Yes, sir.

6   Q    And how did you know it was done?

7   A    In the accounting office, the checks were written back

8   and forth between the two stores in regards to parts and other

9   things.

10  Q    You heard about it being done to win trips or prizes or

11  contests, didn't you?

12  A    Right.  For Cullman, yes.

13  Q    Would Cullman typically buy from Birmingham or Birmingham

14  from Cullman?

15  A    Both would have them.  I believe in the instance that I

16  heard about it was Birmingham bought from Cullman.

17  Q    So the big store would buy from the little store, why

18  would that happen?

19  A    I believe they did it to attain that contest for Cullman,

20  and so that Cullman could win the contest.

21  Q    Okay.  There has been a lot of talk about money and what

22  you make.  You are not ashamed of what you make, are you?

23  A    No, sir.

24  Q    You earned it, didn't you?

25  A    Yes, sir.

1   Q    You didn't earn it by fraudulently trying to take money

2   from Nissan, did you?

3   A    No, sir.

4   Q    Let's do a little elementary math.  The lady, I think her

5   name was Strickland, had testified she ran all these numbers,

6   and in the end it was $64,800.  Is that her figure, if you

7   remember?

8   A    Yes, sir.

9   Q    (Writing on board.)  When all is said and done, at the

10  end of the year, you got two percent of the net profit?

11  A    Each month I received two percent of the net, yes, sir.

12  Q    But it was two percent; is that right?

13  A    Correct.

14  Q    And if Cullman had booked those 15 deals, you would have

15  made money off what Cullman would have got those 15 deals?

16  A    Yes, sir.

17  Q    Well, we'll forget about that, because that's kind of

18  confusing.

19        Two percent -- would you look at my math -- and I

20  apologize for my writing.  Is my math correct?

21  A    It appears to be, yes, sir.

22  Q    So, I understand if you steal a dollar, that's just like

23  stealing a million dollars, but what we're talking about for

24  you is $1,296; is that right?

25  A    Yes, sir.

REDIRECT - BRANCH

1    Q    Out of $150,000 a year salary?

2    A    Yes, sir.

3    Q    Was there ever any discussions between you and Mr.

4    Housner and he said Kim, you can make $1,300 more for doing

5    this?

6    A    No, sir.

7    Q    And Kim, I apologize for plowing the same ground again.

8    Let's go back, I think it was Government's Exhibit 24.  Again,

9    the highlighting is mine.  Let me just ask you a few

10   questions.

11         The subpoena was to Serra Nissan, right?

12   A    Yes, sir.

13   Q    That's the Birmingham store we've been talking about?

14   A    Yes, sir.

15   Q    All the records for Cullman and Birmingham are kept in

16   Birmingham; is that right?

17   A    Yes, sir.

18   Q    Serra Nissan is Birmingham.  Serra Visser Nissan is

19   Cullman.  Is that right?

20   A    That's right.

21   Q    When you got the subpoena, you and your accounting

22   clerks, or whatever, you guys are looking for Birmingham deal

23   jackets, right?

24   A    Yes, sir.

25   Q    For those 15 deals?

REDIRECT - BRANCH

1    A    Yes, sir.

2    Q    Did you ever find them, the Birmingham deal jackets?

3    A    No, sir.

4    Q    What did you find that matched those serial numbers?

5    A    The Cullman deal jackets.

6    Q    And that would have been Serra Visser Nissan, right?

7    A    Yes, sir.

8    Q    And is that not what you said in your attestation?

9    A    I am reading it now.  It appears to be.

10   Q    Well, you said, "these are true and accurate copies of

11   business records maintained at Serra Nissan."  That's right,

12   isn't it?  That's where you kept the records?

13   A    Yes, sir, that's correct.

14   Q    Then you say, "on behalf of Serra Visser," the Cullman

15   store, right?

16   A    Right.

17   Q    And you gave them the only deal jackets that you had that

18   corresponded to those vin numbers?

19   A    Yes, sir.

20   Q    Thank you.

21            MS. WICK:  Two questions, Your Honor.

22            MR. BROOME:  I hadn't finished.

23            MS. WICK:  Oh, I'm so sorry.

24            MR. BROOME:  It's okay.

25   BY MR. BROOME:

1    Q    You were talking a few minutes about a DMS.  What is a

2    DMS?

3    A    I think it's a dealership -- or dealer management system.

4    Q    That's what you were talking about the Dealertrack is in

5    Cullman?

6    A    Correct.

7    Q    And the Reynolds and Reynolds is in Birmingham?

8    A    Yes, sir.

9    Q    Now, just to clarify for me, RDR'ing is what?

10   A    That's through the Nissan system.  It's basically

11   reporting the vehicles sold to Nissan.

12   Q    That's completely different from the accounting systems

13   or the DMS's that we're talking about?

14   A    Yes, sir.

15   Q    But when a car is RDR'd, the warranties, the incentives

16   the customer rebates, all that goes where it was RDR'd, right?

17   A    Yes, sir.

18   Q    Completely separate from the accounting side?

19   A    Right.

20   Q    Now, Kim, when Forest asked you to keep a list of

21   details, you did that, right?

22   A    I did.

23   Q    And I think you told us you added to your list as the

24   sales came in?

25   A    Yes, sir.

1    Q    And you took those Cullman deal jackets to Jeff Green?

2    A    Yes, sir.

3    Q    I believe you told us you never remembered getting those

4    Cullman deal jackets; you never remembered seeing the

5    Birmingham deal jackets for those 15 deals?

6    A    No, sir, I don't.

7    Q    Now, briefly back to that e-mail between you and Randy

8    Visser.  When you got that first e-mail -- it was Government's

9    Exhibit 24.  Again the highlighting is mine.  And you replied

10   to Mr. Visser.  Did you think you had done something wrong?

11   A    I understood his e-mail to state that he wanted me to

12   book the deals in Reynolds and Reynolds accounting for

13   Birmingham.

14   Q    And you hadn't done that?

15   A    No, sir, I had not.

16   Q    So when I am talking about wrong, I am talking about

17   wrong as far as Randy Visser's wanted you to do it?

18   A    Yes, sir.

19   Q    He never personally told you to do that?

20   A    No, sir.

21   Q    And when you said Jeff created these jackets, why did you

22   tell him that, if you hadn't seen him?

23   A    Because Forest had said that he did, and I was just

24   trying to reassure him that they were done.

25   Q    When you said you could manually enter the reports, did

1   you tell him that with the intention to defraud Nissan?

2   A    No, sir.

3   Q    Why did you tell him that?

4   A    Because he wanted them booked in Reynolds and Reynolds,

5   and it was too late to do that.  So the only option I had to

6   do what he wanted me to do was to add them to the report.

7   Q    Again, did you think there was anything wrong or illegal

8   with doing that?

9   A    No, sir.

10  Q    Are you just trying to keep your accounting, the

11  incentives matching up with what -- well, you tell me what you

12  were trying to do.

13  A    I was just trying to make everything match the books, the

14  reports match -- the RDR compared to the report.

15  Q    To defraud somebody?

16  A    No, sir.

17  Q    And he asked, a response to you, a month or so, six weeks

18  later, and said okay.  Right?  Basically just do that if we

19  get audited?

20  A    Yes, sir.

21  Q    Is that the only discussions you had with Mr. Visser

22  about that?

23  A    Yes, sir.

24  Q    Just to clarify one other thing.  In the Birmingham store

25  when we're talking about putting deals into the system, when

1   the sales managers would put a deal into the system, you call

2   that what?

3   A     It would be just --

4   Q     In Birmingham?

5   A     -- a pending status.  The deal would be in pending

6   status.

7   Q     Does accounting look at those deals when they're pending?

8   A     No, sir.

9   Q     And then I think you said the finance and insurance folks

10  or the sales manager would do what?

11  A     They would book the deal.

12  Q     Would accounting generally or customarily look at those

13  deals when they were booked?

14  A     Usually, once the deal was turned in the office, then

15  they would look at those book deals, yes.

16  Q     So when they're booked, you would look at them?

17  A     Right.

18  Q     But not when they're pending?

19  A     No, sir.

20  Q     When Mr. Shepard testified yesterday he put the deals in

21  the system, or whatever he said, what did that mean?  Where

22  were they?  Which part of the steps?

23  A     It said it would be pending, if he put them there in.

24  Q     So accounting wouldn't look at them at that point?

25  A     No, sir.

1    Q    Kim, did you have an honest belief that what you did was

2    not wrong?

3    A    Not wrong, yes, sir.

4    Q    Now, after talking to lawyers for six months, or how ever

5    long, you realize now that it's wrong?

6    A    Yes, sir.

7    Q    If you had known what you know today, back in March, what

8    would you have done?

9    A    I wouldn't have done it.  I would have -- I just wouldn't

10   have done it.

11            MR. BROOME:  Thank you.  That's all I have now.  I

12   am finished.

13            THE COURT:  Ms. Wick, any further questions?

14            MS. WICK:  Very briefly, Your Honor.

15                       RECROSS EXAMINATION

16   BY MS. WICK:

17   Q    You said that you thought this was okay because they had

18   done it in parts, in the parts shifting process?

19   A    I had heard of that, yes.

20   Q    Did you hear about them having to create false documents

21   for the parts incentive process?

22   A    No, I don't remember them discussing that, no.

23   Q    Did you ever even hear of a parts audit?

24   A    We have parts incentive -- sorry, parts inventory audits.

25   Q    Inventory audits, but not parts incentive audits?

1   *A*    No, ma'am.

2   *Q*    So when you realized before August 1st, 2014, that the

3   subpoena requested the shifted deals, did you tell Mr. Baty

4   before signing that attestation that the Birmingham jackets

5   existed?

6            MR. BROOME:  Judge, I am going to object.  There may

7   be some attorney-client privilege involved here.

8            THE COURT:  Okay.  And first of all, you need to

9   make sure we keep quiet in the audience.  Okay, please.

10           Chanetta, read the question back for me, please.

11                  (The last question was read.)

12           THE COURT:  All right.  I am going to allow the

13  question.

14  *A*    I did not personally speak to Alan Baty about those

15  deals.  But I remember either Forest or Randy, one of the two,

16  had told them that the deals that were being requested were

17  Serra Visser Nissan deals, not Serra Nissan deals.  I do

18  remember that conversation.

19  BY MS. WICK:

20  *Q*    Who was present for that conversation?

21  *A*    Like I said, I don't remember if it was Randy or Forest,

22  which one I spoke to about that.

23  *Q*    I want to be a hundred percent clear.  Your understanding

24  was that Randy or Forest told Mr. Baty that they only had --

25  that you only had Cullman deal jackets for those deals?

1   *A*    That these were actually Cullman deals is what I told

2   him.

3   *Q*    Okay.  When Mr. Broome was asking you about the 15

4   Birmingham deal jackets, okay, and you said you never actually

5   saw them after you brought them to Jeff Green?

6   *A*    I brought him the Cullman deal jackets and --

7   *Q*    You are right.  That was my mistake.  You brought Jeff

8   the Cullman deal jackets -- and I am really not trying to

9   confuse anything.

10  *A*    I understand.

11  *Q*    You brought Jeff the Cullman jackets for him to create

12  the Birmingham deal jackets.  And I thought I understood you

13  to say, you never saw the Birmingham deal jackets that Jeff

14  created?

15  *A*    Yes, that is true.

16  *Q*    Wouldn't he have had to bring them back to you for you to

17  have them in the event that Nissan asked for them to be pulled

18  in an audit?

19  *A*    I didn't ask for the deals back, and I don't remember

20  seeing them.

21          MS. WICK:  No further questions, Your Honor.

22          THE COURT:  All right.

23          MR. BROOME:  Nothing else, Your Honor.

24          THE COURT:  All right.  Ms. Branch, you are excused.

25      Thank you.  All right.  I need to meet with counsel.

1            The next stage in this is I am going to give you the

2    instructions on the law.  I need to meet with counsel for a

3    few minutes before we do that.  So let's take a ten-minute

4    break, please.  Okay.

5                         (Jury out at 10:28 a.m.)

6            MR. BROOME:  Judge, I was just instructing folks not

7    to make any comments.

8            THE COURT:  Thank you.  All right.  What is our next

9    order of business?

10           MR. BROOME:  We would rest, Your Honor.

11           THE COURT:  Okay.

12           MR. BROOME:  Then I would renew my motion for

13   judgment of acquittal.  I guess I could do that now.

14           THE COURT:  That's fine.  I do have a question about

15   that motion.  I assume that motion is to all counts; is that

16   right?

17           MR. BROOME:  Yes, Your Honor.

18           THE COURT:  Okay.  For the government, with respect

19   to the wire fraud counts, help me understand, please, what

20   evidence, if any, has the government put in the record that

21   Ms. Branch transmitted by wire communication and interstate

22   commerce some information with respect to the alleged fraud.

23           MS. WICK:  Your Honor, if you are asking if the

24   government has put into evidence that she sat down at a

25   computer and submitted the RDR information, she did not.

1          THE COURT:  Okay.  Is the RDR information the only

2   information that the government has placed in the record that

3   traveled in interstate commerce?

4          MS. WICK:  No, Your Honor.  The witnesses from

5   Nissan North America also testified that the direct deposits

6   would have come in through the bank accounts.  So the funds

7   that they received as a result of the scheme would have also

8   been transferred back.  As the accountant, she would have

9   actually been directly responsible for those.  The ones that

10   we stipulated to in the facts just happened to be the ones

11   that were RDR'd from Birmingham to Franklin, Tennessee.

12          THE COURT:  Say that one more time, please, about

13   the direct deposits.

14          MS. WICK:  So the ones that were stipulated to that

15   Your Honor was addressing.

16          THE COURT:  What are the ones?  Help me.

17          MS. WICK:  So if I understood correctly, the one

18   that Your Honor was referring to were the RDR transmissions

19   that Mr. Shepard said he made, sending the RDR from Birmingham

20   Alabama to Franklin, Tennessee.

21          THE COURT:  Yes.

22          MS. WICK:  If I understood your question was were

23   those the only wire transmissions involved in this case.

24          THE COURT:  Okay.

25          MS. WICK:  No, because when they submitted that

1    false information and Nissan remitted the funds electronically

2    via direct deposit, which there's been lots of testimony about

3    that lump sum direct deposit and the bank statement that was

4    admitted that showed the $172,000, unless they walk that money

5    down to the bank, it was transmitted via wire, and the

6    government would submit that that would be sufficient to

7    survive Rule 29.

8             MR. BROOME:  If I could respond, Your Honor?

9             THE COURT:  Yes, sir.

10            MR. BROOME:  But that deposit was a direct result of

11   the RDR's that either Mr. Shepard or someone else wired by

12   internet to Tennessee.  It was not anything that Ms. Branch

13   would have done.  The monies coming back were in direct

14   response to the RDR's that came from Birmingham by Mr. Shepard

15   or someone else.

16            MS. WICK:  Your Honor, that would be why the

17   government alleged in addition to 1343 and (2) because of the

18   aiding and abetting theory of liability; if she aided and

19   abetted in the crime.  Then that ended up causing wires to be

20   transmitted.  She does not need to be the person who has her

21   finger on the trigger that causes the wire to be transmitted.

22            THE COURT:  That's what I am trying to understand

23   whether the government's theory against Ms. Branch rests on

24   anything -- the wire fraud theory -- rests on anything that

25   Ms. Branch did independently, or whether the government's

1    theory is simply that because Ms. Branch, under the

2    government's theory, played a role in the implementation of

3    Mr. Visser's plan, that she is somehow held responsible,

4    through aiding and abetting or through conspiracy for the RDR

5    information that was wired from Serra Nissan to Nissan North

6    America, or the subsequent transmission of the incentive

7    payment from Nissan North America to Serra Nissan.

8              MS. WICK:  Okay.  So, I think that the answer is is

9    that for all but the fourth element of the wire fraud, the

10   government --

11             THE COURT:  I am talking about the fourth element of

12   the wire fraud.

13             MS. WICK:  So just for the fourth element, I

14   don't -- did her actions, as part of the conspiracy as a

15   participant in the scheme to defraud, cause those wire

16   transmissions to be transmitted?  Absolutely.  It's

17   transmitted or caused.  And I don't think the government would

18   say that has put on any evidence that Ms. Branch directly hit

19   the button that transmitted those wires.  But in terms of

20   submitting evidence that she participated in this scheme that

21   caused all of those transmissions to be submitted, because

22   without all of the accounting that had to be done, it would

23   have been absolutely moot for Mr. Shepard to even RDR those

24   deals.  I think the government has absolutely submitted

25   sufficient information that her actions did cause the RDR'ing

1    to be done, did cause the money to come to the account, that's

2    before you even get to the aiding and abetting theory of

3    liability, if that answers the question.

4              THE COURT:  And the cause is not that Ms. Branch

5    personally directed anyone to do anything.  The government

6    hasn't placed any evidence in the record that Ms. Branch

7    personally caused, by directing someone, to send a wire

8    transmission to Nissan North America.  Correct?

9              MS. WICK:  Well, Mr. Shepard testified that he got

10   the information from that, from the fake deal jackets, and

11   that those fake deal jackets came to him from Jeff Green.  And

12   Jeff Green testified the way he got those deal jackets was

13   that Ms. Branch on four occasions walked them to him.

14             THE COURT:  You are not answering my question.

15   Okay.  I said, has the government put into evidence -- and

16   maybe I didn't ask the question well, so let me try again,

17   because, I -- come to think of it, I probably messed it up.

18             My question is has the government placed any evidence

19   in the record that Ms. Branch directed -- and when I say

20   directed, I mean personally instructed -- anyone to send the

21   RDR from Serra Nissan to Nissan North America?

22             MS. WICK:  No.

23             THE COURT:  Okay.  I am just trying to go --

24             MS. WICK:  I am just trying to think, and I don't

25   want to answer your question incorrectly.  But I don't think

1    we have ever in any way said that she instructed anybody to

2    RDR that information.

3              THE COURT:  Okay.  Okay.  So, the government's

4    theory of cause is simply that Ms. Branch, in some capacity,

5    was part of the implementation of Mr. Visser's plan?

6              MS. WICK:  Yes.  So by participating in the scheme

7    to defraud, which included the misrepresentation of material

8    facts, and acting with the intent to defraud -- and I think we

9    would obviously disagree on some of the facts -- but certainly

10   at a minimum, that when she took those deals, having been

11   instructed by Forest to keep that list in case we get audited

12   and take those deals, and when they come from Cullman, bring

13   them to Jeff so he can make the duplicate jacket, and then

14   Jeff gives those deals to Gerald for them to be inputted into

15   the RDR, she absolutely caused that information to be

16   transmitted.

17             THE COURT:  Okay.  Thank you.

18        The Court's going to reserve ruling on Ms. Branch's

19   Rule 29 motion.

20        Let's go ahead and talk about the jury instructions,

21   please.  You all have what the Court believes to be the final

22   draft of the instructions, but I don't know how much time you

23   all had to review them.  So, do you need some time now?

24             MS. WICK:  No, Your Honor.  The government has no

25   objection to the Court's instructions.

1              MR. BROOME:  Ms. Branch does not either, Your Honor.

2              THE COURT:  Okay.  Why don't we take about a

3    five-minute break, and we'll bring the jury back in to do

4    these instructions.

5         (A recess was taken at 10:44 a.m., until 10:55 a.m.)

6              THE COURT:  The Court has given counsel copies of

7    the Court's proposed verdict form.  Is there any objection

8    from the government to the proposed verdict form?

9              MS. WICK:  Not from the government, Your Honor.

10             THE COURT:  Any objection from the defendant?

11             MR. BROOME:  No, Your Honor.

12             THE COURT:  All right.  Thank you.  All right.

13                  (Jury in at 10:56 a.m.)

14             (Closing Instructions on the Law.)

15             THE COURT:  All right.  The Court is now going to

16   instruct the jury on the law that applies to this case.

17   Members of the jury, you all have copies of the instructions

18   there with you.  You are welcome to read along if you would

19   like to or you may just listen.

20             It is now my duty to instruct you on the rules of law

21   that you must follow and apply in this case.  You must follow

22   the law as I explain it to you, even if you do not agree with

23   the law, and you must follow all of my instructions.  You may

24   not single out or disregard any of the Court's instructions on

25   the law.

1          There are three basic rules about a criminal case like

2    this one that you must keep in mind.  First, the defendant,

3    Ms. Branch, is presumed innocent until proven guilty.  The

4    indictment against Ms. Branch is only an accusation, nothing

5    more.  It is not proof of guilt or anything else.  The

6    defendant therefore starts out with a clean slate.

7          Second, the burden of proof is on the government until

8    the very end of the case.  Ms. Branch does not have to prove

9    her innocence.

10         Third, the government must prove the defendant's guilt

11   beyond a reasonable doubt.  I will give you additional

12   instructions on this point, but bear in mind that the level of

13   proof required is high.

14         You must decide whether the government has proved the

15   specific facts necessary to find Ms. Branch guilty beyond a

16   reasonable doubt.  You must decide the case solely on the

17   evidence presented here in the courtroom.  The parties have

18   introduced evidence in a number of forms.  First, you heard

19   some stipulations during trial.  Stipulated facts are facts

20   that the parties agree are accurate and reliable.  You also

21   heard testimony from witnesses, and the parties introduced

22   various documents into evidence.

23         Some evidence proves of fact directly.  For example,

24   if a witness saw that it was raining outside, that witness

25   could testify that it was raining.  Some evidence proves a

1  fact indirectly.  For example, if a witness testified that she

2  saw wet grass outside and she saw people walking into the

3  courthouse carrying wet umbrellas, that testimony would be

4  indirect proof that it had rained.  Indirect evidence,

5  sometimes called circumstantial evidence, is simply a chain of

6  circumstances that proves a fact.  As far as the law is

7  concerned, it makes no difference whether the evidence is

8  direct or indirect.  You may choose to believe or disbelieve

9  either kind and should give every piece of evidence whatever

10  weight you think is deserves.

11       Certain things are not evidence and must not be

12  considered.  I will list them for you now:

13       Statements and arguments of the lawyers are not

14  evidence.  In their opening statements and closing arguments,

15  the lawyers will discuss the case, but their remarks are not

16  evidence.

17       Questions and objections of the lawyers are not

18  evidence, but witnesses' answers to questions are evidence.

19  You should not think that something is true just because a

20  lawyer's question suggest that it is.  For instance, if a

21  lawyer asks a witness, "you saw the defendant hit his sister,

22  didn't you?" -- that question is no evidence whatsoever of

23  what the witness saw or what the defendant did unless the

24  witness agrees with it.

25       Finally, the indictment against the defendant is not

1  evidence of guilt.

2       Your decision must be based on the evidence presented

3  here.  In considering the evidence, you may use reasoning and

4  common sense to make deductions and reach conclusions.  You

5  must not be influenced in any way by either sympathy for or

6  prejudice against the defendant, Ms. Branch, or the

7  government.  You, the jurors, must evaluate the evidence so

8  that you may decide what happened and determine whether Ms.

9  Branch is guilty or not guilty of the crimes charged in the

10 indictment.

11      When I say you must consider all the evidence

12 presented here at trial, I do not mean that you must accept

13 all the evidence as true or accurate.  You should decide

14 whether you believe what each witness had to say and how

15 important that testimony was.  The number of witnesses

16 testifying concerning a particular point does not necessarily

17 matter.  You may believe everything a witness says or part of

18 it or none of it.  To decide whether you believe any witness,

19 I suggest that you ask yourself a few questions:

20      Did the witness impress you as one who was telling the

21 truth?

22      Did the witness have any particular reason not to tell

23 the truth?

24      Did the witness have a personal interest in the

25 outcome of the case?

1          Did the witness seem to have a good memory?

2          Did the witness have the opportunity and ability to

3     accurately observe the things he or she testified about?

4          Did the witness appear to understand the questions

5     clearly and answer them directly?

6          Did the witness's testimony differ from other

7     testimony or other evidence?

8          To decide whether you believe a witness, you may

9     consider the fact that the witness has been convicted of or

10    pleaded guilty to a felony or a crime involving dishonesty or

11    a false statement.

12         But keep in mind, that a simple mistake does not mean

13    that a witness was not telling the truth as he or she

14    remembers it.  People naturally tend to forget some things or

15    remember them inaccurately.  So if a witness misstated

16    something, you must decide whether it was because of an

17    innocent lapse in memory or an intentional deception.  The

18    significance of your decision may depend on whether the

19    misstatement is about an important fact or about an

20    unimportant detail.

21         As I mentioned, the law presumes every defendant is

22    innocent.  A defendant does not have to prove her innocence or

23    produce any evidence at all.  The government must prove guilt

24    beyond a reasonable doubt.  If the government fails to do so,

25    you must find Ms. Branch not guilty.

1          The government's burden of proof is heavy, but the

2    government's burden of proof only has to exclude any

3    reasonable doubt concerning the defendant's guilt.  A

4    "reasonable doubt" is a real doubt, based on your reason and

5    common sense after you have carefully and impartially

6    considered all the evidence in the case.  "Proof beyond a

7    reasonable doubt" is proof so convincing that you would be

8    willing to rely and act on it without hesitation in the most

9    important of your own affairs.  If you are convinced that Ms.

10   Branch has been proved guilty beyond a reasonable doubt, say

11   so.  If you are not convinced, say so.

12          The indictment contains 16 counts against Ms. Branch.

13   Each count has a number.  You will be given a copy of the

14   indictment to refer to during your deliberations.

15          Count One charges Ms. Branch -- Count One charges that

16   Ms. Branch knowingly and willfully conspired to commit wire

17   fraud.  Counts Two through Sixteen charge that Ms. Branch

18   committed the substantive offense of wire fraud.  Each count

19   of the indictment charges a separate crime.  You must consider

20   each crime and the evidence relating to it separately.  If you

21   find the defendant guilty or not guilty of one crime, that

22   must not affect your verdict for any other crime.

23          With respect to Count One, the conspiracy count, Title

24   18, United States Code, Section 371, makes it a federal crime

25   for anyone to conspire or agree with someone else to do

1    something that would be another federal crime if it was

2    actually carried out.  So under this law, a "conspiracy" is an

3    agreement by two or more people to commit an unlawful act.  In

4    other words, it's a kind of "partnership" for criminal

5    purposes.  Every member of a conspiracy becomes the agent or

6    partner of every other member.

7         The government does not have to prove that the members

8    of the conspiracy made any kind of formal agreement, and the

9    government does not have to prove that the members planned

10   together all the details of the plan or the overt acts that

11   the indictment charges would be carried out in an effort to

12   commit the intended crime.

13        The heart of a conspiracy is the making of the

14   unlawful plan followed by the commission of an overt act.  The

15   government does not have to prove that the conspirators

16   succeeded in carrying out the plan.

17        Ms. Branch can be found guilty of the conspiracy

18   charge in Count One only if the government proves all of the

19   following facts beyond a reasonable doubt:

20        First:  Two or more persons in some way agreed to try

21   to accomplish a shared and unlawful plan.

22        Second:  Ms. Branch knew the unlawful purpose of the

23   plan and willfully joined in it.

24        Third:  During the conspiracy, one of the conspirators

25   knowingly engaged in at least one overt act as described in

1    the indictment.

2          And fourth:  The overt act was committed at or about

3    the time alleged and with the purpose of carrying out or

4    accomplishing some object of the conspiracy.

5          An overt act is any transaction or event, even one

6    that may be entirely innocent and viewed alone, that a

7    conspirator commits to accomplish some object of the

8    conspiracy.

9          Although the indictment describes a number of alleged

10   overt acts, the law requires only that you agree unanimously

11   that the government proved one overt act beyond a reasonable

12   doubt, and you must be unanimous in agreeing about the same

13   overt act.

14         A person may be a conspirator without knowing all the

15   details of the unlawful plan or the names and identities of

16   all the other alleged conspirators.  So if the government

17   proved that Ms. Branch had a general understanding of the

18   unlawful purpose of the plan and willfully joined in the plan

19   or at least -- on at least one occasion, then that is

20   sufficient for you to find Ms. Branch guilty of conspiracy

21   even though Ms. Branch did not participate before, and even

22   though Ms. Branch played only a minor part.

23         Of course, merely associating with certain people,

24   employers, supervisors, superiors, and co-workers, and

25   discussing common goals and interests does not establish proof

1    of a conspiracy.  A person who does not know about a

2    conspiracy but happens to act in a way that advances some

3    purpose of a conspiracy does not automatically become a

4    conspirator.

5          With respect to Counts Two through Sixteen, the wire

6    fraud count, Title 18 United States Code, Section 1343, makes

7    it a federal crime to use interstate wire, radio, or

8    television communications to carry out a scheme to defraud

9    someone else.  Ms. Branch can be found guilty of the crimes

10   charged in Counts two through Sixteen only if you find that

11   the government proved all of the following facts beyond a

12   reasonable doubt:

13         First:  Ms. Branch knowingly devised or participated

14   in a scheme to defraud or to obtain money or property by using

15   false pretenses, representations, or promises.

16         Second:  The false pretenses, representations or

17   promises were about a material fact.

18         Third:  Ms. Branch acted with the intent to

19   defraud; and

20         Fourth:  Ms. Branch transmitted or caused to be

21   transmitted by wire some communication in interstate commerce

22   to help carry out the scheme to defraud.

23         The term "scheme to defraud" includes any plan or

24   course of action intended to deceive or cheat someone out of

25   money or property by using false or fraudulent pretenses,

1    representations, or promises.

2         A statement or representation is "false" or

3    "fraudulent" if it is about a material fact that the speaker

4    knows is untrue or makes with reckless indifference to the

5    truth and makes with the intent to defraud.  A statement or

6    representation, may also be "false" or "fraudulent" when it is

7    a half truth or effectively conceals a material fact and is

8    made with the intent to defraud.

9         A "material fact" is an important fact that a

10   reasonable person would use to decide whether to do or not to

11   do something.  A fact is "material" if it has the capacity or

12   natural tendency to influence a person's decision.  It does

13   not matter what the decision-maker actually relied on --

14   excuse me -- whether the decision maker actually relied on the

15   statement or knew or should have known that the statement was

16   false.

17        The "intent to defraud" is the specific intent to

18   deceive or cheat someone, usually for personal financial gain

19   or to cause financial loss to someone else.

20        The government does not have to prove all the details

21   alleged in the indictment about the precise nature and purpose

22   of the scheme.  It also does not have to prove that the

23   material transmitted by interstate wire was itself false or

24   fraudulent; or that using the wire was intended as the

25   specific or exclusive means of carrying out the alleged fraud;

1    or that Ms. Branch personally made the transmission over the

2    wire.  And the government does not have to prove that the

3    alleged scheme actually succeeded in defrauding anyone.

4         To "use" interstate wire communications is to act so

5    that something would normally be sent through wire, radio, or

6    television communications in the normal course of business.

7    Each separate use of the interstate wire communications as

8    part of the scheme to defraud is a separate crime.

9         It is possible to prove a defendant guilty of a crime

10   even without evidence that the defendant personally performed

11   every act charged.  Ordinarily, any act a person can do may be

12   done by directing another person or "agent," or it may be done

13   by acting with or under the direction of others.  A defendant

14   "aids and abets" a person if the defendant intentionally joins

15   with the person to commit a crime.  A defendant is criminally

16   responsible for the acts of another person if the defendant

17   aids and abets the other person.  A defendant also is

18   responsible if the defendant willfully directs or authorizes

19   the acts of an agent, employee, or other associate.

20        But finding that a defendant is criminally responsible

21   for the acts of another person requires proof that the

22   defendant intentionally associated with or participated in the

23   crime, not just proof that the defendant was simply present at

24   the scene of a crime or knew about it.  In other words, you

25   must find beyond a reasonable doubt, that the defendant was a

1    willful participant and not merely a knowing spectator.

2         There are a few more terms that I need to define for

3    you.  You will see that the indictment charges that a crime

4    was committed "on or about" a certain date.  The government

5    does not have to prove that the crime occurred on the exact

6    date.  The government only has to prove beyond a reasonable

7    doubt that the crime was committed on a date reasonably close

8    to the date alleged.

9         The instructions for conspiracy and for wire fraud

10   both include the word "knowingly."  The word "knowingly" means

11   that an act was done voluntarily and intentionally and not

12   because of a mistake or by accident.

13        The instruction for conspiracy includes the word

14   "willfully."  The word "willfully" means that the act was

15   committed voluntarily and purposely with the intent to do

16   something the law forbids; that is, with the bad purpose to

17   disobey or disregard the law.  While a person must have acted

18   with the intent to do something the law forbids before you can

19   find that person acted "willfully," the person need not be

20   aware of the specific law or rule that her conduct may be

21   violating.

22        "Good faith" is a complete defense to a charge that

23   requires intent to defraud.  A defendant is not required to

24   prove good faith.  The government must prove intent to defraud

25   beyond a reasonable doubt.  An honestly held opinion or an

1    honestly formed belief cannot be fraudulent intent -- even if

2    the opinion or belief is mistaken.  Similarly, evidence of a

3    mistake in judgment, and error in management or carelessness,

4    cannot establish fraudulent intent.

5           Those are the Court's instructions on the law.  After

6    closing arguments, I will give you a short final instruction,

7    but for now, please listen to the parties' closing arguments.

8           The Court will hear from the government.

9           MS. MURNAHAN:  Thank you, Your Honor.

10                     (CLOSING ARGUMENTS)

11           MS. MURNAHAN:  May it please the Court, counsel, and

12   ladies and gentlemen of the jury.  Good morning.  On Monday of

13   this week, my co-counsel, Ms. Wick, stood before you and told

14   you that this really is a simple case.  It's a case about a

15   bunch of people who got together to lie to Nissan, to get

16   money that they weren't entitled to, and then to cover their

17   tracks so that they would get to keep that money and not get

18   caught.

19           Since Monday, you have heard a lot, probably a lot

20   more than you wanted to about pooling sales and incentive

21   programs and RDR's and booking deals, and all about probably

22   the seedy underbelly of the car sales industry.  And I am sure

23   a lot of it was noise to you.  But at the close of evidence --

24   now we are at the close of evidence, I submit to you that Ms.

25   Wick's statement is still as true as it was on Monday.  This

1    is a simple case about people who got together to lie to

2    Nissan North America about which dealership sold 15 cars, so

3    that Serra Nissan in Birmingham could get money it was not

4    entitled to, and that they could beat an audit on the back end

5    so that they wouldn't get a charge back.

6         Now the Court has just instructed you on the counts

7    that have been charged and the elements that the government

8    must prove in order for you to find the defendant guilty.  I

9    don't want to dwell on those too much, but I do want to

10   highlight some of the evidence that the government submits is

11   proof of those elements.

12        Conspiracy, Element Number One:  Two or more persons

13   in some way agreed to try to accomplish a shared and unlawful

14   plan.

15        You have heard this week from Randy Visser, from

16   Gerald Shepard, from Forest Housner, from Jeff Green -- all of

17   whom say, yes, we have this plan to lie to Nissan North

18   America and to boge up these deal jackets so we can keep this

19   incentive money that we didn't earn.  That was the plan.

20        You heard Randy Visser say he devised the plan.  You

21   saw Government's Exhibit 40, what we call the fraud map; the

22   fax that he typed up with his instructions of how to

23   accomplish the plan.  So, that's four people right there who

24   devised this plan or agreed to participate in this plan to

25   commit an unlawful act.

1      The second one:  The defendant knew the unlawful

2  purpose of the plan and willfully joined in it.

3      There is no question that Ms. Branch knew the purpose

4  of the plan.  She knew that they were shifting sales to report

5  cars that were sold in Cullman as being report as being sold

6  in Birmingham.  They were lying to Nissan about where those

7  cars were actually sold so that they could get the money.  And

8  she also knew that they were creating false paperwork so that

9  they could keep the money, so that they could cover their

10  tracks, and that she willfully joined in it.

11      Now the Court instructed you earlier that for

12  "willfully," you must have -- and actually I have it on here

13  (pointing to screen).  To find that someone willfully did

14  something, you must find that the act was committed

15  voluntarily and purposely with the intent to do something the

16  law forbids.  But please note that we do not have to prove

17  that the defendant knew exactly which law she was violating.

18      Now Ms. Branch has testified and you have heard that

19  she had no idea any of this was against the law.  She had no

20  idea any of this was wrong.  Let's think about that for a

21  minute.  Ms. Branch started in the car business when she was

22  16; she is now 34.  She has been in the car industry for 18

23  years.  Over half of her life, she has been involved, in some

24  form or fashion, in the car business.  She put herself through

25  school, she graduated in business, and she worked her way up

1    through the ranks.  She started out, I believe, she said as a

2    receptionist.  She also held jobs as an administrative

3    assistant, then she moved up to office manager, and now, she

4    is a controller.  She is the head of accounting of a car

5    dealership.  And not just any car dealership, she is the head

6    of accounting of a multi-million dollar multiple dealership

7    car sales conglomerate.  That's a lot of responsibility.

8    That's a lot of knowledge she has to have to make this thing

9    work.  And she would ask you to believe that she had no idea

10   that lying to Nissan about which dealership sold a particular

11   car and then falsifying paperwork so that they could fool

12   Nissan on the back end, that there was anything wrong with

13   that.

14           Ladies and gentlemen, when you came into the

15   courthouse today, some of you may have -- or some time earlier

16   this week, some of you may have had a pocket knife in your

17   pocket or a camera or something that the courthouse security

18   asked you to take back out and leave in your car or check

19   downstairs.  One thing that they did not ask you to check at

20   the courthouse door was your common sense.  It is not sensible

21   that the defendant had no idea that there was anything at all

22   wrong with this scheme.

23           The third element:  During the conspiracy, one of the

24   conspirators knowingly engaged in at least one overt act as

25   described in the indictment.  You'll have the indictment.

1    There are several overt acts that we have alleged in the

2    indictment.  An overt act in this case is Kim Branch taking

3    the Cullman deal jackets or deals, walking them over to Jeff

4    Green, so that he could do what he did, falsify the deals.

5    The second time, she gets another batch, takes them over to

6    Jeff Green, so he can do his thing.  She does it a third time.

7    She does it a fourth time.  Those are overt acts, in

8    furtherance of the conspiracy.  If she didn't get those deals

9    to Jeff Green, he couldn't make a false paperwork.  Another

10   overt act is Jeff Green making those false deal jackets -- the

11   Birmingham deal jackets.  We don't know where they are.  We've

12   never found them.  But Jeff Green says they existed.  And

13   really, if he didn't create them, what was the purpose of the

14   whole thing?  If he didn't create them, there would be --

15   there would be nothing for them do in the event -- to pull in

16   the event of an audit.  They had to be created because that

17   was the whole purpose of it.  So, this element talks about

18   knowingly.  And as the Court instructed you, "knowingly" means

19   that it was on purpose.  It was not accidental.

20          So for example, I can knowingly throw this pen on to

21   the floor.  Or I can accidentally drop my pen on to the floor.

22   In either case, the pen is on the floor.  The only difference

23   is my intention in getting the pen on to the floor.  So, what

24   you have to decide with respect to the overt act is did Ms.

25   Branch accidentally take those Cullman deals over to Jeff

1    Green four times or did she do it on purpose?  Did Jeff Green

2    accidentally create false paperwork for those deals or did he

3    do it on purpose?  So that's the third element.

4           The fourth element:  The overt act was committed on or

5    around the time alleged and with the purpose of carrying out

6    the scheme.  The taking -- the transferring of the deal

7    jackets or the deal paperwork was critical to this scheme;

8    critical to carrying out this scheme.  Those false deal

9    jackets had to be created.  They all had to be done -- the

10   false paperwork had to be done in order for this scheme to

11   work.  So that's Count One on conspiracy.

12          Counts Two through Sixteen, wire fraud.  These are 15

13   counts, therefore they're 14 car deals that we're all sick of

14   hearing about at this point, I am sure.  In order for you, the

15   jury, to find the defendant guilty of the wire fraud, you must

16   find four elements:  That the defendant knowingly, again,

17   purposely, not accidentally, devised or participated in a

18   scheme to defraud, or a scheme to obtain money by using false

19   representations or pretenses.

20          Now we know that the defendant did not devise the

21   scheme.  Randy Visser says, this is his scheme, we got a fraud

22   map.  No question Randy Visser devised this scheme.  Ms.

23   Branch participated in the scheme.  How do we know that?  And

24   she has admitted she took the deal jackets.  She has admitted

25   she made accounting entries.  She has admitted she kept track

1    of the deals; she kept a list of them.  And in this e-mail

2    that she sent to Mr. Visser, Government's Exhibit 24, when he

3    e-mailed her and said, hey, do these things get booked in

4    accounting in Birmingham?  What is her response?  In essence,

5    she says, no, Mr. Visser.  They did not get booked in

6    accounting, but don't worry, I got it covered.  I have a list,

7    I am keeping track, I can manipulate the sales data of

8    whichever dealership Nissan is interested in for an audit and

9    add or remove.  I got it covered.  Oh, and by the way, Jeff is

10   creating these deal jackets so that we can cover our tracks in

11   case Nissan pulls one of these deals in an audit.  She

12   participated in the scheme.  And the scheme was to obtain

13   money from Nissan North America by means of false

14   representations.  False pretenses.  The false representation

15   being that Birmingham Serra Nissan sold these 15 cars when in

16   fact that was not true.

17          Two:  The false pretenses or representations were

18   about a material fact.  The Court has instructed you that a

19   material fact is important; something that would change the

20   decision in one way or another, depending on what that fact

21   is.  You have heard representatives from Nissan North America,

22   and you have actually heard Randy Visser or Gerald Shepard or

23   one of those witnesses testify that they knew that accurate

24   RDR reporting, accurate reporting of which dealership sold a

25   car was important to Nissan North America.  It was material.

 1    Why is it important to them?  Because it affects the incentive

 2    money that they have to pay out.  Why would they want to pay

 3    out thousands of dollars to a dealership that didn't actually

 4    sell the cars?  It affects what they pay out.  So, of course,

 5    it's material.

 6            The defendant acted with the intent to defraud.

 7    Intent to defraud in this case means that the intention was to

 8    deceive or cheat somebody, usually, out of money.  That's

 9    exactly what they were doing.  They intended to deceive Nissan

10    North America to cheat them out of money.  That's the intent

11    to defraud, and the defendant knew that that was the purpose

12    of this plan.

13            The defendant transmitted or caused to be transmitted

14    by wire some communication in interstate commerce to carry out

15    the scheme.  There are a couple of points I want to focus on

16    here.  One is the interstate commerce, boring, blah, hmm --

17    okay.  There's a stipulation between the parties, you will see

18    it, it's in evidence, that says that the United States has

19    satisfied that interstate commerce portion of it.

20            MR. BROOME:  Your Honor, I am going to object to

21    that comment.  That's not what that stipulation, says, Your

22    Honor.

23            THE COURT:  Which specific stipulation is it?

24            MR. BROOME:  I think there's a difference in

25    stipulating that wire transfers or transmissions were made and

1    stipulating that they satisfied that requirement.

2            MS. MURNAHAN:  All right.  That's okay.  We have

3    evidence that there were wire transfers in interstate

4    commerce.  One, you heard from Gerald Shepard.  He said that

5    he took the deal jackets, the boged up deal jackets that Jeff

6    Green handed to him, and he entered that information on to

7    whatever the system is that Nissan requires to RDR that car;

8    to report the report sold.  He entered all that information in

9    the system, and he pushed a button and he was here in

10   Birmingham when he did it.  And that information traveled

11   through the internet, and all the wires -- and I don't

12   understand all that stuff -- but it ended up at the

13   headquarters of Nissan North America, which is in Franklin,

14   Tennessee, and you heard Nissan representatives testify to

15   that.  So I will submit to you that the United States has

16   satisfied with or without a stipulation that portion of that

17   element.

18           The defendant transmitted or caused to be transmitted.

19   The defendant did not push the button.  She didn't.  She

20   caused to be transmitted by participating in the scheme.  This

21   leads me to another theory of liability in this case which is

22   aiding and abetting.  A defendant can be held criminally

23   liable for the acts of someone else if that defendant aids and

24   abets that person in the commission of the crime.  To aid and

25   abet, the defendant has to willfully -- or no, voluntarily or

1    intentionally associate with that other person in a crime.

2    This person, the aider and abettor cannot just be in the wrong

3    place at the wrong time.  They have to willfully or

4    intentionally join in the scheme.  You must find beyond a

5    reasonable doubt that the defendant was a willful participant,

6    not merely in the wrong place at the wrong time.

7            Ladies and gentlemen, all the evidence in this case

8    points to the fact that the defendant knew exactly what this

9    scheme was about.  She knew exactly what they were doing.  She

10   knew her role in it.  She knew all of the mechanics of how

11   this had to be done, and she especially knew the mechanics of

12   how to get past an audit.  She knew exactly what she was

13   doing.

14           In conclusion, on Monday Ms. Wick told you a story

15   about when she was in high school and she had a wreck with her

16   car, her red car, and she was scared of what her family would

17   say, her parents would say.  And so she got out her red nail

18   polish and she started dabbing it on the scratches on the car,

19   and her mother caught her.  If the defendant did not know that

20   there was anything wrong with what they were doing, why cover

21   it up?  If you don't know there's something wrong, if she

22   thought Nissan North America would be completely fine with

23   what they were doing, why did they need to cover it up?  Why

24   cover it up?

25           So at the end of your deliberations, the government

1    asks you to return the only verdict that is possible and that

2    is guilty on all counts.  Thank you.

3            THE COURT:  All right.  Mr. Broome.

4            MR. BROOME:  Yes, Your Honor.  May it please the

5    Court, ladies and gentlemen of the jury, ladies of the

6    government.  Last night, I was walking around my neighborhood

7    with two dogs.  I have three.  One is a cocker spaniel, he is

8    eight years old, and he doesn't want to walk anywhere.  And I

9    am walking with my other two dogs, and I am trying to come up

10   with something brilliant to tell you folks to convince you

11   that the government has not proven their case beyond a

12   reasonable doubt as to any of these charges.  And it finally

13   dawned on me after about a half a mile or so, that this is not

14   the typical case that I am used to defending.  I am used to

15   defending the Jeff Greens of this world.  And I am used to

16   defending murders and rapists.  And I am used to defending

17   folks that -- to be quite frank with you -- 95 percent of them

18   are probably guilty.

19           There was something about this case that was

20   different.  This nice lady right here, Kim, not only not

21   guilty, she is completely innocent of doing anything criminal

22   with an unlawful intent, with any intent to defraud, with any

23   intent to steal money from Nissan North America.  That's what

24   was different about this case.  That's what made it so hard

25   for me to come up with something to tell you good people.  But

1    we will try.

2         The government, they get to go before me and they get

3    to go after me, and I only get to go in the middle.  So this

4    is my one chance to address you good folks.  Several things I

5    would like for you to think about, throughout this entire jury

6    deliberation process -- and I will tell you now that I am a

7    very, very firm believer in the jury system.

8         Juries in our country stand between an individual,

9    Kim, and the vast powers of the United States government.

10   They got agents, they got investigators, they got U.S.

11   attorney's offices, they got the power to issue subpoenas,

12   they got the power to get folks indicted, and they got the

13   power to bring folks to trial.  But they don't have the power

14   to convict folks until they convince you good people, beyond a

15   reasonable doubt, that Kim did what they say she did, and that

16   not only that she did it, but that she did it with the intent

17   to defraud, with some unlawful purpose, with some illegal

18   purpose.  And that's why I am such a firm believer in our

19   system.

20        You folks took an oath on Monday to well and truly try

21   all the facts, and I know that's what you will do.  And I know

22   that when it's all said and done, you will render a verdict of

23   not guilty of all 16 counts.

24        Now one thing I would like for you to think about all

25   the way through everything that Ms. Murnahan said and Ms. Wick

1    says is the presumption of innocence.  The judge has already

2    told you, and it's in those jury instructions, the presumption

3    of innocence alone, bites out without nothing else, is enough

4    to acquit someone.

5         You know our forefathers, we have a constitution and

6    that's in the constitution.  It also says and the judge also

7    told you in those jury charges, you have to be convinced of

8    each and every element beyond a reasonable doubt.  So when I

9    am talking and Ms. Wick is talking and during, most

10   importantly, during your deliberations, you got to keep

11   presumption of innocence in your mind, and you have got to

12   keep reasonable doubt in your mind.

13        I told you at the beginning, I am kind of a sports

14   nut.  It's not a baseball game where you win three to two.

15   It's not a football game where you kick the last second field

16   goal and win 17 to 16.  It's a trial.

17        The judge told you in her charges, and you will have

18   it with you, that the government's burden is very high.  It's

19   not beyond all doubt, it's not a hundred percent doubt.

20   Because typically, if it was a hundred percent, you would have

21   to have seen it, then you would not be a juror, you would be a

22   witness.  But that burden is very, very high, and that's what

23   protects our citizens against the government.

24        There's one other thing while I am talking and Ms.

25   Wick is talking, I would like for you to keep in mind.  The

1    judge has charged you --

2              JURORS:  We can't see it.

3              THE COURT:  Are your monitors on, or are they black?

4              JURORS:  They don't do anything.

5              THE COURT:  Can you see the government's monitor

6    there?

7              MR. BROOME:  Yes, it's coming from the last page.

8    That's what happens when I try to use machinery.  Let's just

9    turn to the last page please or page 11.  It's just really not

10   meant for me to use machines.

11             Page 11, starting with the third paragraph, "good

12   faith."  The judge has already charged you and you will have

13   these instructions with you.  "Good faith" is a complete

14   defense, "complete defense to a charge that requires intent to

15   defraud."  And that's what this case is all about -- intent to

16   defraud.  "A defendant is not required to prove good faith."

17   But we tell you that we have.  "The government must prove

18   intent to defraud beyond a reasonable doubt."  To me this

19   sentence is the most important.  "An honestly held opinion or

20   an honestly formed belief..."  cannot, "...cannot be

21   fraudulent intent -- even if the opinion or the belief is

22   mistaken.  Similarly, evidence of a mistake in judgment, an

23   error in management, or carelessness cannot establish

24   fraudulent intent."

25             We would say that that paragraph alone was enough to

1    convince you that Kim is not guilty of any of those 16 counts.

2    She had "complete defense," folks, that's what it says.

3            She has told you -- and I started off with the

4    fairytale story on Monday about a young lady who goes to

5    school and gets a good job, gets a house with her husband and

6    two children, and it's just another day at work in March.  And

7    her mentor or father figure -- and I tell you, we all feel

8    badly for Mr. Housner in his current health problems.  I think

9    we would all agree that's not the man folks describe back in

10   March of 2013.  But if there was anybody that you could trust,

11   just from looking at that gentleman, it would be Forest

12   Housner.

13           That day Kim comes to work like any other day, and she

14   is trying to clean up things there at the dealership.  And I

15   don't know about all of the accounting principles, but it's a

16   pretty stressful situation trying to get things done.  She's

17   got nine people, I think, she said working under her.  But

18   that day in March, Forest says to her, we got to transfer or

19   shift -- whatever word you good people want to use -- some

20   deals from Cullman to Birmingham, because Birmingham is not

21   going to meet their mark.  It sounds fairly innocent.  It

22   doesn't sound so illegal to me.  Especially when you consider

23   that in the context of what Kim thought, not what a lawyer

24   might think, but what she thought at the time.  Well, we have

25   done this before with parts.  We have done this before with

 1   accessories and maintenance equipment.  We have done this

 2   before to meet incentives.  We have sold parts from Cullman to

 3   Birmingham, and we have sold parts from Cullman to Birmingham.

 4   We have done it before.  Now, I agree just because you have

 5   done something before doesn't always make it right.  But if

 6   you have done it before, that's what you are thinking about.

 7   Nobody said that was wrong.  Nobody had ever told her, but we

 8   got to hide this.  That's the frame of mind that Kim Branch

 9   had on that day.  You heard her tell you today, yes, after I

10   have talked with the lawyers and after my life has been -- I

11   am not going to use the word I wanted to -- difficult for the

12   last six to nine months with all of this going on, I know not

13   to do this again.  I know this is now wrong after I talked to

14   lawyers, come to court, everything.

15          That day, March 2013, what was her state of mind?  Now

16   we can't look in somebody's mind and see what their state of

17   mind was.  You have to go by what you heard.  What you heard

18   was Forest had done this before, we had done this before, not

19   with cars now, but with parts and accessories.  I had written

20   the checks for them.  I paid the invoices back and forth.  I

21   knew it was so Cullman could win some prizes.

22          The same thing we have here.  My mentor, my father

23   figure, my number one person at that dealership, he would

24   never tell me to do something wrong.  Never crossed her mind.

25   Never crossed her mind that this is an intent to defraud

1  anyone.  And he tells her to do two very, very simple and

2  very, very, very innocuous things.  One, keep a list of deals,

3  okay?  And two, when the Cullman deal jackets come -- which

4  they come every day down to Birmingham, so that's not

5  unusual -- when the Cullman deal jackets come the rest of the

6  time, this time period of this incentive, carry them to Jeff.

7  Well, that's what she did.  Whether she called them or took

8  them over there, I don't think it really matters, but she got

9  the deal jackets to Jeff.  Like she said, they told her to do

10  it, like her mentor told her to do; the man she trusted.

11       You have heard testimony from Randy Visser that he

12  said it's a hundred percent my idea, and I told Mr. Housner

13  this is what we're going to do.  Forest tells Kim, do these

14  two things.  Do these two things.  Make a list, which she did,

15  and carry the deals to Jeff.

16       Now things, you know, I asked -- maybe I asked it in a

17  sarcastic way.  Were there any smoke-filled rooms where you

18  guys sat around and figured out let's do A, B, and C so we can

19  defraud Nissan?  Nobody said that.

20       In fact, I told you in opening statement, a lot of

21  times what you don't hear is more important than what you do

22  hear.  Just to make sure that I get this right.  I need to

23  look at my notes.  Mr. Byrnes, the DOM or the dealer

24  operations manager, what did he tell us?  Let's start with

25  what he didn't tell us.  He didn't tell us he dealt with Kim

1    about the rules of the contest or the rules of the incentive

2    program.  I think he said, I met her at the grand opening of

3    the Cullman store.  That was it.  You didn't hear Mr. Byrnes,

4    say, I told her you can't be swapping deals.  I told her that

5    was illegal and that was wire fraud.  He swapped the deals.

6    You didn't hear that.  Because it didn't happen.  I also asked

7    him did you ever give her your manual or your instructions or

8    anything for how to do this one?  No, I would have talked to

9    Randy Visser, Forest Housner, Gerald Shepard, Jeff Green, and

10   there may have been others that he talked to.

11         You heard Mr. Randy Visser say, once I found out about

12   this, I tried to pay the money back -- this $64,800.  And I

13   think Mr. Visser said something along the lines that Mr.

14   Byrnes said, just let sleeping dogs lie.  You can't undo it.

15   Just let it lie.  But you didn't hear Mr. Byrnes say he had

16   any direct contact with Kim Branch.  Then you also heard Mr.

17   Byrnes say I believe -- and folks I have been living with this

18   case for several months, and I have read thousands of

19   documents about this.  So if I tell you something that you

20   remember that's wrong, that I said, I can assure you I didn't

21   do it on purpose.  But please hold that against me and don't

22   hold that against Kim.  I promise you I will not intentionally

23   tell you something that's wrong.

24         Mr. Creecy -- let me go back to Mr. Byrnes.  I said

25   anywhere in those rules, if, in fact you had read them does it

1    say anything about that it's illegal to pool sales?  He said,

2    no.

3           Let's go to Mr. Creecy, I think that's how you

4    pronounce his name.  I believe he said he may have talked to

5    Kim about getting some deal jackets for one audit, but that he

6    didn't talk to Kim about the incentive plans.  Kim wasn't

7    involved in his closing meeting that he had.  I think it was

8    just Forest Housner and Randy Visser.  He didn't talk to Kim

9    about that.  He made a whole lot to do about those audits, and

10   she has only been three or four months, and that audit didn't

11   cover but like a month or two when she was there.  But then he

12   did deal with her as far as pulling the deal jackets.  Again,

13   I asked him, anywhere in those instructions or dealer plans or

14   franchise agreements about not pooling resources; he looked at

15   it, and he says, no, but it's just understood you are supposed

16   to do that.  Well, it doesn't say that in their agreement.

17          Then Ms. Strickland came in and said, you know, I

18   heard about years ago it was okay for sister stores to pool

19   resources together.  We kind of phased all that out.  One time

20   it was okay.  She gave us the figure $64,800 with all her

21   calculations.  Again, what you didn't hear was Ms. Strickland

22   ever talking or communicating with Kim Branch.

23          Then we had Randy Visser who says, a hundred percent

24   my idea.  100 percent my idea.  And Mr. Visser has pleaded

25   guilty to it for what he did.  I asked Mr. Visser, did you

1   have any direct contacts with Kim?  And I believe he said, no,

2   with the exception of those e-mails.  And we'll talk about

3   that in a few minutes.  I asked Mr. Visser, did you and Kim

4   sit down in a smoke-filled room and plan how we're going to

5   defraud Nissan North America -- defraud Nissan North America?

6   And he said, no.  I asked him these fraud plans or fraud

7   instructions or whatever the government calls them, did you

8   ever share those with Kim?  You didn't hear at that.  He said

9   no.  They had no evidence that Kim ever saw those fraud

10  instructions, and there's a good reason they don't have any

11  evidence of that because it didn't happen.

12      Then Mr. Visser and I talked about he tried to pay the

13  money back, but you heard what Mr. Visser said.  100 percent

14  my idea.  Then we had Mr. Housner that testified.  He

15  testified Randy Visser tells me this is what we're going to

16  do, we're going to move the deals the rest of the month from

17  Cullman to Birmingham, so Birmingham would meet their

18  objectives.  He agreed that Forest -- Forest agreed that Mr.

19  Visser had told him what to do.

20      Again, nothing did you hear about any meetings of the

21  mind or agreement -- now I understand very few conspirators go

22  to lawyers and make out a contract at how they're going to

23  make the conspiracy.  But you didn't even hear any testimony

24  about anybody talking to Kim about, you know, this is illegal,

25  you do know that?  I just want to tell you in case you don't

1    want to participate.  Nobody said that to Kim because it

2    didn't happen.

3         Mr. Housner said Mr. Visser tells me to use the

4    Cullman deal.  And I am not going to belabor what Mr. Housner

5    said because you folks heard him and heard his demeanor

6    testifying here -- but there's no question he told Kim, gave

7    her some instructions, make a list, carry the Cullman deals to

8    Jeff.

9         One important thing that Mr. Housner did remember --

10   and I am sure you guys will remember this -- yeah, we used to

11   do that when I was in parts and service.  We would sell

12   maintenance equipment, maintenance parts -- and I think he

13   even said oil filters and air filters and things.  If there

14   was a contest, we would have Cullman sell them to Birmingham,

15   so Cullman could win some incentives.  You folks heard him say

16   that.  He remembered that because that's happened.

17        Again, Kim told you, I wrote checks from Cullman to

18   Birmingham and then from Birmingham to Cullman.  It goes to

19   her state of mind at the time she did what she did.  If it's

20   okay with parts and maintenance equipment, why wouldn't it be

21   okay with cars?

22        Then Harold Yelverton came in, the general manager.

23   He said Forest Housner told me to stop RDR'ing cars from

24   Cullman and send the deals to Birmingham.  I think and I am

25   pretty sure that I asked him, Kim didn't tell you that, did

1    she?  And he said, no, Forest told me to do that.  Forest

2    faxed me -- remember he had the fax -- Forest faxed me those

3    instructions of what I was supposed to do.  I asked him, did

4    Kim send you those instructions, or did Kim do anything about

5    transferring those deals from Cullman to Birmingham?  And he

6    said, no.  I think he said he told Greg Boyles about no more

7    RDR'ing cars in Cullman, and a finance man, no more RDR'ing

8    cars in Cullman during this period.  I think Mr. Yelverton

9    also said, I had very little or not much contact with Ms.

10   Branch.

11        Then we had Gerald Shepard.  Personally, I thought

12   Gerald really was a pretty interesting character.  He talked

13   about incentives and the warranties followed the RDR's, and

14   we'll talk about that in a minute.  He talked about the first

15   conversation he had about shifting sales was with Forest

16   Housner.  I asked him, was Kim Branch present during those

17   discussions?  No.  He said he did have some conversations with

18   Ms. Branch talking about that audit process that they had just

19   gone through months before about pooling deals.

20        Then we had Greg Boyles.  And I got the impression he

21   was a little upset about not getting the trip to Las Vegas,

22   and I probably would have, too, because that seemed pretty

23   interesting, going in that warehouse and picking up as much

24   stuff as you could.  But Greg Boyles told us, Harold Yelverton

25   told him to stop RDR'ing cars in Cullman, not Kim Branch.  I

1   asked him if he had any contact with Kim during this period of

2   time, and I believe he told me no contact with Kim about

3   transferring any deals from Cullman to Birmingham.

4          Then we had Jeff Green.  Well, as I told you, Jeff is

5   the kind of guy that I usually end up representing.  That guy

6   can make anything.  He could make utility bills, he could make

7   bank statements, he could make -- well, you heard what all he

8   could make.  He could bogus up the amount of your deals.  He

9   could inflate your incomes.  He could bogus up income

10  statements.  This guy could do just about anything.  And the

11  only reason I tell you that, when he says he gave the deal

12  jackets back to Kim, who are you going to believe?  You got

13  Kim on one side saying, I don't think he ever gave me -- I

14  believe he never gave the deal jackets back to me, or he

15  didn't give the deal jackets back to me.  But you got an

16  admitted convicted felon of bank fraud, consumer fraud, I

17  guess you could forget not pleading guilty to an income tax

18  evasion fraud, who can make up any and all documents in the

19  world, so who are you going to believe?

20         The judge gave you some instructions about

21  credibility.  Are you going to believe Jeff when he says, I

22  gave the deal jackets back to Kim, or are you going to believe

23  Kim when she says, I never got the deal jackets back?

24         Then you have Ms. Branch, Kim, a nice lady.  And

25  again, I concede nice folks commit crimes.  Just not that one.

1    You know, I really don't have the capacity to convey to you

2    folks she didn't do this, other than just keep telling you she

3    didn't do this.

4         Again, we're back to page 11 there talking about the

5    "good faith."  It's a "complete defense," folks.  That's what

6    it says in the judge's charge.  If you believe, Kim Branch

7    acted in good faith with "an honestly held opinion" or an

8    "honestly formed belief," it cannot be fraudulent intent.  If

9    you can't get past the fraudulent intent, the game is over.

10   Back to sports.  You have to find her not guilty because she

11   is not guilty.

12        Now, several other things that I would like to talk to

13   you about -- we won't go over my feeble attempt at math, but I

14   would just like to remind you -- and again, I concede if you

15   steal a dollar, it's the same thing as stealing a million

16   dollars.  But sometimes we have to use our logic a little bit.

17   $1,296, if I'm right.  Why risk everything, your life, your

18   reputation in the community for $1,296?  And again, don't get

19   me wrong, you steal a dollar from me, you are a thief just

20   like you stole a hundred dollars from me.  But it's something

21   to think about.

22        Another thing to think about, the cast of characters

23   of this enterprise -- on a personal note, I will say it's

24   interesting to have my son with me here -- I just wanted to go

25   over the cast of characters that are involved in this.  We got

1    Mr. Visser, and he has been charged, and he has pled guilty.

2    I am just talking about this conspiracy.  There's a whole

3    separate conspiracy, let's don't get that confused that had to

4    do with a consumer fraud that Mr. Shepard pled guilty to and

5    Mr. Green pled guilty to, and I think they said seven or eight

6    others.  While on that subject, no evidence, no, none, zero

7    that Kim was ever involved in that.

8            Then we got Mr. Housner.  I am not sure I am spelling

9    his name right, and he has not been charged.  But you heard

10   everybody say he was the number two guy, he's not charged.

11   Then we had Mr. Yelverton, who said he got one of those target

12   letters.  He didn't report the cars from Cullman.  He didn't

13   RDR the cars to Cullman that were moved to Birmingham.  He has

14   not been charged.  Then we got Mr. Boyles, who said I didn't

15   RDR anymore cars because they told me not to.  He has not been

16   charged.  I am just going to start putting a line right there

17   (writing to board).

18           Well, then we got Mr. Shepard who says, oh yeah, I

19   RDR'd the cars in Birmingham, he has not been charged.  And I

20   will save the best one for last.

21           Mr. Green -- you will have the documents back there,

22   but I went over, in my mind, just adding up things; forged

23   about 300 signatures on all those documents, which he said he

24   created, which we have never seen.  And he fraudulently

25   entered and made up the bill of sales and contracts and all of

1    that, and he has not been charged.

2         But, Mr. Visser and Mr. Shepard and Mr. Green have all

3    pleaded guilty to various things and are all hoping the

4    government is going to recommend a lesser sentence to a judge

5    in their case for coming in here to testify.  So you can take

6    that into consideration as to why they said what they said.

7    Not really putting anything on Kim anyway.

8         A couple other things I would like to go over with

9    you, one, if you remember Monday, I gave you an example, I

10   asked one of you good folks to give me a ride to the bank, and

11   that I got within maybe -- or we got within a couple of blocks

12   of the bank, well, you know, there's a lot of traffic down

13   there, I have been to this bank, there's not any parking, why

14   don't you just pull over right here.  And I need the exercise,

15   and I will walk on to the bank.  And I go in the bank, and I

16   rob the bank, and I walk back to the car.  Nothing unusual.  I

17   get in the car, and say, okay, let's go back to the federal

18   building.  And about that time Birmingham's finest starts the

19   sirens.  Are you a co-conspirator with me to rob that bank?  I

20   robbed the bank.  You drove the getaway car.  You did an overt

21   act which helped me rob the bank.  But again we go back to the

22   charge of "good faith."  You had "an honestly held opinion" or

23   an "honestly formed belief" that all you did was drive me down

24   there.  I agree that's in a different context than this.  I

25   don't think it's very much of a leap to put that over into

1   this case.

2          If you believe Kim honestly didn't believe anything

3   was wrong or illegal with what she did at the time, you have

4   to find her not guilty.  Please keep in mind, this is the last

5   time I get to talk to you about this, the burden is on those

6   folks to prove her guilty beyond a reasonable doubt.  Think

7   about the presumption of innocence.  She is presumed to be

8   innocent.  So every time you are back there looking at a

9   document in that room, looking at a document or going over

10   testimony, just keep thinking the burden is on those folks to

11   prove me guilty beyond a reasonable doubt and the presumption

12   of innocence.

13          Folks, I know I have taken up a lot of your time.  You

14   have been very attentive and I thank you on behalf of Kim.  I

15   am going to ask you good people to find that young lady not

16   guilty of all of these charges and send her home to her family

17   just like she came in the courtroom Monday an innocent person.

18   Thank you.

19          Thank you, Your Honor.

20          THE COURT:  All right.  Rebuttal?

21          MS. WICK:  Your Honor, I apologize, if it wasn't

22   code red, I would not ask, but may we take a two-minute

23   restroom break?

24          THE COURT:  Yeah, I was going give the jurors a

25   chance to stand and stretch.  So if you need a restroom break,

 1    too, that's fine.

 2              MS. WICK:  Thank you, Your Honor.

 3              THE COURT:  Let's take a five-minute break, please.

 4                    (Jury recess at 12:18 p.m.)

 5              MS. WICK:  Your Honor, before we go on a break, I

 6    just wanted to ask, I know we were taking a brief bathroom

 7    break, but I just realized it's 12:18 --

 8              THE COURT:  I am not going to break for lunch.  I am

 9    going to ask the jurors to please listen to the rest of the

10    arguments.

11              MS. WICK:  I know we said there were no time limits,

12    it's just now the government is the only thing standing

13    between them and their lunch break.  What time did you hope to

14    break them for lunch?

15              THE COURT:  Whenever you are done.

16              MS. WICK:  Okay, Your Honor.  Thank you.

17         (Recess taken at 12:20 p.m., until 12:27 p.m.)

18              THE COURT:  Just with respect to the lunch break, I

19    am going to give the jury an instruction to let them know that

20    this is the Court's decision to go forward.  I did give the

21    government the advantage last night when Mr. Broome asked for

22    us to finish up Ms. Branch's cross examination.  The

23    government asked to take a break, and I gave the government

24    the advantage of coming in this morning and starting fresh.

25    So I think it's only fair that we go ahead and complete the

1    closing arguments.

2          MS. WICK:  Yes, Honor, we appreciate your

3    instructions.

4                    (Jury in at 12:29 p.m.)

5          THE COURT:  Ladies and gentlemen, I just wanted to

6    let you know, I do know what time it is and I know you are

7    probably hungry.  It's important with closing arguments to

8    hear everything together and in context.  So I apologize to

9    you for making us run later today through the ordinary lunch

10   hour, and I appreciate your patience with arguments and ask

11   you to pay full attention to the government's rebuttal

12   arguments.

13         All right.  Ms. Wick.

14          MS. WICK:  Thank you, Your Honor.

15         Ladies and gentlemen, I apologize.  I know I am all

16   that stands between you and lunch, so I really am going to try

17   to keep this brief.  You probably heard my stomach growling,

18   so I am with you.

19         There were a few things that Mr. Broome said in

20   rebuttal that I wanted to address.  Every day really good

21   people make really bad decisions.  Nobody is here because the

22   government hasn't charged Ms. Branch with being a bad person.

23   I don't know her.  She may be a really good person.  That's

24   not what she is charged with.  What she is charged with is one

25   count of conspiracy and 15 counts of wire fraud that took

1   place in March 2013.  Because when Forest Housner came to her

2   and said, here is what we're going to do, we're going to shift

3   these sales from Cullman to Birmingham so that we can hit the

4   big money incentive at the end of the month, you need to keep

5   a list of these deals on your desk in case we're audited,

6   because you are the one who submits the financial information

7   to Nissan when they ask for that initial red flag check.  And

8   when the deals come down from Cullman, you need to bring those

9   to Jeff Green so he can make Birmingham deal jackets.  Because

10  in case they pull those during the audit, we have to make sure

11  that the Birmingham deal jacket matches -- the accounting

12  information matches the RDR information.  I just want to give

13  a minute for that to sink in.

14          All of the other evidence in this case, all of the

15  talk about warranties and all of the booking and accounting

16  are all the nomenclature.  Do you have that page 11 that Mr.

17  Broome was talking about?  I want you to hold it in your hand.

18  It says, "an honestly held opinion," "an honestly formed

19  belief."  Mr. Broome is absolutely right.  The government has

20  a very high burden.  We have to prove, beyond a reasonable

21  doubt, that in March 2013, not today -- in March 2013, she

22  knew that what she was doing was wrong.  The government would

23  submit to you that it is not in any stretch of the imagination

24  plausible, that at the time she was maintaining that list to

25  evade the first part of the audit or the time -- the four

1    times that she was schlepping those deals over to Jeff Green

2    for him to make false deal jackets, that she did not know the

3    purpose of that was to evade an audit.  You know one of the

4    craziest things that I heard during the course of this trial?

5    These words:  Mr. Housner's instructions were very innocuous.

6    It's not clandestine to create fake deal jackets.  It's not

7    that wrong to evade an audit.  Just saying that in a higher

8    pitched voice does not make it any less incredulous and false.

9         The Court told you a couple of minutes ago, and my

10   co-counsel represented to you that one of the most important

11   things that you came with into this courtroom was your common

12   sense.  And I can't even remember, but I remember some people

13   said that they had accounting backgrounds.  And I don't know

14   if it's any of you, I failed accounting, so please don't rely

15   on me.

16        But I will tell you this, does your common sense tell

17   you that when somebody has to create a set of false documents,

18   fake deal jackets to evade an audit that, she didn't know that

19   was wrong?  And to be clear, I want to be a hundred percent

20   clear.  She admitted on the stand, she knew when she made

21   those four trips to Jeff Green, the purpose of that was for

22   him to create the fake Birmingham deal jackets like Forest

23   instructed her to do.  There is absolutely no dispute that she

24   knew, on all four of those trips, that what she was doing was

25   bringing the original Cullman deal jacket to the guy at the

1    dealership who was renowned for making fake documents, so that

2    he could make fake deal jackets.

3         I hope the irony is not lost on you that Mr. Broome

4    would not like you to believe a word of what Mr. Green said,

5    because he is a terrible guy for making false documents.

6    Because he made false utility bills, he made false bank

7    statements, he made all these false documents.  But he wants

8    you to forget who walked over the four sets of real documents

9    for Jeff to create the fake deal jackets.  Because as far as

10   the government is concerned, two people testified on the stand

11   that Jeff was going to create those fake deal jackets, and

12   that Ms. Branch was the one who gave them to him, knowing that

13   was his purpose.  Is that any different?  Is Mr. Greene any

14   different because he was the one that signed the forms?  Then

15   she was walking it over saying here are the documents for you

16   to create fake deal jackets so we can evade this audit?

17        That badge on your shirt says "juror," not "born

18   yesterday."

19        I would like to address Mr. Broome's chart, and I am

20   sorry there's no way this is going to go well without this

21   working.  There's no way for us to be able to see it, Your

22   Honor, I just apologize.  (Poster board displayed.)

23        Mr. Broome made one error.  Mr. Yelverton did not

24   testify that he got a target letter, it was a proffer letter,

25   but the rest of this is relatively accurate.  But here is the

1    thing.  All of these people, what they have in common that

2    they testified to cooperation agreements with the government;

3    wherein they came in, accepted responsibility, and told the

4    truth to the government; admitted they lied, admitted they

5    knew what was wrong, and admitted everything that they did to

6    the government.

7            Mr. Yelverton even told you on the stand, you know how

8    he -- he knew it was wrong.  He kept a fax for two years,

9    folded up in his records marked RDR's from Serra Visser Nissan

10   to Serra Birmingham because he knew the day that somebody came

11   knocking, he was going to need the somebody-told-me-to-do-this

12   card.  Every single one of these guys testified that they knew

13   it was wrong.  They knew they were lying, they knew they were

14   deceiving Nissan, they knew about the audit process, they knew

15   that if they got caught, there was going to be a charge back

16   and they would all lose money.  People getting paid on the net

17   would lose money which included the defendant.  Ms. Branch is

18   the only person who wants you to believe that she needed an

19   instruction that said, don't lie, don't cheat, and don't

20   steal, in order for her to know how to do her job as the

21   controller for a multi-million dollar car dealership.

22           When you go back and you look at the evidence of this

23   case, you are going to see lots of documents.  You are going

24   to see all of the 15 deal jackets, which basically are the

25   Cullman deal jackets.

1              Mr. Broome talked about our vast powers.  You know

2      what we did?  We issued a subpoena that said can you give us

3      these?  You know what they gave us?  The Cullman deals.

4      Because they sure weren't going to give us the fake ones.  We

5      never got the fake ones, we'll never -- nobody's ever going to

6      say to you where those fake ones are, whether they're at the

7      bottom of the ocean, at the bottom of a shredder, nobody knows

8      where they are.  All we did was ask for them.  Not

9      surprisingly, they gave us Cullman and not Birmingham, in one

10     of the many steps to cover up what they had done.

11             You heard Mr. Visser testify that on June 17th, 2014,

12     he found out about our subpoena.  Now Ms. Branch said she did

13     not realize that was these 15 deals until, oh, some time

14     before August 1st, 2014.  But you heard Mr. Visser testify

15     that the next day, June the 18th, 2014, he was e-mailing

16     Patrick Byrnes at Serra Nissan.  Hey, we've got 15 deals

17     coincidentally.  We just got to make this right.  What can I

18     do?  Can I leave it?  Can I leave it?  Let me text you.  Can I

19     leave it?  Please tell me.  I can leave it.

20             What did Patrick Byrnes say?  Mr. Visser said let

21     sleeping dogs lie.  Mr. Byrnes did not say that on the stand.

22     Let me be clear.  Mr. Byrnes did not say he said let sleeping

23     dogs lie.  He said, unwind the deals, just unwind them.  He

24     didn't know there was a time limit on that.  Mr. Creecy said,

25     no, they couldn't do that because it was outside of the audit

1    period.

2           What did Mr. Byrnes tell you?  When Mr. Visser called

3    him on the phone, he said we accidentally RDR'd these deals.

4    Accidentally RDR'd them.  After devising that fraud plan in

5    Government's Exhibit 40, he had the nerve to call Mr. Byrnes

6    the day after he got a subpoena from the government and said

7    we accidentally RDR'd these deals.  Come on now.

8           Then after Byrnes sends the e-mails that says this is

9    pooling of sales, which some people know the term, some people

10   don't know the term.  You know what everybody knows, that when

11   you are making false documents to cover something up, when you

12   are evading an audit, that's fraud.  You know who knows that?

13   Accountants.  Especially accountants that get paid $150,000 a

14   year to run a multi-million dollar car dealership.

15          You are going to go back in the jury room, and you

16   have, I think, 45 exhibits.  You are going to have days of

17   testimony.  And you have to ask yourself at the end of the

18   day, is it plausible that she honestly didn't know when she

19   was e-mailing Mr. Visser, yeah, I didn't book those in

20   accounting.  I have them on my desk, stapled to the e-mails

21   that you sent me in the event that we get audited, just in

22   case, so I can add, remove them, do what I need to do to avoid

23   the audit -- oh, bonus.  Jeff Green made a set of deal jackets

24   in the event that they asked them to be pulled.  Because I am

25   the one they're going to call and tell what deals need to be

1   pulled.  Mr. Broome said, well, there's no evidence that Mr.

2   Green brought those deal jackets back to her and she never saw

3   it.

4           Ladies and gentlemen, the evidence throughout this

5   case was that there was one person that Nissan contacted to

6   make sure those deals were pulled.  She may have sent one of

7   her little people to go pull those deals, but the woman

8   responsible for having those jackets on hand the day the

9   auditor came on site was the defendant, Ms. Branch.  And who

10  did it make sense for Mr. Green to bring those fake deal

11  jackets back to in the event that they got audited?  The

12  defendant, Ms. Branch.

13          She didn't write back, I don't understand what you are

14  talking about when you are saying we only had 12 month --

15  whoa, this sounds terrible.  Wait.  I understand now.  I am

16  out.  You didn't see any of that.  What you saw was an

17  attestation under penalty of perjury on August 1st, 2014.

18  Here is the Cullman deals.  Here you go.  You asked for those

19  15 deals, here is the Cullman ones.  Nowhere friends, no

20  telling anybody other than Mr. Visser, oh, yeah, there were

21  these 15 Birmingham deal jackets that I think Jeff created.

22  Common sense.  I can't even say that enough, ladies and

23  gentlemen.

24          The defendant was charged with 16 counts.  The first

25  count is conspiracy, the agreement that they all had to do

1    what they were going to do.  Let me be clear about something,

2    Mr. Broome would have you believe that Ms. Branch lived in a

3    little glass cake dome, a wonderful cake dome where everybody

4    around her understood that everything was wrong and everything

5    was fraud and making false documents is not right.  She

6    doesn't do it in her personal life.  But at work, she wasn't

7    quite sure if making false documents was okay.  But everybody

8    around her somehow knew.  Is that an honestly held belief?  Is

9    that reasonable to think that an accountant truly did not know

10   what she was doing?

11       Knowingly and willfully she did every step of it.  You

12   know what the tragic thing about this is that it was only for

13   $1,286, and that they did all this for $64,800.  That's the

14   tragic thing.  What's really sad is when good people have a

15   moment in their lives when they can either do the right thing

16   or they can do the wrong thing and they do the wrong thing to

17   make any amount of money.

18       We really appreciate your time and attention over the

19   last three days.  And I would submit to you when you go back

20   and look at the evidence and the witnesses, the only

21   reasonable verdict that you will be able to find with your

22   common sense is guilty on all 16 counts.  Thank you so much.

23           THE COURT:  All right.  The Court has a brief final

24   charge for the members of the jury.  Tammi is going to hand

25   that to you now.

1          (Courtroom deputy is handing copies to the jury.)

2             (Final Instructions Before Deliberations.)

3          THE COURT:  All right.  You have now heard the

4    parties' closing arguments.  There are a few final

5    instructions that I must give you.  After I complete these

6    instructions, you will go to the jury room and begin your

7    discussions -- what we call deliberations after you have a

8    lunch break.

9          On the first day of trial, during the preliminary

10   instructions, I discussed note-taking.  If you took notes,

11   those notes are to assist your memory only.  They are not

12   entitled to greater weight than your memory or impression of

13   the testimony that you heard.  Your own recollection and

14   interpretation of the evidence is what matters.

15         When you get to the jury room, choose one of your

16   members to act as foreperson.  The foreperson will direct your

17   deliberations and will speak for you in court.

18         Each of you must decide the case for yourself, but

19   only after fully considering the evidence with the other

20   jurors.  You must discuss the case with one another and try to

21   reach an agreement.  While you discuss the case, do not

22   hesitate to reexamine your own opinion and change your mind if

23   you become convinced that you are wrong, but do not give up

24   your honest beliefs just because others think differently or

25   because you simply want to get the case over with.

1    Your verdict, whether guilty or not guilty, must be

2  unanimous as to each count -- in other words, you must all

3  agree.  Your deliberations are secret, and you will not have

4  to explain your verdict to anyone.

5       Remember that in a very real way, you are judges --

6  judges of the facts.  Your only interest is to seek the truth

7  from the evidence in the case.

8       A verdict form has been prepared for your convenience.

9  I was going to use the Elmo to show this to you, but since

10  we're having technical difficulties, I will just show you the

11  verdict form is going to have a section (pointing) for each of

12  the 16 counts in the indictment, and then it has a line that

13  says "guilty," and there's a blank, and a line that says, "not

14  guilty," and there's a blank.  When you have a unanimous

15  decision as to each count, you will check the appropriate

16  blank.  And then at the conclusion, the jury foreperson must

17  sign and date the verdict form.

18       Take the verdict form with you to the jury room,

19  please.  When you have all agreed on the verdict, your

20  foreperson must fill in the form, sign it, date it, and carry

21  it.  You will then notify Tammi that you have a verdict, and

22  you will return to the courtroom to deliver your verdict.

23       If you wish to communicate with me at any time, please

24  write down your message or question and give it to Tammi.

25  Tammi will bring it to me and I will respond as promptly as

1    possible -- either in writing or by talking to you in the

2    courtroom.  But I caution you not to tell me how many jurors

3    have voted one way or the other at the time.

4          All right.  Instead of retiring to the courtroom --

5    you need to retire to the jury room, and we do need to have a

6    lunch break first before you begin deliberating.  There's one

7    other brief piece of business that I have to do with you.

8          When we have a criminal trial, the Court seats 14

9    jurors.  Only 12 jurors are required to deliberate.  The Court

10   seats 14 jurors in case anyone becomes sick, has to be missing

11   from trial, so that the Court can be sure that there will be

12   12 jurors to deliberate.

13         So, we have two alternate jurors:  They are Mr. Chris

14   Williams and Mr. Brazelton.  You all do not have to come back

15   after the lunch break, but you need to be available by your

16   cell phone, please.  In case anything should happen during the

17   deliberations, there is the chance that we might have to call

18   you back.  So I thank you two very much for your service.

19   Thank you for listening attentively to all the evidence in

20   this case, but you all are excused from deliberations.

21         Members of the jury, why don't you all please plan to

22   come back to the jury room for two o'clock.  At that time,

23   please begin your deliberations.  Until then, please do not

24   discuss the case with one another, please do not look up

25   anything on the internet.  Just enjoy your lunch and be

1    prepared to come back to the jury room to begin deliberations.

2    All right?  Thank you.

3              (Jury out at 12:51 p.m., until 2:00 p.m.)

4              THE COURT:  All right.  Is there anything from

5    either party right now that we need to put on the record?

6              MS. WICK:  Not from the government, Your Honor.

7              MR. BROOME:  Not for Ms. Branch, Your Honor.

8              THE COURT:  I do have one more question for the

9    government with respect to the defendant's motion for

10   acquittal.

11             MS. WICK:  Yes, Your Honor.

12             THE COURT:  There is undisputed evidence that Ms.

13   Branch instructed the clerk when she had the deal jackets or

14   when the deals were -- the 15 deals were to be completed in

15   the accounting system, she did not instruct the clerks to

16   input those deals into the Reynolds and Reynolds system, the

17   Birmingham system.  Instead, the undisputed evidence is that

18   she instructed the clerks to input that information into the

19   Cullman DMS system, the information she testified was capped

20   there.  Help me understand what that means in terms of

21   fraudulent intent.

22             MS. WICK:  Yes, Your Honor.  So, when Mr. Visser

23   sent his instructions saying don't do the bills of sale, don't

24   do the title application --

25             THE COURT:  In June.  Which instructions are you

1    talking about?

2              MS. WICK:  I am sorry, Government's Exhibit 40.  The

3    fax.  When he sent those to Cullman saying, don't do the bills

4    of sale, don't do the title application.  It's very important

5    that these be booked in accounting.  I believe Ms. Branch

6    testified that she said, Mr. Visser frequently misused that

7    term, and what she understood him to mean was that they be

8    finalized in accounting.

9              THE COURT:  Right.

10             MS. WICK:  Ms. Branch was the one who knew that that

11   couldn't happen -- that because of all the nightmares it would

12   create, they had to be finalized in Cullman.  They had to be

13   capped in Cullman instead.  But, if you are asking what the

14   intent to -- if you are asking was that part of her intent to

15   defraud, the government would argue that as the controller

16   part of her scheme was she actually made sure it got done

17   correctly in accounting and not what Mr. Visser said to do.

18             THE COURT:  First of all, she didn't see Mr.

19   Visser's instructions.  That's undisputed.  Government's

20   Exhibit 40 is not something that Ms. Branch ever saw.

21             MS. WICK:  She did claim that, yes, Your Honor.

22             THE COURT:  It's undisputed.  Did you put on any

23   evidence that says that she did see it?

24             MS. WICK:  Other than the evidence that Mr. Housner

25   told her that he gave her instructions and -- if you are

 1   asking -- no, nobody testified that she saw that piece of

 2   paper, Your Honor.

 3             THE COURT:  So it's undisputed?

 4             MS. WICK:  Yes, Your Honor.

 5             THE COURT:  Okay.  So there was never -- and Ms.

 6   Branch also testified that no one gave her instructions about

 7   how to input those 15 deals in the DMS; is that right?

 8             MS. WICK:  I believe it is, Your Honor.

 9             THE COURT:  Okay.  So that's undisputed.

10             MS. WICK:  Yes, Your Honor.

11             THE COURT:  So if she wanted to carry out this

12   fraud, would she have put those deals into the Birmingham

13   system so that they matched what was put into the RDR?  Or

14   would she put them into the Cullman system?

15             MS. WICK:  She would the put them into the Cullman

16   system, Your Honor.  At least two witnesses testified that

17   these are completely separate systems.  The RDR's system and

18   the accounting system.

19             THE COURT:  Understood.

20             MS. WICK:  So what Mr. Green was testifying to in

21   terms of the problem with Government's Exhibit 40, with what

22   Mr. Visser instructed to do was that created a ton of work for

23   the accounting department in terms of what she would have had

24   to do.  She had to book them in Cullman because of the way the

25   funds came from the lender for those cars.

1              THE COURT:  No, let's think about what Mr. Visser

2     said in his e-mail in June of 2013.  He said they had to be

3     booked in Reynolds and Reynolds.  So if there was an audit,

4     the first stage of the audit is you get the information that

5     is taken out of the accounting system.

6              MS. WICK:  Right.

7              THE COURT:  For that information to match the RDR's,

8     because the 15 vehicles were RDR'd in Birmingham, you would

9     have to have the Birmingham accounting information, wouldn't

10    you?

11             MS. WICK:  That's exactly right.  That was her job.

12    Her e-mail says, I can manually add it or --

13             THE COURT:  What did she do in March 2013?

14             MS. WICK:  She had somebody cap the deals in

15    Cullman.

16             THE COURT:  In Cullman.

17             MS. WICK:  Yes, ma'am.

18             THE COURT:  Right.  What does that tell us about her

19    fraudulent intent?

20             MS. WICK:  That she knew how to do it better than

21    Mr. Visser did.

22             THE COURT:  Mr. Visser said they need to be inputted

23    into Reynolds and Reynolds so that if there is an audit --

24             MS. WICK:  Right.

25             THE COURT:  -- the accounting documents will match

1    the RDR.

2            MS. WICK:  Right.  So if Your Honor looks at

3    Government's Exhibit 24, page 2, his response to her says

4    "okay, just manually add them or remove them from the

5    information" because she was responsible for giving that

6    information to Nissan.  So even if it was capped in Cullman,

7    she was responsible for putting that information in the report

8    that Nissan would get in an Excel spreadsheet that she could

9    just --

10           THE COURT:  Ms. Wick, what is the date of Mr.

11   Visser's e-mail?

12           MS. WICK:  June -- the response I believe is July --

13           THE COURT:  No, I want to know the first one,

14   please.

15           MR. BROOME:  June the 3rd -- 1st.

16           THE COURT:  June 1st.  Okay.  If Nissan North

17   America had asked for an audit in April 2013, where would

18   those 15 deals have been reported in the accounting system?

19           MS. WICK:  That audit was before.

20           THE COURT:  I am not talking about that audit.  I

21   am asking if Nissan had said, I want to audit these, we want

22   to audit these 15 deals, and they said that in April, 2013,

23   where would the deals be in DMS?

24           MS. WICK:  In DMS, they were capped in Cullman.

25           THE COURT:  Right.

1              MS. WICK:  Yes.

2              THE COURT:  Would that they be in Reynolds and

3  Reynolds?

4              MS. WICK:  No, they would be in the Dealertrack.

5              THE COURT:  No.

6              MS. WICK:  Based on what Ms. Branch testified, she

7  would have capped them in Dealertrack in Cullman.

8              THE COURT:  Right.  Okay.  So, in May of 2013, if

9  Nissan North America had said, we wanted to do an audit of

10  these 15 deals, where would the information in Serra's

11  accounting system be for those 15 deals?

12             MS. WICK:  Her job was to add it to the Excel

13  spreadsheet, because Nissan didn't pull it, they asked for it.

14             THE COURT:  I know, that's the point I am making.

15             MS. WICK:  She would have had to manually add it to

16  the Birmingham spreadsheet before they gave it to Nissan.

17  That was her job.  That's the government's --

18             THE COURT:  That wasn't communicated to her until

19  June --

20             MS. WICK:  The government -- I am sorry.  I did not

21  mean interrupt you.

22             THE COURT:  It's actually July.  Mr. Broome, I

23  overheard you, but that's right, it's in the second e-mail

24  from Mr. Visser, that that is communicated for the first time

25  to Ms. Branch.

1              MS. WICK:  Yes, Your Honor.  And this is now the

2    government's fault, but one of the reasons why the other

3    exhibits of the audits were relevant was because they were

4    annual audits, and they had just finished an audit and had the

5    closing meeting on March 15th, 2013.

6              THE COURT:  In which Ms. Branch was not present,

7    right?

8              MS. WICK:  Yes.

9              THE COURT:  She did not participate in the 2010

10   audit, did she?

11             MS. WICK:  She actually did.  She --

12             THE COURT:  2010.  That's one of the audits you

13   wanted put in evidence, and the Court excluded it.

14             MS. WICK:  Yeah --

15             THE COURT:  Was she part of the 2011 audit if there

16   was one?

17             MS. WICK:  No, Your Honor, that was before she

18   worked there.

19             THE COURT:  Right.  Was she part of the 2012 audit

20   to the --

21             MS. WICK:  I think there was only ten, 11 and 13.

22             THE COURT:  Okay.  So the 2013 audit, Ms. Branch

23   participated in.

24             MS. WICK:  Yes, Your Honor.

25             THE COURT:  That did not include the 15 vehicles

1    we're talking about.

2              MS. WICK:  That's right, Your Honor.

3              THE COURT:  All right.  Help me understand the

4    fraudulent intent, and what it means that when Ms. Branch put

5    the 15 deals into the DMS system, she put them into the

6    Cullman tracker system?

7              MS. WICK:  That's right.  Okay.

8              THE COURT:  And remember, it's undisputed that no

9    one told her where to put the deals.  So she believed they

10   were Cullman deals, and the Cullman clerk put those deals in

11   the Cullman tracker system.

12             MS. WICK:  Your Honor, I am going to back up for a

13   second.

14             THE COURT:  Okay

15             MS. WICK:  I think that what Ms. Branch testified to

16   was that Forest Housner came to her in March '13 and said,

17   we're going to shift these 15 deals, you need to keep a list,

18   you need to bring the jacket to Jeff Green.

19             THE COURT:  Right.

20             MS. WICK:  Okay.  She does that, and then

21   subsequently at some point those deals are capped in Cullman.

22             THE COURT:  Yes.

23             MS. WICK:  Okay.  She knew, based on her accounting

24   experience, as Mr. Green testified, that if she actually

25   finalized those deals in Birmingham, there were going to be

1    all these extra accounting issues that were going to have to

2    be done.  So it made absolute sense for her to cap those deals

3    in Cullman, because when they did the fraud on the Birmingham

4    side, they only had to put it in pending or book status just

5    to get the documents made, just to get the RDR -- that

6    information done, they did not have to finalize it.  So it can

7    sit and never get finalized in Birmingham.  She knew that she

8    could cap those deals in Cullman, and if there was an audit

9    later, when Nissan asked for the Excel spreadsheet, either for

10   Birmingham or Cullman, if they asked for Cullman, she would

11   just leave it and upload it.  And if they asked for

12   Birmingham, she would manually add it to the Excel spreadsheet

13   that they would submit to Nissan.

14           THE COURT:  If they asked for Cullman, they would

15   have 15 deals in Cullman that didn't have RDR's to match.

16   Right?

17           MS. WICK:  One moment, Your Honor.

18         Your Honor, I just want to make sure I understand you.

19   You are asking specifically could they have unRDR'd the deals.

20           THE COURT:  No, that's not what I am asking.  You

21   just argued to me that Ms. Branch had figured out that she

22   only put the information about the deals in a Cullman tracker

23   system, and that way if Nissan wanted to audit Cullman and

24   they asked for information, they would get the tracker

25   information.  If Nissan wanted to audit Birmingham, then Ms.

1  Branch would have to go in and make a manual adjustment in the

2  paperwork because she hadn't put the deals -- she hadn't

3  finalized the deals in Reynolds and Reynolds.

4         And my question to you is if Nissan North America had

5  said, we want to audit Serra Visser Nissan, the Cullman store,

6  they would have found 15 deals in the Serra Visser accounting

7  for which they had no RDR's because the cars were RDR'd in

8  Birmingham, so that would immediately flagged to Nissan North

9  America that something didn't match.

10         MS. WICK:  No, Your Honor, I think the problem is

11  this -- if Nissan were to do an audit of Birmingham, because

12  that's where they RDR'd the cars, they would have 15 RDR's.

13  Right?

14         THE COURT:  Right.

15         MS. WICK:  They would have the -- and if they came

16  -- let's start with step one.  They would have the 15 RDR's.

17  They reconciled -- they asked Ms. Branch to send the

18  accounting information.  She capped them in Cullman, but she

19  could easily just type into the Excel spreadsheet, she could

20  manually, literally manually type them into the accounting

21  information in the Excel spreadsheet that she would then send

22  to Nissan to say, here are these 15 deals, here is the

23  information in accounting, so now the 15 RDR's match the 15 in

24  accounting, and then they had the 15 deal jackets if they

25  showed up on site.  But they didn't RDR these deals in

1    Cullman.  She never had to have RDR information to match in

2    Cullman, because they wouldn't have popped up in Nissan's RDR

3    system for an audit.  So if they audited Cullman, there

4    weren't 15 RDR's for them to audit.  Is that even remotely

5    close to what you are asking?

6          THE COURT:  That does answer the question about your

7    statement that if there was an audit of Cullman, that she

8    would already have put the documents in the accounting system

9    in Cullman.

10         MS. WICK:  Yes, I don't believe there's any dispute

11   that she capped -- or excuse me.  That either she or somebody

12   in her office capped those 15 deals in Cullman.  That's how it

13   had to be done because of the finances with the lender.  I

14   don't believe that's in dispute.  But that doesn't change her

15   ability then if Nissan audited Birmingham to manually add that

16   information to the Excel spreadsheet that she sends to Nissan

17   and says, here is our accounting data, because she had the

18   ability to manually add that information to the Excel

19   spreadsheet.

20         THE COURT:  Okay.  I understand your argument.

21         MS. WICK:  I am sorry it took me so long to get

22   there.

23         THE COURT:  No, just following through.  Okay.

24   Thank you.

25         MR. BROOME:  Judge, could I briefly respond?

1          THE COURT:  Oh, please.

2          MR. BROOME:  Judge, the government keeps talking

3   about if, if, if we did this, but we never did that.  They're

4   talking about some wire fraud that I did on or about March of

5   2013, and then they're speculating about what might have been

6   done down the road if there was an audit.  I think that's a

7   distinction.

8          THE COURT:  Okay.  All right.  Got it.  Thanks.

9              (Recess taken at 1:08 p.m.)

10         (Jury deliberations began at 2:00 p.m.)

11     (Out of the presence of the jury at 3:09 p.m.)

12         THE COURT:  I hate to bring you all in for this, but

13  it's a quick procedural question from the jury, but I want to

14  make sure we have everything on the record.

15        We have a question from the jury:  Do we have a copy

16  of the indictment; we cannot find it?

17        We did not give the jury a copy of the indictment when

18  we gave them the exhibits.  So, we have Document One, the

19  indictment.  We're using the unsigned copy of the indictment.

20         MS. MURNAHAN:  Your Honor, is the forfeiture

21  provision removed from that?

22         THE COURT:  Oh, you know -- good question.  It is

23  not.  Thank you for bringing that to the Court's attention.

24        So we are removing pages 9 and 10 from Document One

25  and giving the jury pages 1 through 8.  Any objections?

1          MS. WICK:  Not from the government, Your Honor.

2          MR. BROOME:  No, Your Honor.

3          THE COURT:  Thank you.

4              (Continued jury deliberation.)

5        (Out of the presence of the jury at 5:36 p.m.)

6          THE COURT:  My plan is to call the jury.  Yesterday

7    Ms. Morgan mentioned when we were talking about whether to

8    keep going, that it takes her almost an hour to commute back

9    and forth to the courthouse, and I don't want anyone in the

10   jury to feel like they're being pressured to stay to keep

11   working when they, in the back of their minds, they may be

12   concerned about driving back and forth.  So, unless anybody

13   has an objection, I would like to offer them the alternative

14   for retiring for now and coming back tomorrow.

15         MS. WICK:  No objection from the government, Your

16   Honor.

17         MR. BROOME:  None from Ms. Branch, Your Honor.

18         THE COURT:  All right.

19              (Jury in at 5:38 p.m.)

20         THE COURT:  The Court wanted to check with the

21   members of the jury to see how you feel about timing.  It is a

22   little after 5:30.

23          Ms. Morgan, I know yesterday when we were talking

24   about when to leave, you mentioned that you have an hour

25   commute back and forth to the courthouse.  So, I wanted to see

1    how you all feel.  Would you like to retire for the evening

2    and come back in the morning to deliberate some more, or do

3    you feel like you want to continue working right now?  We're

4    not in a rush to leave if you all want to continue working,

5    that's fine, but if it's an inconvenience for you now, we're

6    going to be here tomorrow, too.  So, it's up to you all.

7              JUROR BALAZS:  Can we have a minute?

8              THE COURT:  Do you want to go back into the jury

9    room and talk a minute?

10             JUROR MORGAN:  Could we huddle?

11             THE COURT:  Sure.

12        (Jury conferring with one another.)

13             JUROR MONTGOLF:  We have a person that has a

14   mandatory meeting tomorrow.  Do we need to call in an

15   alternate?

16             THE COURT:  What do the parties say about that?

17             MS. WICK:  Your Honor, if the jurors want to return

18   tomorrow and one of the jurors has a conflict, I would hate

19   for them to miss out, if they want to call in an alternate.  I

20   know that might extend things, but whatever the Court feels is

21   best, frankly, and whatever is best for the jury.

22             MR. BROOME:  That's pretty much Ms. Branch's

23   feelings, too, Your Honor.  I would hate to inconvenience the

24   lady.

25             THE COURT:  And the alternative -- is there any way

 1    -- Ms. Balazs, is it you -- Ms. Montgolf, do you have the

 2    meeting?

 3              JUROR MONTGOLF:  No, it's her.

 4              THE COURT:  So Ms. Manning, you have the meeting.

 5    Is there any way you could go to the meeting and leave by

 6    2:00?

 7              JUROR MANNING:  Yes.

 8              THE COURT:  Is there any way that you could go to

 9    the meeting for a while and that you all could resume

10    deliberating after lunch?  Do you think if you explain the

11    circumstance at work that they would help divide the

12    responsibilities so that you could come back, and I could ask

13    the jury to come back after lunch?  Because you've been

14    working hard already.

15              JUROR MANNING:  I really don't know how it works

16    because it is a home-school meeting.  Then I have to take the

17    kids to the meeting.  I mean, we got to get the books and all

18    of that.

19              THE COURT:  Okay.  I tell you what, I hate to ask

20    this, but would you all mind stepping back in the jury room

21    for a minute and let me talk to counsel.

22                        (Jury out 5:43 p.m.)

23              THE COURT:  All right.  I guess the Court, we all

24    have two options here; two that I have thought of.  You all

25    may have other suggestions and I welcome your suggestions.

1    One would be to take tomorrow off and ask the jurors to come

2    back on Monday to deliberate so that we can continue the

3    deliberations with the 12 jurors who are here.  I don't know

4    what other inconveniences that may create by not finishing the

5    deliberations tomorrow.  Of course, there is no assurance that

6    if we bring in a new juror, bring in one of the alternates,

7    that we will have a verdict by the end of the day tomorrow.

8           So, I would like to hear from you all and again hear

9    other suggestions that you may have.  I didn't ask how close

10   they are.

11          MS. WICK:  That was the only thing I was probably

12   going to ask, Your Honor.  But go ahead, Mr. Broome.

13          MR. BROOME:  Judge, the only potential problem next

14   week is I have another trial week in Calhoun County, and I am

15   usually the entertainment.  I have been told that I am second.

16          THE COURT:  And your son hasn't passed the bar yet?

17          MR. BROOME:  No, Your Honor.  And again, thank you,

18   Your Honor, for allowing him.

19          THE COURT:  What is your name?

20          WILL BROOME:  I am Will.

21          MR. BROOME:  He is a Junior, but we don't call him

22   that.  I am second.

23           So I don't -- the case may resolve.  I was hoping to

24   go back to the jail tonight and talk to a client in the jail.

25   During the break, I talked to the district attorney's office

1    and they may made me an offer that my client should not refuse

2    on that case.   It doesn't always mean you take it, but...

3                THE COURT:   Right.  Ms. Wick.

4                MS. WICK:   Your Honor, I started to say earlier you

5    didn't ask them how close they are.   That information might be

6    helpful, and maybe if we know the answer to that, it may

7    resolve things.   If not, Mr. Broome and I can talk to see --

8                THE COURT:   Ms. Coe, do you mind asking the jurors,

9    please?

10               Ms. Wick, do I remember correctly, too, that you will

11   be in St. Louis next week?

12               MS. WICK:   I'll be here at least through Wednesday,

13   Your Honor.

14               THE COURT:   Okay.

15   (Brief pause.)

16               THE COURT:   Ms. Coe, what did the panel members of

17   the jury tell you about timing?

18               THE COURTROOM DEPUTY:   They said they're not even

19   close to a decision at this point.

20               MS. WICK:   Your Honor, my co-counsel made a really

21   good point.   She said they've had it for three hours, maybe

22   bringing in the alternate might actually be the best solution.

23   I would also hate for that juror to miss this mandatory home

24   meeting.   That sounds very important to her.   But at the same

25   time, I will be here next week.   So if the Court wants to, you

1    know, break and bring them in Monday, I think either way is

2    probably fine with the government.

3              THE COURT:  Just so you all will know, we have a bit

4    of a logistical challenge, too, because our jury clerk is out

5    today, and so we're not sure whether we can get the cell phone

6    number for the alternate juror tonight.  And if we can't, we

7    would have to start working in the morning on trying to get in

8    touch with the alternate to have the alternate come in.  So

9    that could happen quickly or not.  I just don't know.

10             MS. WICK:  Well, Your Honor, I apologize.  We raced

11   over here.  We did not bring any of the lists of the jurors.

12   So I am not actually sure who the next alternate would be.

13             MR. BROOME:  I think we can help you with that one.

14   It doesn't matter if you look at my notes because it's over.

15             MS. WICK:  Was Mr. Williams the young man that was

16   in the front left corner here?

17             THE COURT:  Yes, ma'am.  I believe.

18             MS. WICK:  My memory is he is friends with Mr.

19   Gabriel Evans, and he probably has -- he may have the

20   gentleman's phone number.

21             THE COURT:  He may.

22             MS. WICK:  I just wasn't sure if it was the right

23   guy.

24             THE COURT:  He is friends with the other Mr.

25   Williams; is that correct?

 1               MR. BROOME:  They went to Troy.

 2               THE COURT:  Oh, Mr. Evans then.  Okay.

 3               MS. WICK:  That's the only suggestion that I can

 4    make.

 5               THE COURT:  That might work

 6               MR. BROOME:  Your Honor --

 7               THE COURT:  That's what I had down.  I think that is

 8    right.

 9               MR. BROOME:  Judge, I can probably, if the Court

10    might just give me a note to be absent from state court, I am

11    fine with tomorrow, but I think I can probably work something

12    out.

13               THE COURT:  Are you stating a preference for what

14    you would like?

15               MR. BROOME:  No, not really Your Honor, if they can

16    do it tomorrow.

17               MS. WICK:  I guess at this point, the government's

18    presence would probably just -- if there's a chance to reach

19    the alternate, that would probably be the best thing.

20               MR. BROOME:  I guess the other thing would be --

21    never had this situation in 38 years.  Does the alternate

22    brought in on the deliberations or are they to go back and

23    kind of start over?

24               THE COURT:  I will instruct them to go back and

25    start over.  It can't be a unanimous decision unless he has

1    been part of the discussions throughout.

2              MS. WICK:  So we would have lost three hours of

3    deliberations.  But if we wait until Monday, we'll lose eight

4    tomorrow, possibly.  So it's in some ways it's...

5              THE COURT:  Well, again, I can ask Tammi to go ask

6    the jurors if there would be any problem if we take off and

7    resume on Monday.  That's not altogether unusual.

8              MR. BROOME:  I do have one question, Your Honor, and

9    I may be wrong.  I thought Your Honor was going to Huntsville

10   next week or...

11             THE COURT:  As of right now, I am not.

12             MR. BROOME:  Oh, okay.  I'm sorry.

13             THE COURT:  Something came up in that case -- I did,

14   and that case has been continued for the time being.  So I am

15   actually around.  I don't know what Monday looks like, but I

16   know I am here.

17             MS. WICK:  Your Honor, if the government -- if the

18   government had to give a preference, it would probably be to

19   just call the alternate.  If the Court wants to wait until

20   Monday, that's understandable, too.

21             THE COURT:  Okay.  And if you all want, I can ask

22   the jurors if they have a preference because it might help

23   make the decision if some of them express concern about

24   waiting until Monday.

25             MS. WICK:  That would be great, Your Honor, because,

1    theoretically, if they thought that they were say five hours

2    away, they could theoretically get that done tomorrow and not

3    want to have to deal with this over the weekend.  So maybe

4    asking the jurors may be really helpful.

5            THE COURT:  Mr. Broome, this is very important to

6    your client.  So, let me hear from you.

7            MR. BROOME:  Judge, I guess our presence would also

8    be to call in the alternate and start over tomorrow.

9            THE COURT:  Okay.  All right.  Tammi, will you bring

10   in the jury, please.

11           THE COURTROOM DEPUTY:  Yes, ma'am.

12           MR. BROOME:  I guess one consideration would be if,

13   one, this gentleman has the alternate's phone number, and I

14   don't know how you would go about asking that except just to

15   ask.

16           THE COURT:  Is it all right with counsel if I ask

17   Mr. Evans if he would by any chance have that number?  If we

18   can't reach the court clerk, if he is willing to share his

19   cell phone number with Tammi, Tammi can call him and see if we

20   can connect with Mr. Williams?

21                   (Jury in at 5:56 p.m.)

22           THE COURT:  This is an unusual situation.  It

23   doesn't arise all that often.  The parties have discussed the

24   situation, and I have discussed different options with them.

25   We have decided to go ahead and allow Ms. Manning to attend

1   her meeting tomorrow and call one of the alternate jurors in.

2   I don't want this to come as a surprise to you.  Number one,

3   we have to reach him.  So that means that I am going to need

4   to ask you all to come back tomorrow morning.  But I am not

5   sure when we will be able to reach him to have him here.

6          Number two, when we do reach him and he gets here, the

7   Court is going to instruct you all that you have to begin your

8   deliberations over again, because that juror will have to be

9   part of the totality of the conversations.  Okay?  So, that's

10  how we plan to proceed.

11         The alternate juror is Mr. Williams.  We are going to

12  work on getting his cell phone number from our court clerk who

13  took care of helping to organize you all when you came in on

14  Monday.  Mr. Evans, do you know Mr. Williams?

15         JUROR EVANS:  Yeah, I do.  I don't have his number.

16  He has my number.

17         THE COURT:  We were wondering if you might be an

18  alternative source of a telephone number?

19         JUROR EVANS:  I can still reach him, though, but

20  like social media, or something like that.

21         THE COURT:  All right.  Well, let us see if we can

22  reach him by cell phone.  But if you are willing to share your

23  cell phone number with Tammi, if we can't do that, if you have

24  a way of reaching out to him, is that okay with everyone?

25         MS. WICK:  We would greatly appreciate it.  Thank

1    you.

2              MR. BROOME:  That's fine, Your Honor.

3              THE COURT:  Because we don't know exactly when we'll

4    be able to get in touch with Mr. Williams, how about if you

5    all plan to get started at 10:00 tomorrow morning.  That gives

6    us a little bit of time to be working in the morning to try to

7    reach Mr. Williams if we can't find him tonight.

8          I suppose, another alternative that I can discuss with

9    counsel, if we get to this bridge, we could talk about calling

10   in the other alternate if we can't reach Mr. Williams.

11         We know what our options are.  I appreciate your

12   patience while we try to work through this this evening, and

13   we will look forward to seeing you all tomorrow.

14         Ms. Manning, thank you very much for your service.  If

15   you will, just to be on the safe side, please leave your cell

16   phone number with Tammi, that would be helpful.  Okay?

17         Everybody have a nice evening and drive home safely.

18   And please remember, even though you have begun deliberating,

19   you can't talk about the case outside of your deliberations.

20   All right?  Thank you.

21              (Jurors out at 5:59 p.m.)

22              THE COURT:  Any objections from any party as to how

23   the Court handled that?

24              MS. WICK:  Not at all, Your Honor.

25              MR. BROOME:  None for Ms. Branch, Your Honor.

1              THE COURT:  You all have a good evening.  See you in

2      the morning.

3                   (Proceedings concluded at 6:00 p.m.)

## $

**$1,286** [1] - 791:13
**$1,296** [3] - 727:24, 778:17, 778:18
**$1,300** [1] - 728:4
**$100,000** [1] - 706:4
**$130,000** [1] - 705:21
**$150,000** [3] - 705:25, 728:1, 789:13
**$172,000** [1] - 739:4
**$30,000** [1] - 705:19
**$50,000** [1] - 706:3
**$500** [3] - 723:20, 723:25, 724:3
**$64,800** [4] - 727:6, 772:12, 773:20, 791:13
**$700** [3] - 723:20, 723:25, 724:3

## '

**'13** [1] - 802:16

## 1

**1** [1] - 806:25
**10** [1] - 806:24
**100** [2] - 773:24, 774:13
**10:00** [1] - 817:5
**10:28** [1] - 737:5
**10:44** [1] - 743:5
**10:55** [1] - 743:5
**10:56** [1] - 743:13
**11** [5] - 768:9, 768:11, 778:4, 784:16, 801:21
**1110** [1] - 697:8
**12** [4] - 790:14, 794:9, 794:12, 810:3
**120** [1] - 705:21
**12:18** [2] - 782:4, 782:7
**12:20** [1] - 782:17
**12:27** [1] - 782:17
**12:29** [1] - 783:4
**12:51** [1] - 795:3
**13** [3] - 696:9, 698:3, 801:21
**1343** [2] - 739:17, 751:6
**14** [3] - 760:13, 794:8, 794:10
**15** [65] - 701:4, 701:20, 701:22, 702:1, 702:5, 711:14, 713:8, 713:9, 713:15, 714:21,

714:22, 715:3, 715:5, 715:22, 716:9, 716:12, 716:13, 716:15, 719:15, 719:16, 719:19, 719:21, 720:14, 722:2, 723:14, 723:19, 724:3, 725:1, 725:2, 727:14, 727:15, 728:25, 731:5, 736:3, 756:2, 760:12, 761:15, 783:25, 787:24, 788:13, 788:16, 790:19, 790:21, 795:14, 797:7, 798:8, 799:18, 799:22, 800:10, 800:11, 801:25, 802:5, 802:17, 803:15, 804:6, 804:12, 804:16, 804:22, 804:23, 804:24, 805:4, 805:12
**15th** [2] - 701:19, 801:5
**16** [9] - 720:10, 748:12, 757:22, 766:23, 767:16, 769:1, 790:24, 791:22, 793:12
**17** [1] - 767:16
**1729** [2] - 696:24, 697:24
**17th** [1] - 788:11
**18** [3] - 748:24, 751:6, 757:22
**1801** [1] - 697:5
**18th** [1] - 788:15
**1952** [1] - 697:9
**1:08** [1] - 806:9
**1st** [8] - 715:18, 716:11, 719:18, 735:2, 788:14, 790:17, 799:15, 799:16

## 2

**2** [4] - 720:7, 720:8, 739:17, 799:3
**20** [3] - 705:18, 705:19, 725:13
**200** [1] - 713:5
**2010** [2] - 801:9, 801:12
**2011** [1] - 801:15
**2012** [1] - 801:19

**2013** [21] - 701:18, 701:19, 704:22, 705:20, 705:24, 706:17, 723:2, 726:4, 769:10, 770:15, 784:1, 784:21, 798:2, 798:13, 799:17, 799:22, 800:8, 801:5, 801:22, 806:5
**2014** [13] - 705:2, 706:1, 715:18, 716:11, 719:18, 720:10, 722:2, 722:18, 735:2, 788:11, 788:14, 788:15, 790:17
**2015** [2] - 696:9, 698:3
**23** [2] - 713:13, 720:8
**24** [7] - 717:11, 717:12, 721:4, 728:8, 731:9, 761:2, 799:3
**25** [2] - 701:17
**29** [2] - 739:7, 742:19
**2:00** [3] - 795:3, 806:10, 809:6

## 3

**300** [3] - 713:2, 713:5, 779:23
**34** [1] - 757:22
**35203** [3] - 696:25, 697:6, 697:25
**36202** [1] - 697:9
**371** [1] - 748:24
**38** [1] - 813:21
**3:09** [1] - 806:11
**3rd** [2] - 717:14, 799:15

## 4

**40** [7] - 724:5, 724:16, 756:21, 789:5, 796:2, 796:20, 797:21
**45** [1] - 789:16
**4th** [1] - 697:5

## 5

**50** [1] - 706:4
**5:36** [1] - 807:5
**5:38** [1] - 807:19
**5:30** [1] - 807:22
**5:43** [1] - 809:22
**5:56** [1] - 815:21
**5:59** [1] - 817:21

## 6

**699** [1] - 698:7
**6:00** [1] - 818:3

## 7

**724** [1] - 698:7
**734** [1] - 698:7
**755** [1] - 698:9

## 8

**8** [1] - 806:25
**806** [1] - 698:10

## 9

**9** [1] - 806:24
**95** [1] - 765:17
**9:15** [1] - 696:9
**9:30** [1] - 699:3
**9:32** [1] - 699:8

## A

**a.m** [7] - 696:9, 699:3, 699:8, 737:5, 743:5, 743:13
**abet** [1] - 763:25
**abets** [3] - 753:14, 753:17, 763:24
**abetted** [1] - 739:19
**abetting** [4] - 739:18, 740:4, 741:2, 763:22
**abettor** [1] - 764:2
**ability** [5] - 709:13, 709:15, 747:2, 805:15, 805:18
**able** [8] - 700:24, 703:21, 703:24, 704:14, 786:21, 791:21, 816:5, 817:4
**absent** [1] - 813:10
**absolute** [1] - 803:2
**absolutely** [7] - 714:16, 740:16, 740:23, 740:24, 742:15, 784:19, 785:23
**accept** [1] - 746:12
**accepted** [3] - 700:6, 700:8, 787:3
**access** [2] - 711:18, 712:23
**accessed** [3] - 712:6, 712:9, 712:25
**accessories** [3] - 726:2, 770:1, 770:19
**accident** [1] - 754:12

**accidental** [1] - 759:19
**accidentally** [7] - 759:21, 759:25, 760:2, 760:17, 789:3, 789:4, 789:7
**accomplish** [4] - 749:21, 750:7, 756:13, 756:23
**accomplishing** [1] - 750:4
**account** [1] - 741:1
**accountant** [3] - 712:22, 738:8, 791:9
**accountants** [2] - 789:13
**accounting** [57] - 699:24, 700:18, 700:20, 700:21, 700:22, 700:24, 701:1, 702:7, 709:22, 711:14, 723:13, 723:15, 723:18, 723:21, 724:3, 726:7, 728:21, 730:12, 730:18, 731:12, 732:10, 733:7, 733:12, 733:24, 740:22, 758:4, 758:6, 760:25, 761:4, 761:6, 769:15, 784:11, 784:15, 785:13, 785:14, 789:20, 795:15, 796:5, 796:8, 796:17, 797:18, 797:23, 798:5, 798:9, 798:25, 799:18, 800:11, 802:23, 803:1, 804:6, 804:18, 804:20, 804:23, 804:24, 805:8, 805:17
**accounts** [1] - 738:6
**accuracy** [1] - 714:11
**accurate** [8] - 705:1, 719:25, 729:10, 744:20, 746:13, 761:23, 761:24, 786:25
**accurately** [1] - 747:3
**accusation** [1] - 744:4
**acknowledge** [1] - 719:24
**acknowledgment** [1] - 713:23
**acquit** [1] - 767:4
**acquittal** [2] - 737:13,

795:10
**act** [23] - 748:8, 749:3, 749:14, 749:25, 750:2, 750:5, 750:11, 750:13, 751:2, 753:4, 753:11, 754:11, 754:14, 756:25, 757:14, 758:24, 759:2, 759:10, 759:24, 760:4, 780:21, 792:16
**acted** [5] - 751:18, 754:17, 754:19, 762:6, 778:7
**acting** [2] - 742:8, 753:13
**action** [1] - 751:24
**actions** [2] - 740:14, 740:25
**acts** [8] - 749:10, 750:10, 753:16, 753:19, 753:21, 759:1, 759:7, 763:23
**actual** [1] - 717:24
**add** [10] - 732:6, 761:9, 789:22, 798:12, 799:4, 800:12, 800:15, 803:12, 805:15, 805:18
**added** [1] - 730:23
**adding** [1] - 779:22
**addition** [1] - 739:17
**additional** [1] - 744:11
**address** [3] - 766:4, 783:20, 786:19
**addressing** [1] - 738:15
**adjustment** [1] - 804:1
**administrative** [1] - 758:2
**admitted** [10] - 716:1, 739:4, 760:24, 760:25, 777:16, 785:20, 787:4, 787:5
**advances** [1] - 751:2
**advantage** [2] - 782:21, 782:24
**affairs** [1] - 748:9
**affect** [1] - 748:22
**affected** [1] - 725:17
**affects** [2] - 762:1, 762:4
**affidavit** [1] - 714:5
**agent** [3] - 749:5, 753:12, 753:19
**agents** [1] - 766:10
**ago** [2] - 773:18, 785:9
**agree** [9] - 715:17,

743:22, 744:20, 748:25, 750:10, 769:9, 770:4, 780:24, 793:3
**agreed** [6] - 749:20, 756:13, 756:24, 774:18, 793:19
**agreeing** [1] - 750:12
**agreement** [6] - 749:3, 749:8, 773:16, 774:21, 790:25, 792:21
**agreements** [2] - 773:14, 787:2
**agrees** [1] - 745:24
**ahead** [3] - 719:8, 742:20, 782:25, 810:12, 815:25
**aid** [1] - 763:24
**aided** [1] - 739:18
**aider** [1] - 764:2
**aiding** [4] - 739:18, 740:4, 741:2, 763:22
**aids** [3] - 753:14, 753:17, 763:23
**air** [1] - 775:13
**AL** [4] - 696:25, 697:6, 697:9, 697:25
**ALABAMA** [1] - 696:3
**Alabama** [2] - 696:8, 738:20
**Alan** [1] - 735:14
**ALL** [1] - 699:10
**alleged** [1] - 737:22, 739:17, 750:3, 750:9, 750:16, 752:21, 752:25, 753:3, 754:8, 759:1, 760:5
**allow** [2] - 735:12, 815:25
**allowing** [1] - 810:18
**almost** [1] - 807:8
**alone** [3] - 750:6, 767:3, 768:25
**alternate** [15] - 794:13, 808:15, 808:19, 811:22, 812:6, 812:8, 812:12, 813:19, 813:21, 814:19, 815:8, 816:1, 816:11, 817:10
**alternate's** [1] - 815:13
**alternates** [1] - 810:6
**alternative** [4] - 807:13, 808:25, 816:18, 817:8
**altogether** [1] - 814:7

**AMANDA** [1] - 697:4
**America** [20] - 738:5, 740:6, 740:7, 741:8, 741:21, 756:2, 756:18, 761:13, 761:21, 761:25, 762:10, 763:13, 764:22, 765:23, 774:5, 799:17, 800:9, 804:4, 804:9
**AMERICA** [1] - 696:6
**amount** [2] - 777:8, 791:17
**anniston** [1] - 697:9
**annual** [1] - 801:4
**answer** [9] - 704:5, 718:6, 719:6, 719:8, 740:8, 741:25, 747:5, 805:6, 811:6
**answering** [1] - 741:14
**answers** [3] - 708:25, 741:3, 745:18
**anyway** [1] - 780:7
**apologize** [10] - 719:3, 720:9, 724:19, 727:20, 728:7, 781:21, 783:8, 783:15, 786:22, 812:10
**app** [2] - 710:16, 711:2
**appear** [1] - 747:4
**APPEARANCES** [1] - 697:1
**application** [4] - 710:19, 711:4, 795:24, 796:4
**applications** [3] - 710:15, 711:9, 711:15
**applies** [1] - 743:16
**apply** [1] - 743:21
**appreciate** [5] - 783:2, 783:10, 791:18, 816:25, 817:11
**appropriate** [1] - 793:15
**April** [2] - 799:17, 799:22
**argue** [1] - 796:15
**argued** [1] - 803:21
**argument** [1] - 805:20
**arguments** [10] - 745:13, 745:14, 755:6, 755:7, 782:10, 783:1, 783:7, 783:10, 783:12, 792:4
**ARGUMENTS** [2] - 698:9, 755:10

**arise** [1] - 815:23
**ashamed** [1] - 726:22
**assist** [1] - 792:11
**assistant** [2] - 697:4, 758:3
**associate** [2] - 753:19, 764:1
**associated** [1] - 753:22
**associating** [1] - 750:23
**assume** [1] - 737:15
**assurance** [1] - 810:5
**assure** [1] - 772:20
**attached** [1] - 721:6
**attachment** [1] - 722:3
**attain** [1] - 726:19
**attempt** [1] - 778:13
**attend** [1] - 815:25
**attention** [3] - 783:11, 791:18, 806:23
**attentive** [1] - 781:14
**attentively** [1] - 794:19
**attestation** [8] - 713:12, 718:24, 719:18, 719:23, 720:21, 729:8, 735:4, 790:17
**Attorney** [1] - 697:4
**attorney** [4] - 714:6, 714:13, 714:19, 735:7
**attorney's** [2] - 766:11, 810:25
**ATTORNEY'S** [1] - 697:3
**attorney-client** [1] - 735:7
**audience** [1] - 735:9
**audit** [58] - 701:16, 701:18, 701:23, 702:2, 702:4, 702:9, 702:11, 702:21, 702:22, 703:4, 703:12, 703:15, 703:18, 703:20, 734:23, 736:18, 756:4, 759:16, 761:8, 761:11, 764:12, 773:5, 773:10, 776:18, 784:10, 784:25, 785:3, 785:7, 785:18, 786:16, 787:14, 788:25, 789:12, 789:23, 798:3, 798:4, 798:23, 799:17, 799:19, 799:20,

799:21, 799:22, 800:9, 801:4, 801:10, 801:15, 801:19, 801:22, 803:8, 803:23, 803:25, 804:5, 804:11, 805:3, 805:4, 805:7, 806:6
**audited** [7] - 732:19, 742:11, 784:5, 789:21, 790:11, 805:3, 805:15
**auditor** [2] - 702:24, 790:9
**auditors** [4] - 703:2, 703:7, 703:17, 704:8
**audits** [7] - 734:24, 734:25, 773:9, 801:3, 801:4, 801:12
**August** [8] - 696:9, 698:3, 715:18, 716:11, 719:18, 735:2, 788:14, 790:17
**authorizes** [1] - 753:18
**automatically** [1] - 751:3
**available** [1] - 794:15
**Avenue** [4] - 696:24, 697:5, 697:8, 697:24
**avoid** [1] - 789:22
**aware** [3] - 715:21, 719:19, 754:20

# B

**backgrounds** [1] - 785:13
**bad** [4] - 708:20, 754:16, 783:21, 783:22
**badge** [1] - 786:17
**badly** [1] - 769:8
**balanced** [1] - 703:10
**BALAZS** [1] - 808:7
**Balazs** [1] - 809:1
**ballpark** [1] - 704:24
**bank** [16] - 709:21, 738:6, 739:3, 739:5, 777:7, 777:16, 780:10, 780:12, 780:13, 780:15, 780:16, 780:19, 780:20, 780:21, 786:6
**bar** [1] - 810:16
**base** [1] - 705:19
**baseball** [1] - 767:14
**based** [4] - 746:2,

748:4, 800:6, 802:23
**basic** [1] - 744:1
**basis** [7] - 705:7, 705:8, 712:6, 712:11, 712:13, 712:25, 713:6
**batch** [1] - 759:5
**bathroom** [1] - 782:6
**Baty** [4] - 715:13, 735:3, 735:14, 735:24
**Baty's** [1] - 720:10
**bear** [1] - 744:12
**beat** [1] - 756:4
**beating** [1] - 718:16
**become** [3] - 719:19, 751:3, 792:23
**becomes** [2] - 749:5, 794:10
**BEFORE** [1] - 696:12
**began** [1] - 806:10
**begin** [5] - 792:6, 794:6, 794:23, 795:1, 816:7
**beginning** [1] - 767:13
**begun** [1] - 817:18
**behalf** [3] - 720:2, 729:14, 781:14
**belabor** [1] - 775:4
**belief** [8] - 734:1, 755:1, 755:2, 768:21, 778:8, 780:23, 784:19, 791:8
**belief..** [1] - 768:20
**beliefs** [1] - 792:24
**believer** [2] - 766:7, 766:18
**believes** [1] - 742:21
**bench** [3] - 718:10, 718:11, 719:10
**best** [5] - 779:20, 808:21, 811:22, 813:19
**better** [1] - 798:20
**between** [7] - 726:8, 728:3, 731:7, 762:17, 766:8, 782:13, 783:16
**beyond** [20] - 744:11, 744:15, 747:24, 748:6, 748:10, 749:19, 750:11, 751:11, 753:25, 754:6, 754:25, 764:4, 765:11, 766:14, 767:8, 767:19, 768:18, 781:6, 781:11, 784:20

**big** [3] - 724:7, 726:17, 784:4
**bill** [5] - 710:16, 710:19, 711:3, 711:8, 779:25
**billing** [1] - 711:22
**bills** [6] - 710:14, 711:14, 777:6, 786:6, 795:23, 796:3
**Birmingham** [102] - 696:8, 696:25, 697:6, 697:25, 700:11, 700:16, 700:20, 701:6, 701:10, 701:11, 703:22, 703:25, 704:1, 704:8, 704:9, 709:7, 709:10, 709:12, 709:15, 711:3, 711:9, 711:15, 713:16, 713:18, 716:10, 716:15, 717:2, 717:4, 717:15, 717:16, 717:25, 719:14, 719:17, 719:22, 720:22, 724:1, 724:9, 725:1, 726:13, 726:16, 728:13, 728:15, 728:16, 728:18, 728:22, 729:2, 730:7, 731:5, 731:13, 732:24, 733:4, 735:4, 736:4, 736:12, 736:13, 738:11, 738:19, 739:14, 756:3, 757:6, 759:11, 761:4, 761:15, 763:10, 769:20, 770:3, 771:4, 774:17, 775:14, 775:18, 775:24, 776:5, 777:3, 779:13, 779:19, 784:3, 784:9, 784:11, 785:22, 787:10, 788:9, 790:21, 795:17, 797:12, 798:8, 798:9, 800:16, 802:25, 803:3, 803:7, 803:10, 803:12, 803:25, 804:8, 804:11, 805:15
**Birmingham's** [1] - 780:18
**bit** [3] - 778:16, 812:3,

817:6
**bites** [1] - 767:3
**black** [1] - 768:3
**blah** [1] - 762:16
**blank** [3] - 793:13, 793:14, 793:16
**blocks** [1] - 780:11
**board** [2] - 727:9, 786:22
**board)** [1] - 779:17
**boge** [1] - 756:18
**boged** [1] - 763:5
**bogus** [2] - 777:8, 777:9
**bold** [1] - 724:8
**bonus** [1] - 789:23
**book** [8] - 700:15, 700:25, 731:12, 733:11, 733:15, 789:19, 797:24, 803:4
**booked** [14] - 700:22, 700:23, 701:2, 701:9, 701:10, 724:8, 727:14, 732:4, 733:13, 733:16, 761:3, 761:5, 796:5, 798:3
**booking** [5] - 699:25, 700:4, 723:15, 755:21, 784:15
**bookkeeping** [2] - 703:4, 703:9
**books** [4] - 703:10, 703:11, 732:13, 809:17
**boring** [1] - 762:16
**born** [1] - 786:17
**bottom** [2] - 788:6
**bought** [1] - 726:16
**BOX** [1] - 697:9
**Boyles** [4] - 776:6, 776:20, 776:24, 779:14
**BRANCH** [2] - 696:8, 698:7
**Branch** [82] - 699:13, 699:19, 709:5, 713:24, 716:7, 717:14, 719:13, 736:24, 737:21, 739:12, 739:23, 739:25, 740:1, 740:18, 741:4, 741:6, 741:13, 741:19, 742:4, 743:1, 744:3, 744:4, 744:8, 744:15, 746:6, 746:9, 747:25, 748:10,

748:12, 748:15, 748:16, 748:17, 749:17, 749:22, 750:17, 750:20, 750:21, 750:22, 751:9, 751:13, 751:18, 751:20, 753:1, 757:3, 757:18, 757:21, 759:2, 759:25, 760:23, 770:8, 772:16, 773:22, 776:10, 776:16, 776:18, 776:25, 777:24, 778:6, 783:22, 786:12, 787:17, 788:12, 790:9, 790:12, 791:2, 795:7, 795:13, 796:5, 796:10, 796:20, 797:6, 800:6, 800:25, 801:6, 801:22, 802:4, 802:15, 803:21, 804:1, 804:17, 807:17, 817:25
**Branch's** [4] - 720:15, 742:18, 782:22, 808:22
**Brazelton** [1] - 794:14
**break** [18] - 716:3, 737:4, 743:3, 781:23, 781:25, 782:3, 782:5, 782:7, 782:8, 782:13, 782:14, 782:18, 782:23, 792:8, 794:6, 794:15, 810:25, 812:1
**breaking** [2] - 716:5, 719:1
**bridge** [1] - 817:9
**brief** [5] - 782:6, 783:17, 791:23, 794:7, 811:15
**briefly** [5] - 701:16, 713:12, 731:7, 734:14, 805:25
**bright** [1] - 711:10
**brilliant** [1] - 765:10
**bring** [16] - 717:22, 718:2, 736:16, 742:12, 743:3, 766:13, 784:8, 790:10, 793:25, 802:18, 806:12, 810:6, 812:1, 812:11, 815:9
**bringing** [4] - 699:5,

785:25, 806:23, 811:22
**Broome** [16] - 724:6, 736:3, 765:3, 782:21, 783:19, 784:17, 784:19, 786:3, 786:23, 787:25, 790:1, 791:2, 800:22, 810:12, 811:7, 815:5
**BROOME** [56] - 697:8, 704:4, 707:3, 707:11, 708:23, 709:1, 715:25, 716:17, 716:20, 718:5, 718:9, 719:5, 724:19, 724:23, 724:25, 729:22, 729:24, 729:25, 734:11, 735:6, 736:23, 737:6, 737:10, 737:12, 737:17, 739:8, 739:10, 743:1, 743:11, 762:20, 762:24, 765:4, 768:7, 795:7, 799:15, 805:25, 806:2, 807:2, 807:17, 808:22, 810:13, 810:17, 810:20, 810:21, 812:13, 813:1, 813:6, 813:9, 813:15, 813:20, 814:8, 814:12, 815:7, 815:12, 817:2, 817:25
**Broome's** [1] - 786:19
**brought** [6] - 736:5, 736:6, 736:7, 736:11, 790:2, 813:22
**building** [1] - 780:18
**bunch** [1] - 755:15
**burden** [8] - 744:7, 748:1, 748:2, 767:18, 767:22, 781:5, 781:10, 784:20
**business** [10] - 712:5, 720:1, 725:18, 729:11, 737:9, 753:6, 757:21, 757:24, 757:25, 794:7
**businesses** [1] - 712:24
**but..** [1] - 811:2
**butcher** [1] - 715:1

**button** [3] - 740:19, 763:9, 763:19
**buy** [3] - 704:3, 726:13, 726:17
**BY** [11] - 696:12, 699:18, 704:7, 707:17, 709:4, 716:6, 719:11, 724:25, 729:25, 734:16, 735:19
**Byrnes** [13] - 771:23, 772:3, 772:14, 772:15, 772:17, 772:24, 788:16, 788:20, 788:21, 788:22, 789:2, 789:5, 789:8

## C

**cabinet** [2] - 712:2, 713:3
**cake** [2] - 791:3
**calculate** [3] - 704:19, 705:4, 705:7
**calculations** [1] - 773:21
**Calhoun** [1] - 810:14
**camera** [1] - 758:17
**cannot** [9] - 701:2, 755:1, 755:4, 764:2, 768:20, 768:23, 778:8, 806:16
**cap** [4] - 709:16, 798:14, 803:2, 803:8
**capacity** [3] - 742:4, 752:11, 778:1
**capped** [13] - 700:9, 701:6, 709:9, 709:11, 795:19, 796:13, 799:6, 799:24, 800:7, 802:21, 804:18, 805:11, 805:12
**capping** [1] - 724:1
**caps** [2] - 711:22, 724:12
**car** [30] - 701:14, 703:22, 703:25, 704:1, 704:3, 704:9, 707:6, 710:4, 714:22, 730:15, 755:22, 757:21, 757:22, 757:24, 758:4, 758:5, 758:7, 758:11, 758:18, 760:13, 761:25, 763:7, 764:16, 764:18, 780:16, 780:17, 780:20,

787:21, 789:14
**card** [1] - 787:12
**care** [1] - 816:13
**carefully** [1] - 748:5
**carelessness** [2] - 755:3, 768:23
**carried** [2] - 749:2, 749:11
**carry** [8] - 751:8, 751:22, 762:14, 771:6, 771:15, 775:7, 793:20, 797:11
**carrying** [6] - 745:3, 749:16, 750:3, 752:25, 760:5, 760:8
**cars** [20] - 710:10, 710:12, 756:2, 757:5, 757:7, 761:15, 762:4, 770:19, 775:21, 775:23, 776:7, 776:8, 776:25, 779:12, 779:13, 779:15, 779:19, 797:25, 804:7, 804:12
**Case** [1] - 696:7
**case** [49] - 708:22, 738:23, 742:11, 743:16, 743:21, 744:1, 744:8, 744:16, 745:15, 746:25, 748:6, 755:14, 756:1, 759:2, 759:22, 761:11, 762:7, 763:21, 764:7, 765:11, 765:14, 765:19, 765:24, 768:15, 772:18, 774:25, 780:5, 781:1, 784:5, 784:10, 784:14, 787:23, 789:22, 790:5, 792:18, 792:20, 792:21, 792:25, 793:7, 794:10, 794:16, 794:20, 794:24, 810:23, 811:2, 814:13, 814:14, 817:19
**cast** [2] - 778:22, 778:25
**caught** [3] - 755:18, 764:19, 787:15
**caused** [8] - 740:17, 740:21, 741:7, 742:15, 751:20,

762:13, 763:18, 763:20
**causes** [1] - 739:21
**causing** [1] - 739:19
**caution** [1] - 794:2
**CCR** [2] - 696:23, 697:23
**cell** [7] - 794:16, 812:5, 815:19, 816:12, 816:22, 816:23, 817:15
**Center** [1] - 711:3
**certain** [6] - 704:13, 713:3, 745:11, 750:23, 754:4
**certainly** [1] - 742:9
**certification** [3] - 713:22, 720:13, 720:16
**certify** [1] - 719:24
**chain** [1] - 745:5
**challenge** [1] - 812:4
**chance** [5] - 766:4, 781:25, 794:17, 813:18, 815:17
**Chanetta** [4] - 696:23, 697:23, 716:23, 735:10
**change** [3] - 761:19, 792:22, 805:14
**character** [1] - 776:12
**characterization** [1] - 709:2
**characters** [2] - 778:22, 778:25
**charge** [9] - 748:17, 749:18, 754:22, 756:5, 768:14, 778:6, 780:22, 787:15, 791:24
**charged** [17] - 746:9, 751:10, 753:11, 756:7, 768:1, 768:12, 779:1, 779:9, 779:10, 779:14, 779:16, 779:19, 780:1, 783:22, 783:24, 790:24
**charges** [9] - 748:15, 748:19, 749:11, 754:3, 765:12, 767:7, 767:17, 781:16
**chart** [1] - 786:19
**cheat** [5] - 751:24, 752:18, 762:8, 762:10, 787:19
**check** [10] - 702:16, 703:3, 703:9,

703:16, 714:24, 758:18, 758:19, 784:7, 793:15, 807:20
**checks** [3] - 726:7, 770:20, 775:17
**children** [1] - 769:6
**choose** [2] - 745:8, 792:15
**Chris** [1] - 794:13
**circumstance** [1] - 809:11
**circumstances** [1] - 745:6
**circumstantial** [1] - 745:5
**citizens** [1] - 767:23
**city** [1] - 709:15
**claim** [1] - 796:21
**clandestine** [1] - 785:6
**clarify** [2] - 730:9, 732:24
**clarifying** [1] - 700:1
**clean** [2] - 744:6, 769:14
**clear** [11] - 707:14, 712:18, 716:14, 718:8, 718:9, 723:10, 735:23, 785:19, 785:20, 788:22, 791:1
**clearly** [2] - 722:8, 747:5
**clerk** [10] - 710:17, 710:21, 710:25, 711:22, 714:10, 795:13, 802:10, 812:4, 815:18, 816:12
**clerks** [3] - 728:22, 795:15, 795:18
**client** [4] - 735:7, 810:24, 811:1, 815:6
**close** [7] - 754:7, 755:23, 755:24, 805:5, 810:9, 811:5, 811:19
**CLOSING** [2] - 698:9, 755:10
**Closing** [1] - 743:14
**closing** [9] - 701:19, 745:14, 755:6, 755:7, 773:7, 783:1, 783:7, 792:4, 801:5
**co** [5] - 750:24, 755:13, 780:19, 785:10, 811:20
**co-conspirator** [1] - 780:19

**co-counsel** [3] - 755:13, 785:10, 811:20
**co-workers** [1] - 750:24
**cocker** [1] - 765:7
**code** [1] - 781:22
**Code** [2] - 748:24, 751:6
**coe** [2] - 811:8, 811:16
**coincidentally** [1] - 788:17
**color** [1] - 711:10
**coming** [7] - 715:12, 739:13, 768:7, 780:5, 782:24, 807:14
**comment** [1] - 762:21
**comments** [2] - 719:7, 737:7
**commerce** [7] - 737:22, 738:3, 751:21, 762:14, 762:16, 762:19, 763:4
**commission** [2] - 749:14, 763:24
**commit** [6] - 748:16, 749:3, 749:12, 753:15, 756:25, 777:25
**commits** [1] - 750:7
**committed** [7] - 748:18, 750:2, 754:4, 754:7, 754:15, 757:14, 760:4
**common** [9] - 746:4, 748:5, 750:25, 758:20, 785:11, 785:16, 787:1, 790:22, 791:22
**communicate** [1] - 793:23
**communicated** [2] - 800:18, 800:24
**communicating** [1] - 773:22
**communication** [3] - 737:21, 751:21, 762:14
**communications** [4] - 751:8, 753:4, 753:6, 753:7
**community** [1] - 778:18
**commute** [2] - 807:8, 807:25
**compared** [1] - 732:14
**complete** [7] - 754:22,

768:13, 768:14, 769:2, 778:5, 782:25, 792:5
**completed** [1] - 795:14
**completely** [6] - 713:21, 730:12, 730:18, 764:22, 765:21, 797:17
**computer** [6] - 721:15, 721:20, 722:14, 722:18, 722:22, 737:25
**conceals** [1] - 752:7
**concede** [2] - 777:25, 778:14
**concern** [1] - 814:23
**concerned** [3] - 745:7, 786:10, 807:12
**concerning** [2] - 746:16, 748:3
**concluded** [1] - 818:3
**conclusion** [3] - 719:10, 764:14, 793:16
**conclusions** [1] - 746:4
**conduct** [1] - 754:20
**conference** [1] - 719:10
**conferring** [1] - 808:12
**conflict** [1] - 808:18
**confuse** [1] - 736:9
**confused** [1] - 779:3
**confusing** [2] - 716:8, 727:18
**confusion** [3] - 708:6, 708:12, 718:4
**conglomerate** [1] - 758:7
**connect** [1] - 815:20
**consider** [4] - 746:11, 747:9, 748:19, 769:22
**consideration** [2] - 780:6, 815:12
**considered** [2] - 745:12, 748:6
**considering** [2] - 746:3, 792:19
**conspiracy** [26] - 740:4, 740:14, 748:23, 749:2, 749:5, 749:8, 749:13, 749:17, 749:24, 750:4, 750:8, 750:20, 751:1, 751:2, 751:3, 754:9, 754:13,

756:12, 758:23, 759:8, 760:11, 774:23, 779:2, 779:3, 783:25, 790:25
**conspirator** [4] - 750:7, 750:14, 751:4, 780:19
**conspirators** [5] - 749:15, 749:24, 750:16, 758:24, 774:21
**conspire** [1] - 748:25
**conspired** [1] - 748:16
**constantly** [2] - 711:19, 712:10
**constitution** [2] - 767:5, 767:6
**consumer** [2] - 777:16, 779:4
**CONT'D** [1] - 699:17
**contact** [4] - 772:16, 776:9, 777:1, 777:2
**contacted** [1] - 790:5
**contacts** [1] - 774:1
**contains** [1] - 748:12
**content** [2] - 714:11, 714:17
**contest** [4] - 726:19, 726:20, 772:1, 775:14
**contests** [1] - 726:11
**context** [3] - 769:23, 780:24, 783:8
**continue** [3] - 808:3, 808:4, 810:2
**continued** [2] - 807:4, 814:14
**contract** [2] - 709:21, 774:22
**contracts** [1] - 779:25
**contribute** [1] - 714:13
**controller** [5] - 704:19, 708:16, 758:4, 787:21, 796:15
**convenience** [1] - 793:8
**conversation** [4] - 717:3, 735:18, 735:20, 776:15
**conversations** [6] - 722:16, 722:21, 723:1, 723:4, 776:17, 816:9
**convey** [1] - 778:1
**convict** [1] - 766:14
**convicted** [2] - 747:9, 777:16

**convince** [3] - 765:10, 766:14, 769:1
**convinced** [4] - 748:9, 748:11, 767:7, 792:23
**convincing** [1] - 748:7
**cooperation** [1] - 787:2
**copied** [2] - 715:16, 721:17
**copies** [6] - 719:25, 721:11, 729:10, 743:6, 743:17, 792:1
**copy** [4] - 748:13, 806:15, 806:17, 806:19
**corner** [1] - 812:16
**correct** [13] - 700:3, 700:10, 700:17, 700:21, 713:25, 720:5, 722:25, 727:13, 727:20, 729:13, 730:6, 741:8, 812:25
**correctly** [5] - 705:17, 712:14, 738:17, 796:17, 811:10
**corresponded** [1] - 729:18
**coster** [3] - 709:6, 709:20, 710:22
**counsel** [11] - 718:8, 736:25, 737:2, 743:6, 755:11, 755:13, 785:10, 809:21, 811:20, 815:16, 817:9
**count** [9] - 748:13, 748:15, 748:18, 748:23, 751:6, 783:25, 790:25, 793:2, 793:15
**Count** [4] - 748:15, 748:23, 749:18, 760:11
**country** [1] - 766:8
**counts** [14] - 737:15, 737:19, 748:12, 748:17, 756:6, 760:12, 760:13, 765:2, 766:23, 769:1, 783:25, 790:24, 791:22, 793:12
**Counts** [2] - 751:5, 751:10
**County** [1] - 810:14
**couple** [4] - 762:15, 780:8, 780:11, 785:9
**course** [7] - 715:7,

750:23, 751:24, 753:6, 762:4, 785:4, 810:5
**court** [6] - 708:2, 770:14, 792:17, 813:10, 815:18, 816:12
**COURT** [148] - 696:2, 699:5, 699:9, 699:11, 704:6, 707:13, 709:3, 716:5, 716:19, 716:22, 718:10, 718:13, 718:18, 719:4, 719:7, 724:22, 734:13, 735:8, 735:12, 736:22, 736:24, 737:8, 737:11, 737:14, 737:18, 738:1, 738:12, 738:16, 738:21, 738:24, 739:9, 739:22, 740:11, 741:4, 741:14, 741:23, 742:3, 742:17, 743:2, 743:6, 743:10, 743:12, 743:15, 762:23, 765:3, 768:3, 768:5, 781:20, 781:24, 782:3, 782:8, 782:15, 782:18, 783:5, 791:23, 792:3, 795:4, 795:8, 795:12, 795:25, 796:9, 796:18, 796:22, 797:3, 797:5, 797:9, 797:11, 797:19, 798:1, 798:7, 798:13, 798:16, 798:18, 798:22, 798:25, 799:10, 799:13, 799:16, 799:20, 799:25, 800:2, 800:5, 800:8, 800:14, 800:18, 800:22, 801:6, 801:9, 801:12, 801:15, 801:19, 801:22, 801:25, 802:3, 802:8, 802:14, 802:19, 802:22, 803:14, 803:20, 804:14, 805:6, 805:20, 805:23, 806:1, 806:4, 806:12, 806:22, 807:3,

807:6, 807:18, 807:20, 808:8, 808:11, 808:16, 808:25, 809:4, 809:8, 809:19, 809:23, 810:16, 810:19, 811:3, 811:8, 811:14, 811:16, 812:3, 812:17, 812:21, 812:24, 813:2, 813:5, 813:7, 813:13, 813:24, 814:5, 814:11, 814:13, 814:21, 815:5, 815:9, 815:16, 815:22, 816:17, 816:21, 817:3, 817:22, 818:1
**Court** [28] - 696:23, 697:23, 712:21, 724:19, 742:21, 743:6, 743:15, 755:8, 755:11, 756:6, 757:11, 759:18, 761:18, 765:5, 785:9, 791:23, 794:8, 794:9, 794:11, 801:13, 807:20, 808:20, 809:23, 811:25, 813:9, 814:19, 816:7, 817:23
**Court's** [7] - 742:18, 742:25, 743:7, 743:24, 755:5, 782:20, 806:23
**courthouse** [6] - 745:3, 758:15, 758:17, 758:20, 807:9, 807:25
**Courthouse** [2] - 696:24, 697:24
**COURTROOM** [2] - 811:18, 815:11
**courtroom** [6] - 744:17, 781:17, 785:11, 793:22, 794:2, 794:4
**Courtroom** [1] - 792:1
**cover** [9] - 755:16, 757:9, 761:10, 764:20, 764:23, 764:24, 773:11, 788:9, 789:11
**covered** [4] - 700:2, 718:16, 761:6, 761:9
**cR-15-MHH-0154-S** [1] - 696:7

**craziest** [1] - 785:4
**create** [14] - 717:4,
734:20, 736:11,
759:13, 759:14,
760:2, 785:6,
785:17, 785:22,
786:9, 786:11,
786:16, 796:12,
810:4
**created** [14] - 702:9,
715:23, 716:15,
717:1, 717:2,
717:15, 717:16,
731:21, 736:14,
759:16, 760:9,
779:24, 790:21,
797:22
**creating** [2] - 757:8,
761:10
**credibility** [1] - 777:21
**credits** [1] - 703:10
**Creecy** [6] - 701:23,
702:5, 702:14,
772:24, 773:3,
788:24
**crime** [20] - 739:19,
747:10, 748:19,
748:20, 748:21,
748:22, 748:24,
749:1, 749:12,
751:7, 753:8, 753:9,
753:15, 753:23,
753:24, 754:3,
754:5, 754:7,
763:24, 764:1
**crimes** [3] - 746:24,
751:9, 777:25
**criminal** [4] - 744:1,
749:4, 765:21, 794:8
**criminally** [3] -
753:15, 753:20,
763:22
**critical** [2] - 760:7,
760:8
**CROSS** [1] - 699:17
**Cross** [1] - 698:4
**cross** [2] - 699:12,
782:22
**crossed** [2] - 770:24,
770:25
**Cullman** [115] - 700:3,
700:8, 700:9, 701:5,
701:7, 703:22,
704:2, 709:7, 709:9,
709:11, 709:16,
711:4, 711:15,
715:7, 715:9,
716:13, 717:23,
717:24, 719:17,
719:21, 720:4,

720:6, 720:19,
720:21, 720:23,
721:1, 723:21,
724:1, 726:12,
726:13, 726:14,
726:16, 726:19,
726:20, 727:14,
727:15, 728:15,
728:19, 729:5,
729:14, 730:5,
731:1, 731:4,
735:25, 736:1,
736:6, 736:8,
736:11, 742:12,
757:5, 759:3,
759:25, 769:20,
770:2, 770:3,
770:21, 771:3,
771:5, 772:3,
774:17, 775:4,
775:7, 775:14,
775:15, 775:17,
775:18, 775:24,
776:5, 776:7, 776:8,
776:25, 777:3,
779:12, 779:13,
784:3, 784:8,
785:25, 787:25,
788:3, 788:8,
790:18, 790:19,
795:19, 796:3,
796:12, 796:13,
797:14, 797:15,
797:24, 798:15,
798:16, 799:6,
799:24, 800:7,
802:6, 802:10,
802:11, 802:21,
803:3, 803:8,
803:10, 803:14,
803:15, 803:22,
803:23, 804:5,
804:18, 805:1,
805:2, 805:3, 805:7,
805:9, 805:12
**Cullman's** [1] - 709:16
**current** [1] - 769:8
**custodian** [1] - 714:9
**customarily** [1] -
733:12
**customer** [2] - 704:2,
730:16
**customers** [1] - 713:3


**D**

**dabbing** [1] - 764:18
**daily** [6] - 712:5,
712:10, 712:11,
712:13, 712:24,

713:6
**data** [4] - 702:7,
719:25, 761:7,
805:17
**date** [7] - 754:4, 754:6,
754:7, 754:8,
793:17, 793:20,
799:10
**dates** [5] - 721:21,
721:22, 722:10,
722:23
**dawned** [1] - 765:13
**days** [2] - 789:16,
791:19
**dead** [1] - 718:16
**deal** [110] - 700:15,
700:22, 700:23,
700:25, 701:1,
702:7, 702:8,
702:12, 702:13,
702:17, 702:20,
702:24, 703:16,
703:19, 703:22,
703:25, 704:8,
704:13, 706:15,
709:22, 709:24,
710:16, 711:4,
711:9, 711:15,
711:21, 711:22,
712:6, 712:12,
712:13, 712:24,
713:5, 713:18,
715:22, 716:10,
716:15, 717:15,
717:16, 717:18,
719:14, 720:4,
720:6, 720:22,
723:12, 725:1,
728:22, 729:2,
729:5, 729:17,
731:1, 731:4, 731:5,
733:1, 733:5,
733:11, 733:14,
735:25, 736:4,
736:6, 736:8,
736:12, 736:13,
741:10, 741:11,
741:12, 756:18,
759:3, 759:10,
759:11, 760:6,
760:7, 760:8,
760:24, 761:10,
763:5, 771:3, 771:5,
771:9, 773:5,
773:12, 775:4,
777:11, 777:14,
777:15, 777:22,
777:23, 784:9,
784:11, 785:2,
785:6, 785:18,

785:22, 785:25,
786:2, 786:9,
786:11, 786:16,
787:24, 787:25,
789:23, 790:2,
790:10, 790:21,
795:13, 804:24,
815:3
**dealer** [5] - 707:6,
712:18, 730:3,
771:23, 773:13
**dealership** [29] -
704:19, 704:21,
706:3, 707:23,
707:25, 708:3,
708:10, 708:15,
708:21, 713:15,
713:17, 721:5,
721:19, 722:1,
722:16, 730:3,
756:2, 758:5, 758:6,
758:10, 761:8,
761:24, 762:3,
769:14, 770:23,
786:1, 787:21,
789:14
**Dealertrack** [4] -
709:16, 730:4,
800:4, 800:7
**dealing** [1] - 710:14
**deals** [145] - 701:4,
701:6, 701:20,
701:22, 702:1,
702:5, 702:11,
703:20, 709:9,
709:17, 710:19,
711:14, 711:18,
712:9, 712:11,
712:12, 712:23,
713:2, 713:4, 713:5,
713:7, 713:8,
713:15, 714:21,
715:3, 715:5, 715:7,
715:10, 715:11,
715:22, 716:10,
716:12, 716:13,
716:16, 717:17,
717:23, 717:24,
717:25, 718:2,
719:15, 719:16,
719:19, 719:21,
720:14, 720:25,
721:1, 721:6,
721:13, 721:20,
722:2, 722:17,
722:22, 722:24,
723:3, 723:14,
724:3, 724:8, 725:2,
727:14, 727:15,
728:25, 731:5,

731:12, 732:25,
733:7, 733:13,
733:15, 733:20,
735:3, 735:15,
735:16, 735:17,
735:25, 736:1,
736:19, 740:24,
742:10, 742:12,
742:14, 755:21,
759:3, 759:4, 759:8,
759:25, 760:2,
760:13, 761:1,
761:11, 769:20,
771:2, 771:15,
772:4, 772:5,
774:16, 775:7,
775:24, 776:5,
776:19, 777:3,
777:8, 784:5, 784:8,
785:1, 788:3,
788:13, 788:16,
788:23, 789:3,
789:7, 789:25,
790:6, 790:7,
790:18, 790:19,
795:14, 795:16,
797:7, 797:12,
798:14, 799:18,
799:22, 799:23,
800:10, 800:11,
802:5, 802:9,
802:10, 802:17,
802:21, 802:25,
803:2, 803:8,
803:15, 803:19,
803:22, 804:2,
804:3, 804:6,
804:22, 804:25,
805:12
**dealt** [1] - 771:25
**debits** [1] - 703:9
**deceive** [4] - 751:24,
752:18, 762:8, 762:9
**deceiving** [1] - 787:14
**deception** [1] - 747:17
**decide** [10] - 744:14,
744:16, 746:8,
746:13, 746:18,
747:8, 747:16,
752:10, 759:24,
792:18
**decided** [2] - 723:3,
815:25
**decision** [11] - 746:2,
747:18, 752:12,
752:13, 752:14,
761:20, 782:20,
793:15, 811:19,
813:25, 814:23
**decision-maker** [1] -

752:13
**decisions** [1] - 783:21
**declare** [1] - 713:24
**deductions** [1] - 746:4
**defendant** [46] -
743:10, 744:2,
744:6, 745:21,
745:23, 745:25,
746:6, 747:21,
747:22, 748:21,
753:9, 753:10,
753:13, 753:14,
753:15, 753:16,
753:17, 753:18,
753:20, 753:22,
753:23, 753:25,
754:23, 756:8,
757:1, 757:17,
758:21, 760:15,
760:16, 760:20,
762:6, 762:11,
762:13, 763:18,
763:19, 763:22,
763:23, 763:25,
764:5, 764:8,
764:19, 768:16,
787:17, 790:9,
790:12, 790:24
**DEFENDANT** [1] -
697:8
**Defendant** [1] - 696:9
**defendant's** [3] -
744:10, 748:3, 795:9
**defending** [4] -
765:14, 765:15,
765:16
**defense** [6] - 718:7,
754:22, 768:14,
769:2, 778:5
**DEFENSE** [1] - 698:5
**define** [1] - 754:2
**defraud** [30] - 732:1,
732:15, 740:15,
742:7, 742:8, 751:8,
751:14, 751:19,
751:22, 751:23,
752:5, 752:8,
752:17, 753:8,
754:23, 754:24,
760:18, 762:6,
762:7, 762:11,
765:22, 766:17,
768:15, 768:16,
768:18, 770:25,
771:19, 774:5,
796:15
**defrauding** [1] - 753:3
**deliberate** [4] - 794:9,
794:12, 808:2, 810:2
**deliberating** [3] -

794:6, 809:10,
817:18
**deliberation** [2] -
766:6, 807:4
**deliberations** [17] -
748:14, 764:25,
767:10, 792:7,
792:17, 793:3,
794:17, 794:20,
794:23, 795:1,
806:10, 810:3,
810:5, 813:22,
814:3, 816:8, 817:19
**Deliberations** [1] -
792:2
**deliver** [1] - 793:22
**demeanor** [1] - 775:5
**department** [1] -
797:23
**deposit** [3] - 739:2,
739:3, 739:10
**deposits** [2] - 738:5,
738:13
**DEPUTY** [2] - 811:18,
815:11
**deputy** [1] - 792:1
**describe** [1] - 769:9
**described** [2] -
749:25, 758:25
**describes** [1] - 750:9
**deserves** [1] - 745:10
**desk** [12] - 721:3,
721:6, 721:7,
721:11, 721:13,
721:24, 722:11,
722:13, 722:17,
722:23, 784:5,
789:20
**desktop** [4] - 721:14,
722:6, 722:9, 722:13
**detail** [1] - 747:20
**details** [4] - 730:21,
749:10, 750:15,
752:20
**determine** [1] - 746:8
**devise** [1] - 760:20
**devised** [5] - 751:13,
756:20, 756:24,
760:17, 760:22
**devising** [1] - 789:4
**differ** [1] - 747:6
**difference** [4] -
711:11, 745:7,
759:22, 762:24
**different** [12] - 707:4,
707:11, 725:9,
725:14, 725:17,
730:12, 765:20,
765:24, 780:24,
786:13, 786:14,

815:24
**differently** [1] - 792:24
**difficult** [1] - 770:11
**difficulties** [1] -
793:10
**direct** [10] - 738:5,
738:13, 739:2,
739:3, 739:10,
739:13, 745:8,
772:16, 774:1,
792:16
**Direct** [1] - 698:4
**directed** [3] - 741:5,
741:19, 741:20
**directing** [2] - 741:7,
753:12
**direction** [1] - 753:13
**directly** [5] - 708:24,
738:9, 740:18,
744:23, 747:5
**directs** [1] - 753:18
**disagree** [1] - 742:9
**disbelieve** [1] - 745:8
**discuss** [5] - 745:15,
792:20, 792:21,
794:24, 817:8
**discussed** [3] -
792:10, 815:23,
815:24
**discussing** [2] -
734:22, 750:25
**discussions** [5] -
728:3, 732:21,
776:17, 792:7, 814:1
**dishonesty** [1] -
747:10
**disobey** [1] - 754:17
**dispute** [3] - 785:23,
805:10, 805:14
**disregard** [2] - 743:24,
754:17
**distinction** [1] - 806:7
**district** [1] - 810:25
**DISTRICT** [3] - 696:2,
696:3, 696:13
**divide** [1] - 809:11
**DIVISION** [1] - 696:4
**DMS** [9] - 701:15,
709:11, 730:1,
730:2, 795:19,
797:7, 799:23,
799:24, 802:5
**DMS's** [1] - 730:13
**document** [3] -
713:20, 781:9
**Document** [2] -
806:18, 806:24
**documents** [26] -
710:20, 711:12,
715:13, 719:24,

721:2, 721:4, 721:9,
734:20, 744:22,
772:19, 777:18,
779:21, 779:23,
785:17, 786:1,
786:5, 786:7, 786:8,
786:15, 787:23,
789:11, 791:5,
791:7, 798:25,
803:5, 805:8
**dogs** [5] - 765:7,
765:9, 772:14,
788:21, 788:23
**dollar** [6] - 727:22,
758:6, 778:15,
778:19, 787:21,
789:14
**dollars** [4] - 727:23,
762:3, 778:16,
778:20
**DOM** [1] - 771:23
**dome** [2] - 791:3
**done** [39] - 711:21,
726:2, 726:6,
726:10, 727:9,
731:10, 731:14,
731:24, 734:8,
734:9, 734:10,
734:18, 739:13,
740:22, 741:1,
753:12, 754:11,
760:9, 760:10,
764:11, 766:22,
769:16, 769:25,
770:1, 770:4, 770:5,
770:6, 770:18,
782:15, 788:10,
796:16, 803:2,
803:6, 805:13,
806:6, 815:2
**door** [1] - 758:20
**double** [1] - 702:17
**doubling** [1] - 718:25
**doubt** [25] - 744:11,
744:16, 747:24,
748:3, 748:4, 748:7,
748:10, 749:19,
750:12, 751:12,
753:25, 754:7,
754:25, 764:5,
765:12, 766:15,
767:8, 767:12,
767:19, 768:18,
781:6, 781:11,
784:21
**down** [15] - 713:23,
716:3, 716:5, 719:1,
719:2, 737:24,
739:5, 771:4, 774:4,
780:12, 780:23,

784:8, 793:24,
806:6, 813:7
**downstairs** [1] -
758:19
**draft** [2] - 699:5,
742:22
**drafting** [1] - 714:17
**drive** [3] - 721:17,
780:23, 817:17
**driving** [1] - 807:12
**drop** [1] - 759:21
**drove** [1] - 780:20
**dumb** [1] - 719:2
**duplicate** [3] - 702:16,
717:23, 742:13
**during** [18] - 712:19,
721:3, 721:13,
723:18, 744:19,
748:14, 749:24,
758:23, 767:9,
767:10, 776:8,
776:16, 777:1,
784:10, 785:4,
792:9, 794:16,
810:25
**duty** [1] - 743:20
**dwell** [1] - 756:9

## E

**e-mail** [14] - 716:14,
717:1, 717:13,
718:1, 720:8,
720:10, 731:7,
731:8, 731:11,
761:1, 798:2,
798:12, 799:11,
800:23
**e-mailed** [4] - 699:6,
714:18, 717:14,
761:3
**e-mailing** [2] - 788:15,
789:19
**e-mails** [4] - 721:6,
774:2, 789:8, 789:20
**earn** [2] - 727:1,
756:19
**earned** [1] - 726:24
**easily** [1] - 804:19
**editorial** [1] - 719:7
**effectively** [1] - 752:7
**effort** [1] - 749:11
**eight** [3] - 765:8,
779:5, 814:3
**either** [13] - 722:17,
735:15, 739:11,
743:1, 745:9, 746:5,
759:22, 791:15,
794:1, 795:5, 803:9,
805:11, 812:1

**electronically** [1] - 739:1
**Element** [1] - 756:12
**element** [9] - 740:9, 740:11, 740:13, 758:23, 759:17, 760:3, 760:4, 763:17, 767:8
**elementary** [1] - 727:4
**elements** [3] - 756:7, 756:11, 760:16
**Elmo** [1] - 793:9
**employee** [1] - 753:19
**employers** [1] - 750:24
**end** [10] - 727:6, 727:10, 744:8, 756:4, 758:12, 764:25, 777:5, 784:4, 789:17, 810:7
**ended** [2] - 739:19, 763:12
**engaged** [2] - 749:25, 758:24
**enjoy** [1] - 794:25
**enter** [1] - 731:25
**entered** [5] - 707:4, 710:13, 763:6, 763:8, 779:25
**enterprise** [1] - 778:23
**entertainment** [1] - 810:15
**entire** [1] - 766:5
**entirely** [1] - 750:6
**entirety** [1] - 714:7
**entitled** [3] - 755:16, 756:4, 792:12
**entries** [1] - 760:25
**equipment** [4] - 726:2, 770:1, 775:12, 775:20
**equivalent** [1] - 714:5
**error** [3] - 755:3, 768:23, 786:23
**especially** [3] - 764:11, 769:22, 789:13
**ESQ** [1] - 697:8
**essence** [1] - 761:4
**establish** [3] - 750:25, 755:4, 768:23
**established** [1] - 721:3
**evade** [5] - 784:25, 785:3, 785:7, 785:18, 786:16
**evading** [1] - 789:12
**evaluate** [1] - 746:7
**EVANS** [2] - 816:15, 816:19

**Evans** [4] - 812:19, 813:2, 815:17, 816:14
**evasion** [1] - 777:18
**evening** [5] - 718:14, 808:1, 817:12, 817:17, 818:1
**event** [7] - 736:17, 750:5, 759:15, 759:16, 789:21, 789:24, 790:11
**evidence** [58] - 737:20, 737:24, 740:18, 740:20, 741:6, 741:15, 741:18, 744:17, 744:18, 744:22, 744:23, 744:25, 745:4, 745:5, 745:7, 745:9, 745:11, 745:14, 745:16, 745:18, 745:22, 746:1, 746:2, 746:3, 746:7, 746:11, 746:13, 747:7, 747:23, 748:6, 748:20, 753:10, 755:2, 755:23, 755:24, 756:10, 762:18, 763:3, 764:7, 768:22, 774:9, 774:11, 779:6, 784:14, 787:22, 790:1, 790:4, 791:20, 792:14, 792:19, 793:7, 794:19, 795:12, 795:17, 796:23, 796:24, 801:13
**exact** [1] - 754:5
**exactly** [9] - 709:19, 714:8, 757:17, 762:9, 764:8, 764:9, 764:12, 798:11, 817:3
**EXAMINATION** [3] - 699:17, 724:24, 734:15
**examination** [3] - 699:12, 718:14, 782:22
**example** [4] - 744:23, 745:1, 759:20, 780:9
**Excel** [8] - 799:8, 800:12, 803:9, 803:12, 804:19, 804:21, 805:16, 805:18
**except** [1] - 815:14

**exception** [1] - 774:2
**exclude** [1] - 748:2
**excluded** [1] - 801:13
**exclusive** [1] - 752:25
**excuse** [2] - 752:14, 805:11
**excused** [2] - 736:24, 794:20
**exercise** [1] - 780:14
**Exhibit** [14] - 701:17, 713:13, 721:4, 724:5, 724:16, 728:8, 731:9, 756:21, 761:2, 789:5, 796:2, 796:20, 797:21, 799:3
**exhibit** [2] - 718:15, 720:7
**exhibits** [3] - 789:16, 801:3, 806:18
**exist** [1] - 725:2
**existed** [2] - 735:5, 759:12
**experience** [1] - 802:24
**explain** [4] - 709:19, 743:22, 793:4, 809:10
**explaining** [1] - 699:25
**express** [1] - 814:23
**extend** [1] - 808:20
**extended** [1] - 710:4
**extra** [1] - 803:1

# F

**fact** [20] - 712:22, 713:16, 744:23, 745:1, 745:6, 747:9, 747:19, 751:17, 752:3, 752:7, 752:9, 752:11, 761:16, 761:18, 761:19, 761:20, 764:8, 771:20, 772:25
**facts** [11] - 708:2, 738:10, 742:8, 742:9, 744:15, 744:19, 749:19, 751:11, 766:21, 793:6
**failed** [1] - 785:14
**fails** [1] - 747:24
**fair** [3] - 708:11, 722:15, 782:25
**fairly** [1] - 769:21
**fairytale** [1] - 769:4
**faith** [8] - 754:22,

754:24, 768:12, 768:13, 768:16, 778:5, 778:7, 780:22
**fake** [16] - 702:8, 703:21, 741:10, 741:11, 785:6, 785:18, 785:22, 786:1, 786:2, 786:9, 786:11, 786:16, 788:4, 788:5, 790:10
**false** [31] - 734:20, 739:1, 747:11, 751:15, 751:16, 751:25, 752:2, 752:6, 752:16, 752:23, 757:8, 759:9, 759:10, 760:2, 760:8, 760:10, 760:18, 761:13, 761:14, 761:17, 785:2, 785:8, 785:17, 786:5, 786:6, 786:7, 789:11, 791:5, 791:7
**falsify** [1] - 759:4
**falsifying** [1] - 758:11
**familiar** [8] - 703:15, 706:7, 706:8, 707:18, 707:19, 707:21, 707:24, 708:13
**family** [2] - 764:16, 781:16
**far** [5] - 725:1, 731:17, 745:6, 773:12, 786:9
**fashion** [1] - 757:24
**father** [2] - 769:7, 770:22
**fault** [1] - 801:2
**fax** [5] - 724:6, 756:22, 776:2, 787:8, 796:3
**faxed** [2] - 776:2
**federal** [4] - 748:24, 749:1, 751:7, 780:17
**Federal** [2] - 696:24, 697:24
**feeble** [1] - 778:13
**feelings** [1] - 808:23
**fees** [2] - 708:21, 709:23
**felon** [1] - 777:16
**felony** [1] - 747:10
**few** [10] - 699:7, 728:9, 730:1, 737:3, 746:19, 754:2, 774:3, 774:21, 783:19, 792:4
**field** [1] - 767:15
**Fifth** [2] - 696:24, 697:24

**figure** [4] - 727:6, 769:7, 770:23, 773:20
**figured** [2] - 771:18, 803:21
**filed** [2] - 711:22, 711:24
**files** [3] - 712:6, 712:18, 712:25
**filing** [2] - 712:2, 713:3
**fill** [1] - 793:20
**filled** [2] - 771:17, 774:4
**filters** [2] - 775:13
**final** [6] - 700:8, 700:16, 742:21, 755:6, 791:23, 792:4
**Final** [1] - 792:2
**finalize** [4] - 700:22, 701:2, 701:14, 803:6
**finalized** [7] - 700:19, 701:11, 796:8, 796:12, 802:25, 803:7, 804:3
**finalizing** [2] - 700:20, 724:1
**finally** [2] - 745:25, 765:12
**finance** [3] - 701:10, 733:9, 776:7
**finances** [1] - 805:13
**financial** [4] - 705:9, 752:18, 752:19, 784:6
**fine** [8] - 707:10, 737:14, 764:22, 782:1, 808:5, 812:2, 813:11, 817:2
**finest** [1] - 780:18
**finger** [1] - 739:21
**finish** [1] - 782:22
**finished** [3] - 729:22, 734:12, 801:4
**finishing** [1] - 810:4
**firm** [2] - 766:7, 766:18
**first** [19] - 700:4, 700:11, 713:23, 715:7, 731:8, 735:8, 744:2, 744:18, 749:20, 751:13, 776:14, 784:25, 790:24, 792:9, 794:6, 796:18, 798:4, 799:13, 800:24
**five** [3] - 743:3, 782:3, 815:1
**five-minute** [2] -

743:3, 782:3
**flag** [1] - 784:7
**flagged** [1] - 804:8
**floor** [4] - 759:21, 759:22, 759:23
**focus** [1] - 762:15
**folded** [1] - 787:9
**folks** [21] - 733:9, 737:6, 765:10, 765:17, 766:4, 766:12, 766:13, 766:14, 766:20, 769:2, 769:9, 772:17, 775:5, 775:15, 777:25, 778:2, 778:5, 780:10, 781:6, 781:10, 781:13
**follow** [3] - 743:21, 743:23
**followed** [2] - 749:14, 776:13
**following** [4] - 718:11, 749:19, 751:11, 805:23
**fool** [1] - 758:11
**football** [1] - 767:15
**FOR** [2] - 697:3, 697:8
**forbids** [3] - 754:16, 754:18, 757:16
**forefathers** [1] - 767:5
**foregoing** [1] - 713:25
**foreperson** [4] - 792:16, 793:16, 793:20
**Forest** [29] - 717:4, 721:12, 725:4, 725:6, 725:18, 725:23, 730:20, 731:23, 735:15, 735:21, 735:24, 742:11, 756:16, 769:11, 769:18, 770:18, 771:13, 772:9, 773:8, 774:18, 775:23, 776:1, 776:2, 776:15, 784:1, 785:22, 802:16
**forfeiture** [1] - 806:20
**forged** [1] - 779:22
**forget** [4] - 727:17, 747:14, 777:17, 786:8
**forgetting** [1] - 725:18
**form** [10] - 716:1, 716:17, 743:7, 743:8, 757:24, 793:8, 793:11, 793:17, 793:18,

793:20
**formal** [1] - 749:8
**formed** [5] - 755:1, 768:20, 778:8, 780:23, 784:18
**forms** [2] - 744:18, 786:14
**forth** [5] - 726:8, 770:20, 807:9, 807:12, 807:25
**forward** [2] - 782:20, 817:13
**foundation** [1] - 707:14
**four** [11] - 717:22, 718:1, 741:13, 756:23, 760:1, 760:16, 773:10, 784:25, 785:21, 785:24, 786:8
**fourth** [7] - 740:9, 740:11, 740:13, 750:2, 751:20, 759:7, 760:4
**frame** [1] - 770:8
**franchise** [1] - 773:14
**frank** [1] - 765:17
**Franklin** [3] - 738:11, 738:20, 763:13
**frankly** [1] - 808:21
**fraud** [29] - 737:19, 737:22, 739:24, 740:9, 740:12, 748:17, 748:18, 751:6, 752:25, 754:9, 756:21, 760:12, 760:15, 760:21, 772:5, 774:6, 774:9, 777:16, 777:18, 779:4, 783:25, 789:4, 789:12, 791:5, 797:12, 803:3, 806:4
**fraudulent** [13] - 751:25, 752:3, 752:6, 752:24, 755:1, 755:4, 768:21, 768:24, 778:8, 778:9, 795:21, 798:19, 802:4
**fraudulently** [2] - 727:1, 779:24
**frequently** [1] - 796:6
**fresh** [1] - 782:24
**friends** [3] - 790:19, 812:18, 812:24
**front** [1] - 812:16
**full** [1] - 783:11

**fully** [1] - 792:19
**function** [1] - 723:22
**funds** [3] - 738:6, 739:1, 797:25
**furtherance** [1] - 759:8

## G

**Gabriel** [1] - 812:19
**gain** [1] - 752:18
**game** [3] - 767:14, 767:15, 778:9
**general** [2] - 750:17, 775:22
**generally** [1] - 733:12
**gentleman** [2] - 769:11, 815:13
**gentleman's** [1] - 812:20
**gentlemen** [8] - 755:12, 758:14, 764:7, 765:5, 783:5, 783:15, 790:4, 790:23
**Gerald** [7] - 742:14, 756:16, 761:22, 763:4, 772:9, 776:11, 776:12
**getaway** [1] - 780:20
**given** [3] - 721:22, 743:6, 748:13
**glass** [1] - 791:3
**goal** [1] - 767:16
**goals** [1] - 750:25
**government** [76] - 706:17, 715:14, 720:5, 721:7, 721:9, 721:16, 722:1, 722:17, 722:22, 737:18, 737:20, 737:24, 738:2, 739:6, 739:17, 740:10, 740:17, 740:24, 741:5, 741:15, 741:18, 742:24, 743:8, 743:9, 744:7, 744:10, 744:14, 746:7, 747:23, 747:24, 749:7, 749:9, 749:15, 749:18, 750:11, 750:16, 751:11, 752:20, 753:2, 754:4, 754:6, 754:24, 755:8, 756:7, 756:10, 764:25, 765:6, 765:11, 766:2,

766:9, 767:23, 768:17, 774:7, 780:4, 782:12, 782:21, 782:23, 783:22, 784:19, 784:22, 786:10, 787:2, 787:4, 787:6, 789:6, 795:6, 795:9, 796:15, 800:20, 806:2, 807:1, 807:15, 812:2, 814:17, 814:18
**government's** [14] - 701:17, 739:23, 739:25, 740:2, 742:3, 748:1, 748:2, 767:18, 768:5, 783:11, 796:19, 800:17, 801:2, 813:17
**Government's** [12] - 713:13, 721:4, 724:5, 724:16, 728:8, 731:8, 756:21, 761:2, 789:5, 796:2, 797:21, 799:3
**graduated** [1] - 757:25
**grand** [2] - 720:15, 772:2
**grass** [1] - 745:2
**great** [1] - 814:25
**greater** [1] - 792:12
**greatly** [1] - 816:25
**Green** [28] - 731:1, 736:5, 741:11, 741:12, 756:16, 759:4, 759:6, 759:9, 759:10, 759:12, 760:1, 763:6, 772:9, 777:4, 779:5, 779:21, 780:2, 784:9, 785:1, 785:21, 786:4, 789:23, 790:2, 790:10, 797:20, 802:18, 802:24
**greene** [1] - 786:13
**Greens** [1] - 765:15
**Greg** [2] - 776:6, 776:20, 776:24
**ground** [1] - 728:7
**growling** [1] - 783:17
**guess** [11] - 704:12, 704:14, 717:9, 723:21, 737:13, 777:17, 809:23, 813:17, 813:20, 815:7, 815:12
**guilt** [5] - 744:5,

744:10, 746:1, 747:23, 748:3
**guilty** [37] - 744:3, 744:15, 746:9, 747:10, 747:25, 748:10, 748:21, 749:17, 750:20, 751:9, 753:9, 756:8, 760:15, 765:2, 765:18, 765:21, 766:23, 769:1, 773:25, 777:17, 778:10, 778:11, 779:1, 779:4, 779:5, 780:3, 781:4, 781:6, 781:11, 781:16, 791:22, 793:1, 793:13, 793:14
**guy** [8] - 700:8, 777:5, 777:10, 779:10, 785:25, 786:5, 812:23
**guys** [6] - 709:14, 723:2, 728:22, 771:18, 775:10, 787:12

## H

**HAIKALA** [1] - 696:12
**half** [3] - 752:7, 757:23, 765:13
**hand** [5] - 703:25, 710:24, 784:17, 790:8, 791:24
**handed** [2] - 704:8, 763:6
**handing** [1] - 792:1
**handle** [1] - 724:2
**handled** [1] - 817:23
**hard** [3] - 721:17, 765:24, 809:14
**Harold** [2] - 775:22, 776:24
**hate** [5] - 806:12, 808:18, 808:23, 809:19, 811:23
**head** [2] - 758:4, 758:5
**headquarters** [1] - 763:13
**health** [1] - 769:8
**hear** [16] - 734:20, 734:23, 755:8, 771:21, 771:22, 772:3, 772:6, 772:15, 773:21, 774:8, 774:20, 774:23, 783:8, 810:8, 815:6
**heard** [36] - 708:5,

708:9, 708:10,
726:3, 726:10,
726:16, 734:19,
744:18, 744:21,
755:19, 756:15,
756:20, 757:18,
761:21, 761:22,
763:4, 763:14,
770:9, 770:17,
771:11, 772:11,
772:16, 773:18,
774:13, 775:5,
775:15, 777:7,
779:9, 783:17,
785:4, 788:11,
788:14, 792:3,
792:13
**hearing** [3] - 706:16,
718:12, 760:14
**hearings** [1] - 712:4
**heart** [1] - 749:13
**heavy** [1] - 748:1
**held** [11] - 701:19,
718:11, 740:3,
754:25, 758:2,
763:22, 768:19,
778:7, 780:22,
784:18, 791:8
**help** [8] - 737:19,
738:16, 751:22,
795:20, 802:3,
809:11, 812:13,
814:22
**helped** [1] - 780:21
**helpful** [6] - 700:1,
715:2, 724:12,
811:6, 815:4, 817:16
**helping** [1] - 816:13
**hereby** [1] - 719:24
**herewith** [1] - 719:25
**herself** [1] - 757:24
**hesitate** [2] - 699:22,
792:22
**hesitation** [1] - 748:8
**hide** [1] - 770:8
**high** [5] - 744:13,
764:15, 767:18,
767:22, 784:20
**higher** [1] - 785:7
**highlight** [1] - 756:10
**highlighting** [2] -
728:9, 731:9
**hit** [3] - 740:18,
745:21, 784:3
**hmm** [1] - 762:16
**hold** [3] - 772:21,
772:22, 784:17
**home** [4] - 781:16,
809:16, 811:23,
817:17

**home-school** [1] -
809:16
**honest** [2] - 734:1,
792:24
**honestly** [13] - 754:25,
755:1, 768:19,
768:20, 778:7,
778:8, 780:22,
780:23, 781:2,
784:18, 789:18,
791:8
**Honor** [79] - 699:15,
699:16, 707:3,
707:7, 708:24,
715:25, 716:4,
718:23, 724:18,
729:21, 734:14,
736:21, 736:23,
737:10, 737:17,
737:23, 738:4,
738:15, 738:18,
739:8, 739:16,
742:24, 743:1,
743:9, 743:11,
755:9, 762:20,
762:22, 765:4,
781:19, 781:21,
782:2, 782:5,
782:16, 783:2,
783:14, 786:22,
795:6, 795:7,
795:11, 795:22,
796:21, 797:2,
797:4, 797:8,
797:10, 797:16,
799:2, 801:1,
801:17, 801:24,
802:2, 802:12,
803:17, 803:18,
804:10, 806:20,
807:1, 807:2,
807:16, 807:17,
807:18, 808:23,
810:12, 810:17,
810:18, 811:4,
811:13, 811:20,
812:10, 813:6,
813:15, 814:8,
814:9, 814:17,
814:25, 817:2,
817:24, 817:25
**HONORABLE** [1] -
696:12
**hope** [2] - 782:13,
786:3
**hoping** [2] - 780:3,
810:23
**horse** [1] - 718:16
**hour** [3] - 783:10,
807:8, 807:24

**hours** [3] - 811:21,
814:2, 815:1
**house** [2] - 725:6,
769:5
**Housner** [23] - 717:4,
721:12, 723:2,
723:4, 725:4,
725:18, 728:4,
756:16, 769:8,
769:12, 771:12,
772:9, 773:8,
774:14, 775:3,
775:4, 775:9,
775:23, 776:16,
779:8, 784:1,
796:24, 802:16
**Housner's** [1] - 785:5
**huddle** [1] - 808:10
**HUGHES** [1] - 696:12
**hundred** [7] - 735:23,
767:19, 767:20,
771:12, 773:23,
778:20, 785:19
**hungry** [1] - 783:7
**Huntsville** [1] - 814:9
**husband** [1] - 769:5

# I

**icon** [1] - 722:13
**idea** [9] - 704:13,
757:19, 757:20,
758:9, 758:21,
771:12, 773:24,
774:14
**identities** [1] - 750:15
**illegal** [7] - 732:7,
766:17, 769:22,
772:5, 773:1,
774:24, 781:3
**images** [1] - 719:24
**imagination** [1] -
784:23
**immediately** [1] -
804:8
**impartially** [1] - 748:5
**implementation** [2] -
740:2, 742:5
**important** [16] -
702:20, 746:15,
747:19, 748:9,
752:9, 761:19,
761:25, 762:1,
768:19, 771:21,
775:9, 783:7,
785:10, 796:4,
811:24, 815:5
**important..** [1] - 724:8
**importantly** [1] -
767:10

**impress** [1] - 746:20
**impression** [2] -
776:20, 792:12
**inaccurately** [1] -
747:15
**incentive** [12] -
703:17, 734:21,
734:24, 734:25,
740:6, 755:20,
756:19, 762:1,
771:6, 772:1, 773:6,
784:4
**incentives** [6] -
703:12, 730:15,
732:11, 770:2,
775:15, 776:13
**include** [3] - 720:13,
754:10, 801:25
**included** [2] - 742:7,
787:17
**includes** [2] - 751:23,
754:13
**including** [1] - 705:20
**income** [2] - 777:9,
777:17
**incomes** [1] - 777:9
**inconvenience** [2] -
808:5, 808:23
**inconveniences** [1] -
810:4
**incorrectly** [1] -
741:25
**increase** [1] - 706:3
**incredulous** [1] -
785:8
**independently** [1] -
739:25
**indicted** [1] - 766:12
**indictment** [19] -
744:4, 745:25,
746:10, 748:12,
748:14, 748:19,
749:11, 750:1,
750:9, 752:21,
754:3, 758:25,
759:2, 793:12,
806:16, 806:17,
806:19
**indifference** [1] -
752:4
**indirect** [3] - 745:4,
745:8
**indirectly** [1] - 745:1
**individual** [1] - 766:8
**industry** [2] - 755:22,
757:22
**inflate** [1] - 777:9
**influence** [1] - 752:12
**influenced** [1] - 746:5
**information** [38] -

712:6, 712:25,
737:22, 737:25,
738:1, 738:2, 739:1,
740:5, 740:25,
741:10, 742:2,
742:15, 763:6,
763:8, 763:10,
784:6, 784:12,
795:18, 795:19,
798:4, 798:7, 798:9,
799:5, 799:6, 799:7,
800:10, 803:6,
803:22, 803:24,
803:25, 804:18,
804:21, 804:23,
805:1, 805:16,
805:18, 811:5
**initial** [1] - 784:7
**innocence** [7] - 744:9,
747:22, 767:1,
767:3, 767:11,
781:7, 781:12
**innocent** [8] - 744:3,
747:17, 747:22,
750:6, 765:21,
769:21, 781:8,
781:17
**innocuous** [2] - 771:2,
785:5
**input** [3] - 795:16,
795:18, 797:7
**inputted** [2] - 742:14,
798:22
**inside** [1] - 703:20
**instance** [2] - 726:15,
745:20
**instead** [3] - 794:4,
795:17, 796:13
**instruct** [5] - 743:16,
743:20, 795:15,
813:24, 816:7
**instructed** [11] -
741:20, 742:1,
742:11, 756:6,
757:11, 759:18,
761:18, 785:23,
795:13, 795:18,
797:22
**instructing** [1] - 737:6
**instruction** [5] -
724:2, 754:13,
755:6, 782:19,
787:19
**instructions** [38] -
699:6, 723:13,
723:17, 724:7,
724:16, 737:2,
742:20, 742:22,
742:25, 743:4,
743:17, 743:23,

743:24, 744:12,
754:9, 755:5,
756:22, 767:2,
768:13, 772:7,
773:13, 774:7,
774:10, 775:7,
776:3, 776:4,
777:20, 783:3,
785:5, 792:5, 792:6,
792:10, 795:23,
795:25, 796:19,
796:25, 797:6
**Instructions** [2] -
743:14, 792:2
**insurance** [1] - 733:9
**intelligent** [1] - 725:15
**intended** [4] - 749:12,
751:24, 752:24,
762:9
**intent** [33] - 742:8,
751:18, 752:5,
752:8, 752:17,
754:15, 754:18,
754:23, 754:24,
755:1, 755:4,
757:15, 762:6,
762:7, 762:10,
765:22, 765:23,
766:16, 768:14,
768:15, 768:18,
768:21, 768:24,
770:25, 778:8,
778:9, 795:21,
796:14, 798:19,
802:4
**intention** [3] - 732:1,
759:23, 762:7
**intentional** [1] -
747:17
**intentionally** [6] -
753:14, 753:22,
754:11, 764:1,
764:4, 772:22
**interest** [2] - 746:24,
793:6
**interested** [1] - 761:8
**interesting** [3] -
776:12, 776:23,
778:24
**interests** [1] - 750:25
**internal** [2] - 703:2,
703:7
**internet** [3] - 739:12,
763:11, 794:25
**interpretation** [1] -
792:14
**interrupt** [1] - 800:21
**interstate** [11] -
737:21, 738:3,
751:7, 751:21,

752:23, 753:4,
753:7, 762:14,
762:16, 762:19,
763:3
**introduced** [2] -
744:18, 744:21
**inventory** [2] - 734:24,
734:25
**investigators** [1] -
766:10
**invoices** [1] - 770:20
**involved** [6] - 735:7,
738:23, 757:23,
773:7, 778:25, 779:7
**involving** [1] - 747:10
**irony** [1] - 786:3
**issue** [1] - 766:11
**issued** [4] - 713:15,
713:16, 719:13,
788:1
**issues** [1] - 803:1
**it's..** [1] - 814:4
**itself** [2] - 716:2,
752:23
**IV** [2] - 696:12, 698:3

## J

**jacket** [12] - 703:22,
703:25, 704:8,
711:4, 711:9,
717:16, 717:17,
718:3, 742:13,
784:11, 785:25,
802:18
**jackets** [86] - 702:8,
702:12, 702:13,
702:17, 702:20,
702:24, 703:16,
703:19, 704:13,
711:16, 713:18,
713:19, 715:22,
716:10, 716:15,
717:2, 717:5,
717:20, 719:14,
720:4, 720:6,
720:18, 720:19,
720:23, 723:12,
725:2, 725:3,
728:23, 729:2,
729:5, 729:17,
731:1, 731:4, 731:5,
731:21, 735:4,
735:25, 736:4,
736:6, 736:8,
736:11, 736:12,
736:13, 741:10,
741:11, 741:12,
756:18, 759:3,
759:10, 759:11,

760:7, 760:9,
760:24, 761:10,
763:5, 771:3, 771:5,
771:9, 773:5,
773:12, 777:12,
777:14, 777:15,
777:22, 777:23,
784:9, 785:2, 785:6,
785:18, 785:22,
786:2, 786:9,
786:11, 786:16,
787:24, 787:25,
789:23, 790:2,
790:8, 790:11,
790:21, 795:13,
804:24
**jail** [2] - 810:24
**Jeff** [45] - 715:22,
716:15, 717:2,
717:4, 717:15,
717:16, 718:2,
723:12, 731:1,
731:21, 736:5,
736:7, 736:11,
736:13, 741:11,
741:12, 742:13,
742:14, 756:16,
759:3, 759:6, 759:9,
759:10, 759:12,
759:25, 760:1,
761:9, 763:5,
765:15, 771:6,
771:9, 771:15,
772:9, 775:8, 777:4,
777:21, 784:9,
785:1, 785:21,
786:9, 786:11,
789:23, 790:21,
802:18
**JENNIFER** [1] - 697:5
**job** [8] - 704:18, 705:4,
711:8, 769:5,
787:20, 798:11,
800:12, 800:17
**jobs** [1] - 758:2
**join** [1] - 764:4
**joined** [4] - 749:23,
750:18, 757:2,
757:10
**joins** [1] - 753:14
**JUDGE** [1] - 696:13
**judge** [17] - 708:23,
716:17, 724:19,
735:6, 737:6, 767:1,
767:6, 767:17,
768:1, 768:12,
777:20, 780:4,
805:25, 806:2,
810:13, 813:9, 815:7
**Judge** [2] - 704:4,

709:1
**judge's** [1] - 778:6
**judges** [2] - 793:5,
793:6
**judgment** [3] - 737:13,
755:3, 768:22
**July** [2] - 799:12,
800:22
**jumped** [1] - 699:19
**June** [13] - 716:14,
717:14, 720:10,
722:2, 722:18,
788:11, 788:15,
795:25, 798:2,
799:12, 799:15,
799:16, 800:19
**Junior** [1] - 810:21
**juries** [1] - 766:8
**JUROR** [8] - 808:7,
808:10, 808:13,
809:3, 809:7,
809:15, 816:15,
816:19
**juror** [7] - 767:21,
786:17, 810:6,
811:23, 812:6,
816:8, 816:11
**JURORS** [3] - 699:10,
768:2, 768:4
**jurors** [21] - 746:7,
781:24, 782:9,
792:20, 794:2,
794:9, 794:10,
794:12, 794:13,
808:17, 808:18,
810:1, 810:3, 811:8,
812:11, 814:6,
814:22, 815:4,
816:1, 817:21
**Jury** [5] - 743:13,
806:10, 807:19,
808:12, 815:21
**JURY** [2] - 696:12,
698:10
**jury** [50] - 699:4,
699:8, 718:12,
720:15, 724:20,
737:5, 742:20,
743:3, 743:16,
743:17, 755:12,
760:15, 765:5,
766:5, 766:7, 767:2,
767:7, 782:4,
782:19, 783:4,
789:15, 791:24,
792:1, 792:6,
792:15, 793:16,
793:18, 794:5,
794:21, 794:22,
795:1, 795:3,

806:11, 806:13,
806:15, 806:17,
806:25, 807:4,
807:5, 807:6,
807:10, 807:21,
808:8, 808:21,
809:13, 809:20,
809:22, 811:17,
812:4, 815:10

## K

**keep** [23] - 705:8,
712:22, 730:20,
732:10, 735:9,
742:11, 744:2,
747:12, 755:17,
756:18, 757:9,
767:10, 767:12,
767:25, 771:2,
778:2, 781:4,
781:10, 783:17,
784:4, 802:17,
807:8, 807:10
**keeping** [1] - 761:7
**keeps** [1] - 806:2
**kept** [5] - 728:15,
729:12, 760:25,
761:1, 787:8
**kick** [1] - 767:15
**kids** [1] - 809:17
**Kim** [48] - 720:15,
725:1, 728:4, 728:7,
730:20, 734:1,
759:2, 765:20,
766:9, 766:15,
769:1, 769:13,
769:23, 770:8,
771:13, 771:25,
772:16, 772:22,
773:5, 773:6, 773:8,
773:22, 774:1,
774:3, 774:8, 774:9,
774:24, 775:1,
775:6, 775:17,
775:25, 776:4,
776:16, 776:25,
777:1, 777:2,
777:12, 777:13,
777:22, 777:23,
777:24, 778:6,
779:7, 780:7, 781:2,
781:14
**KIMBERLY** [2] -
696:8, 698:7
**kind** [12] - 699:19,
718:16, 718:24,
719:1, 727:17,
745:9, 749:4, 749:8,
767:13, 773:19,

777:5, 813:23
**knife** [1] - 758:16
**knocking** [1] - 787:11
**knowing** [3] - 750:14, 754:1, 786:12
**knowingly** [1] - 748:16, 749:25, 751:13, 754:10, 758:24, 759:18, 759:20, 760:16, 791:11
**knowledge** [1] - 758:8
**knowledgeable** [1] - 725:15
**known** [2] - 734:7, 752:15
**knows** [4] - 752:4, 788:7, 789:10, 789:12

# L

**ladies** [9] - 755:12, 758:14, 764:7, 765:5, 783:5, 783:15, 790:4, 790:22
**lady** [6] - 727:4, 765:20, 769:4, 777:24, 781:15, 808:24
**language** [1] - 724:13
**lapse** [1] - 747:17
**Las** [1] - 776:21
**last** [13] - 699:6, 716:25, 718:20, 735:11, 765:6, 767:15, 768:7, 768:9, 770:12, 779:20, 781:4, 782:21, 791:19
**late** [1] - 732:5
**Law** [1] - 743:14
**law** [19] - 699:6, 737:2, 743:16, 743:20, 743:22, 743:23, 743:25, 745:6, 747:21, 749:2, 750:10, 754:16, 754:17, 754:18, 754:20, 755:5, 757:16, 757:17, 757:19
**lawyer** [2] - 745:21, 769:23
**lawyer's** [1] - 745:20
**lawyers** [7] - 734:4, 745:13, 745:15, 745:17, 770:10, 770:14, 774:22

**leads** [1] - 763:21
**leap** [1] - 780:25
**least** [9] - 705:18, 705:19, 705:21, 749:25, 750:19, 758:24, 797:16, 811:12
**leave** [10] - 758:18, 788:18, 788:19, 803:11, 807:24, 808:4, 809:5, 817:15
**left** [2] - 706:4, 812:16
**legal** [2] - 708:21, 723:5
**lender** [2] - 797:25, 805:13
**less** [1] - 785:8
**lesser** [1] - 780:4
**letter** [2] - 786:24
**letters** [1] - 779:12
**level** [2] - 719:3, 744:12
**liability** [3] - 739:18, 741:3, 763:21
**liable** [1] - 763:23
**lie** [8] - 755:15, 756:1, 756:17, 772:14, 772:15, 787:19, 788:21, 788:23
**lied** [1] - 787:4
**life** [4] - 757:23, 770:10, 778:17, 791:6
**limit** [2] - 718:25, 788:24
**limits** [1] - 782:11
**line** [4] - 707:14, 779:16, 793:12, 793:13
**lines** [1] - 772:13
**list** [28] - 715:9, 715:10, 721:6, 721:12, 721:14, 721:20, 721:23, 721:24, 722:2, 722:4, 722:5, 722:8, 722:17, 722:22, 722:24, 723:11, 730:20, 730:23, 742:11, 745:12, 761:1, 761:6, 771:2, 771:14, 775:7, 784:5, 784:24, 802:17
**listen** [3] - 743:19, 755:7, 782:9
**listening** [1] - 794:19
**lists** [1] - 812:11
**literally** [2] - 710:24, 804:20

**lived** [1] - 791:2
**lives** [1] - 791:15
**living** [1] - 772:17
**located** [2] - 709:7, 709:12, 709:14
**logic** [1] - 778:16
**logistical** [1] - 812:4
**look** [15] - 703:13, 715:8, 727:19, 733:7, 733:12, 733:15, 733:16, 733:24, 770:16, 771:23, 787:22, 791:20, 794:24, 812:14, 817:13
**looked** [2] - 715:10, 773:14
**looking** [7] - 701:18, 711:20, 713:17, 728:22, 769:11, 781:8, 781:9
**looks** [2] - 799:2, 814:15
**lose** [3] - 787:16, 787:17, 814:3
**loss** [1] - 752:19
**lost** [4] - 725:10, 725:11, 786:3, 814:2
**Louis** [1] - 811:11
**lump** [1] - 739:3
**lunch** [12] - 782:8, 782:13, 782:14, 782:18, 783:9, 783:16, 792:8, 794:6, 794:15, 794:25, 809:10, 809:13
**lying** [3] - 757:6, 758:10, 787:13

# M

**ma'am** [19] - 699:10, 701:25, 702:3, 704:23, 704:25, 705:3, 708:17, 709:8, 712:20, 713:1, 714:15, 720:12, 723:6, 723:8, 724:4, 735:1, 798:17, 812:17, 815:11
**machinery** [1] - 768:8
**machines** [1] - 768:10
**MADELINE** [1] - 696:12
**mail** [14] - 716:14, 717:1, 717:13, 718:1, 720:8, 720:10, 731:7,

731:8, 731:11, 761:1, 798:2, 798:12, 799:11, 800:23
**mailed** [4] - 699:6, 714:18, 717:14, 761:3
**mailing** [2] - 788:15, 789:19
**mails** [4] - 721:6, 774:2, 789:8, 789:20
**maintain** [1] - 723:11
**maintained** [2] - 720:1, 729:11
**maintaining** [1] - 784:24
**maintenance** [5] - 726:1, 770:1, 775:12, 775:20
**maker** [2] - 752:13, 752:14
**man** [7] - 725:6, 725:15, 725:19, 769:9, 771:10, 776:7, 812:15
**management** [3] - 730:3, 755:3, 768:23
**manager** [9] - 700:12, 700:13, 700:14, 700:15, 701:10, 733:10, 758:3, 771:24, 775:22
**managers** [1] - 733:1
**mandatory** [2] - 808:14, 811:23
**manipulate** [1] - 761:7
**Manning** [3] - 809:4, 815:25, 817:14
**MANNING** [2] - 809:7, 809:15
**manual** [2] - 772:7, 804:1
**manually** [10] - 710:13, 731:25, 798:12, 799:4, 800:15, 803:12, 804:20, 805:15, 805:18
**map** [2] - 756:21, 760:22
**March** [15] - 701:19, 723:2, 726:4, 734:7, 769:6, 769:10, 769:18, 770:15, 784:1, 784:21, 798:13, 801:5, 802:16, 806:4
**mark** [1] - 769:21
**marked** [1] - 787:9
**match** [8] - 732:13,

732:14, 798:7, 798:25, 803:15, 804:9, 804:23, 805:1
**matched** [3] - 722:8, 729:4, 797:13
**matches** [2] - 784:11, 784:12
**matching** [1] - 732:11
**material** [11] - 742:7, 751:17, 752:3, 752:7, 752:9, 752:11, 752:23, 761:18, 761:19, 761:25, 762:5
**math** [4] - 727:4, 727:19, 727:20, 778:13
**matter** [3] - 746:17, 752:13, 812:14
**matters** [2] - 771:8, 792:14
**mean** [12] - 703:13, 705:7, 711:19, 718:3, 733:21, 741:20, 746:12, 747:12, 796:7, 800:21, 809:17, 811:2
**means** [8] - 752:25, 754:10, 754:14, 759:18, 761:13, 762:7, 795:20, 802:4, 816:3
**meant** [1] - 768:10
**mechanics** [2] - 764:10, 764:11
**media** [1] - 816:20
**medically** [1] - 725:16
**meet** [5] - 736:25, 737:2, 769:21, 770:2, 774:17
**meeting** [13] - 701:19, 723:18, 773:7, 801:5, 808:14, 809:2, 809:4, 809:5, 809:9, 809:16, 809:17, 811:24, 816:1
**meetings** [1] - 774:20
**member** [2] - 749:5, 749:6
**members** [8] - 743:17, 749:7, 749:9, 791:24, 792:16, 794:21, 807:21, 811:16
**memory** [5] - 747:1, 747:17, 792:11, 792:12, 812:18
**mentioned** [5] - 703:2,

721:2, 747:21,
807:7, 807:24
**mentor** [3] - 769:7,
770:22, 771:10
**merely** [3] - 750:23,
754:1, 764:6
**message** [1] - 793:24
**messed** [1] - 741:17
**met** [1] - 772:2
**middle** [3] - 699:11,
717:13, 766:3
**might** [10] - 769:24,
794:17, 806:5,
808:20, 811:5,
811:22, 813:5,
813:10, 814:22,
816:17
**mile** [1] - 765:13
**million** [7] - 704:25,
705:13, 727:23,
758:6, 778:15,
787:21, 789:14
**mind** [20] - 705:10,
744:2, 744:12,
747:12, 767:11,
767:12, 767:25,
770:8, 770:15,
770:16, 770:17,
770:24, 770:25,
774:21, 775:19,
779:22, 781:4,
792:22, 809:20,
811:8
**minds** [1] - 807:11
**mine** [2] - 728:9, 731:9
**minimum** [1] - 742:10
**minor** [2] - 699:7,
750:22
**minute** [11] - 716:7,
737:3, 743:3,
757:21, 776:14,
781:22, 782:3,
784:13, 808:7,
808:9, 809:21
**minutes** [4] - 730:1,
737:3, 774:3, 785:9
**mischaracterize** [1] -
703:5
**misrepresentation** [1]
- 742:7
**miss** [2] - 808:19,
811:23
**missing** [2] - 713:2,
794:10
**misstated** [1] - 747:15
**misstatement** [1] -
747:19
**mistake** [6] - 720:9,
736:7, 747:12,
754:12, 755:3,

768:22
**mistaken** [2] - 755:2,
768:22
**misused** [1] - 796:6
**moment** [2] - 791:15,
803:17
**Monday** [16] - 755:12,
755:19, 755:25,
764:14, 766:20,
769:4, 780:9,
781:17, 810:2,
812:1, 814:3, 814:7,
814:15, 814:20,
814:24, 816:14
**money** [25] - 726:21,
727:1, 727:15,
739:4, 741:1,
751:14, 751:25,
755:16, 755:17,
756:3, 756:19,
757:7, 757:9,
760:18, 761:13,
762:2, 762:8,
762:10, 765:23,
772:12, 774:13,
784:4, 787:16,
787:17, 791:17
**monies** [1] - 739:13
**monitor** [1] - 768:5
**monitors** [1] - 768:3
**MONTGOLF** [2] -
808:13, 809:3
**Montgolf** [1] - 809:1
**month** [6] - 727:11,
732:17, 773:11,
774:16, 784:4,
790:14
**monthly** [1] - 705:7
**months** [6] - 718:1,
734:4, 770:12,
772:18, 773:10,
776:19
**moot** [1] - 740:23
**Morgan** [2] - 807:7,
807:23
**MORGAN** [1] - 808:10
**morning** [9] - 699:9,
755:12, 782:24,
808:2, 812:7, 816:4,
817:5, 817:6, 818:2
**most** [5] - 720:14,
748:8, 767:9,
768:19, 785:10
**mother** [1] - 764:19
**motion** [5] - 737:12,
737:15, 742:19,
795:9
**motivation** [1] -
708:25
**move** [1] - 774:16

**moved** [2] - 758:3,
779:13
**MR** [54] - 704:4, 707:3,
707:11, 708:23,
709:1, 715:25,
716:17, 716:20,
718:5, 718:9, 719:5,
724:19, 724:23,
724:25, 729:22,
729:24, 729:25,
734:11, 735:6,
736:23, 737:6,
737:10, 737:12,
737:17, 739:8,
739:10, 743:1,
743:11, 762:20,
762:24, 765:4,
768:7, 795:7,
799:15, 805:25,
806:2, 807:2,
807:17, 808:22,
810:13, 810:17,
810:21, 812:13,
813:1, 813:6, 813:9,
813:15, 813:20,
814:8, 814:12,
815:7, 815:12,
817:2, 817:25
**MS** [111] - 699:16,
699:18, 704:7,
707:7, 707:16,
707:17, 708:24,
709:4, 716:3, 716:6,
716:23, 718:7,
718:23, 719:11,
724:18, 729:21,
729:23, 734:14,
734:16, 735:19,
736:21, 737:23,
738:4, 738:14,
738:17, 738:22,
738:25, 739:16,
740:8, 740:13,
741:9, 741:22,
741:24, 742:6,
742:24, 743:9,
755:9, 755:11,
763:2, 781:21,
782:2, 782:5,
782:11, 782:16,
783:2, 783:14,
795:6, 795:11,
795:22, 796:2,
796:10, 796:21,
796:24, 797:4,
797:8, 797:10,
797:15, 797:20,
798:6, 798:11,
798:14, 798:17,
798:20, 798:24,
799:2, 799:12,

799:19, 799:24,
800:1, 800:4, 800:6,
800:12, 800:15,
800:20, 801:1,
801:8, 801:11,
801:14, 801:17,
801:21, 801:24,
802:2, 802:7,
802:12, 802:15,
802:20, 802:23,
803:17, 804:10,
804:15, 805:10,
805:21, 806:20,
807:1, 807:15,
808:17, 810:11,
811:4, 811:12,
811:20, 812:10,
812:15, 812:18,
812:22, 813:3,
813:17, 814:2,
814:17, 814:25,
816:25, 817:24
**multi** [2] - 758:6,
787:21, 789:14
**multi-million** [3] -
758:6, 787:21,
789:14
**multiple** [2] - 704:4,
758:6
**murders** [1] - 765:16
**Murnahan** [1] - 766:25
**MURNAHAN** [5] -
697:5, 755:9,
755:11, 763:2,
806:20
**must** [35] - 743:21,
743:23, 744:2,
744:10, 744:14,
744:16, 745:11,
746:2, 746:5, 746:7,
746:11, 746:12,
747:16, 747:23,
747:25, 748:19,
748:22, 750:12,
753:25, 754:17,
754:24, 756:8,
757:12, 757:14,
760:15, 764:4,
768:17, 792:5,
792:18, 792:20,
793:1, 793:2,
793:16, 793:20

**N**

**nail** [1] - 764:17
**name** [4] - 727:5,
773:4, 779:9, 810:19
**named** [1] - 709:5
**names** [1] - 750:15

**natural** [1] - 752:12
**naturally** [1] - 747:14
**nature** [1] - 752:21
**necessarily** [1] -
746:16
**necessary** [1] - 744:15
**need** [31] - 712:1,
712:12, 713:4,
713:8, 719:7,
720:16, 735:8,
736:25, 737:2,
739:20, 742:23,
754:2, 754:19,
764:23, 771:22,
780:14, 781:25,
784:4, 784:8,
787:11, 789:22,
789:25, 794:5,
794:15, 795:5,
798:22, 802:17,
802:18, 808:14,
816:3
**needed** [3] - 713:10,
714:8, 787:18
**needs** [1] - 716:4
**neighborhood** [1] -
765:6
**nerve** [1] - 789:5
**net** [8] - 704:19,
704:21, 705:2,
705:19, 705:20,
727:10, 727:11,
787:16
**never** [28] - 708:5,
708:9, 717:19,
717:24, 718:6,
721:12, 724:6,
725:3, 731:3, 731:4,
731:19, 736:4,
736:13, 759:12,
770:24, 770:25,
777:14, 777:23,
779:24, 788:4,
790:2, 797:5, 803:7,
805:1, 806:3, 813:21
**new** [2] - 710:10,
810:6
**next** [9] - 710:20,
737:1, 737:8,
788:15, 810:13,
811:11, 811:25,
812:12, 814:10
**nice** [4] - 765:20,
777:24, 777:25,
817:17
**night** [5] - 699:6,
712:19, 721:18,
765:6, 782:21
**nightmares** [1] -
796:11

**nine** [2] - 769:17, 770:12
**Nissan** [90] - 702:2, 702:18, 703:5, 703:12, 703:16, 703:17, 705:15, 705:16, 705:21, 705:24, 706:5, 708:15, 713:15, 715:4, 715:21, 719:14, 720:1, 720:11, 720:14, 720:19, 720:20, 720:25, 723:7, 727:2, 728:11, 728:18, 729:6, 729:11, 730:10, 730:11, 732:1, 735:17, 736:17, 738:5, 739:1, 740:5, 740:7, 741:8, 741:21, 755:15, 756:2, 756:3, 756:17, 757:6, 758:10, 758:12, 761:8, 761:11, 761:13, 761:15, 761:21, 761:25, 762:9, 763:7, 763:13, 763:14, 764:22, 765:23, 771:19, 774:5, 784:7, 787:9, 787:14, 788:16, 790:5, 799:6, 799:8, 799:16, 799:21, 800:9, 800:13, 800:16, 803:9, 803:13, 803:23, 803:25, 804:4, 804:5, 804:8, 804:11, 804:22, 805:15, 805:16
**Nissan's** [1] - 805:2
**nobody** [8] - 711:13, 770:7, 771:19, 775:1, 783:21, 788:7, 797:1
**nobody's** [1] - 788:5
**noise** [1] - 755:23
**nomenclature** [1] - 784:16
**none** [4] - 746:18, 779:6, 807:17, 817:25
**normal** [1] - 753:6
**normally** [1] - 753:5
**North** [23] - 696:24, 697:5, 697:24, 738:5, 740:5, 740:7,

741:8, 741:21, 756:2, 756:17, 761:13, 761:21, 761:25, 762:10, 763:13, 764:22, 765:23, 774:5, 799:16, 800:9, 804:4, 804:8
**NORTHERN** [1] - 696:3
**notarize** [1] - 714:10
**notarized** [1] - 714:5
**note** [4] - 757:16, 778:23, 792:10, 813:10
**note-taking** [1] - 792:10
**notes** [4] - 771:23, 792:10, 792:11, 812:14
**nothing** [8] - 714:16, 724:15, 736:23, 744:4, 759:15, 767:3, 774:20, 780:16
**notice** [4] - 711:6, 711:8, 711:11, 721:8
**noticing** [1] - 721:7
**notify** [2] - 700:18, 793:21
**nowhere** [1] - 790:19
**number** [22] - 705:11, 715:8, 718:13, 744:18, 746:15, 748:13, 750:9, 770:23, 779:10, 812:6, 812:20, 815:13, 815:17, 815:19, 816:2, 816:6, 816:12, 816:15, 816:16, 816:18, 816:23, 817:16
**Number** [1] - 756:12
**numbers** [4] - 705:23, 727:5, 729:4, 729:18
**nut** [1] - 767:14

**O**

**o'clock** [1] - 794:22
**oath** [5] - 699:14, 706:19, 712:7, 714:5, 766:20
**object** [9] - 708:23, 709:1, 715:25, 716:17, 716:19, 735:6, 750:4, 750:7, 762:20
**objection** [6] - 719:2,

742:25, 743:7, 743:10, 807:13, 807:15
**objections** [3] - 745:17, 806:25, 817:22
**objectives** [1] - 774:18
**observe** [1] - 747:3
**obtain** [3] - 751:14, 760:18, 761:12
**obviously** [1] - 742:9
**occasion** [1] - 750:19
**occasions** [1] - 741:13
**occurred** [1] - 754:5
**ocean** [1] - 788:6
**October** [1] - 706:17
**OF** [4] - 696:3, 696:6, 696:12
**offense** [1] - 748:18
**offer** [2] - 807:13, 811:1
**office** [8] - 709:12, 711:14, 712:22, 726:7, 733:14, 758:3, 805:12, 810:25
**OFFICE** [1] - 697:3
**offices** [1] - 766:11
**often** [3] - 708:19, 712:5, 815:23
**oil** [1] - 775:13
**old** [2] - 706:3, 765:8
**once** [5] - 701:14, 703:7, 711:21, 733:14, 772:11
**One** [8] - 748:15, 748:23, 749:18, 756:12, 760:11, 806:18, 806:24
**one** [92] - 701:14, 701:15, 702:4, 702:5, 702:6, 702:7, 704:5, 704:25, 705:22, 712:12, 713:4, 713:6, 713:7, 718:13, 721:4, 722:19, 732:24, 735:15, 735:22, 738:12, 738:17, 744:2, 746:20, 748:21, 749:24, 749:25, 750:5, 750:11, 750:19, 757:1, 758:19, 758:23, 758:24, 761:11, 761:20, 761:23, 762:16, 763:4, 765:7, 766:4, 766:24, 767:24,

770:23, 771:2, 772:8, 773:5, 773:19, 775:9, 777:13, 777:25, 779:11, 779:20, 780:9, 780:10, 783:24, 784:6, 785:3, 785:10, 786:12, 786:14, 786:23, 787:12, 788:9, 789:25, 790:5, 790:6, 792:15, 792:20, 794:3, 794:6, 794:24, 795:8, 796:10, 797:6, 799:13, 801:2, 801:12, 801:16, 802:9, 803:17, 804:16, 808:12, 808:18, 810:1, 810:6, 812:13, 814:8, 815:12, 815:13, 816:1, 816:2
**ones** [10] - 701:4, 702:14, 738:9, 738:10, 738:14, 738:16, 788:4, 788:5, 790:19
**opening** [3] - 745:14, 771:20, 772:2
**operation** [2] - 712:5, 712:24
**operations** [1] - 771:24
**opinion** [8] - 754:25, 755:2, 768:19, 768:21, 778:7, 780:22, 784:18, 792:22
**opportunity** [1] - 747:2
**option** [1] - 732:5
**options** [3] - 809:24, 815:24, 817:11
**or..** [1] - 814:10
**order** [8] - 699:21, 722:9, 722:10, 737:9, 756:8, 760:10, 760:14, 787:20
**ordinarily** [1] - 753:11
**ordinary** [1] - 783:9
**organize** [1] - 816:13
**original** [3] - 720:16, 721:1, 785:25
**outcome** [1] - 746:25
**outside** [5] - 699:4, 744:24, 745:2, 788:25, 817:19

**overheard** [1] - 800:23
**overt** [16] - 749:10, 749:14, 749:25, 750:2, 750:5, 750:10, 750:11, 750:13, 758:24, 759:1, 759:2, 759:7, 759:10, 759:24, 760:4, 780:20
**owe** [1] - 708:13
**own** [3] - 748:9, 792:13, 792:22

**P**

**p.m** [15] - 782:4, 782:17, 783:4, 795:3, 806:9, 806:10, 806:11, 807:5, 807:19, 809:22, 815:21, 817:21, 818:3
**P.O** [1] - 697:9
**page** [10] - 717:13, 720:7, 720:8, 768:7, 768:9, 768:11, 778:4, 784:16, 799:3
**pages** [2] - 806:24, 806:25
**paid** [3] - 770:20, 787:16, 789:13
**panel** [1] - 811:16
**paper** [1] - 797:2
**paperwork** [10] - 703:19, 705:5, 711:20, 757:8, 758:11, 759:9, 760:2, 760:7, 760:10, 804:2
**paragraph** [2] - 768:11, 768:25
**parents** [1] - 764:17
**parking** [1] - 780:13
**part** [21] - 701:23, 702:1, 702:22, 704:18, 705:4, 711:8, 713:22, 719:12, 733:22, 740:14, 742:5, 746:17, 750:22, 753:8, 784:25, 796:14, 796:16, 801:15, 801:19, 814:1, 816:9
**participant** [3] - 740:15, 754:1, 764:5
**participate** [4] - 750:21, 756:24, 775:1, 801:9
**participated** [7] -

740:20, 751:13, 753:22, 760:17, 760:23, 761:12, 801:23
**participating** [2] - 742:6, 763:20
**particular** [4] - 713:4, 746:16, 746:22, 758:10
**parties** [6] - 744:17, 744:20, 744:21, 762:17, 808:16, 815:23
**parties'** [2] - 755:7, 792:4
**partner** [1] - 749:6
**partnership** [1] - 749:4
**parts** [16] - 726:1, 726:8, 734:18, 734:21, 734:23, 734:24, 734:25, 769:25, 770:2, 770:3, 770:19, 775:11, 775:12, 775:20
**party** [2] - 795:5, 817:22
**passed** [1] - 810:16
**past** [2] - 764:12, 778:9
**patience** [2] - 783:10, 817:12
**Patrick** [2] - 788:16, 788:20
**pause** [1] - 811:15
**pay** [8] - 706:5, 714:24, 762:2, 762:4, 772:12, 774:12, 783:11
**paying** [2] - 708:21, 723:21
**payment** [1] - 740:7
**payoffs** [1] - 709:22
**pen** [4] - 759:20, 759:21, 759:22, 759:23
**penalty** [3] - 713:25, 715:20, 790:17
**pending** [9] - 700:12, 700:25, 701:9, 733:5, 733:7, 733:18, 733:23, 803:4
**people** [21] - 745:2, 747:14, 749:3, 750:23, 755:15, 756:1, 756:23, 765:25, 766:14, 769:17, 769:19,

781:15, 783:21, 785:12, 786:10, 787:1, 787:16, 789:9, 790:7, 791:14
**percent** [15] - 705:18, 706:5, 727:10, 727:11, 727:12, 727:19, 735:23, 765:17, 767:19, 767:20, 771:12, 773:23, 773:24, 774:13, 785:19
**perfectly** [2] - 718:8, 718:9
**performed** [1] - 753:10
**period** [4] - 771:6, 776:8, 777:1, 789:1
**perjury** [3] - 713:25, 715:20, 790:17
**person** [25] - 700:15, 739:20, 750:14, 751:1, 752:10, 753:11, 753:12, 753:14, 753:15, 753:16, 753:17, 753:21, 754:17, 754:19, 763:24, 764:1, 764:2, 770:23, 781:17, 783:22, 783:23, 787:18, 790:5, 808:13
**person's** [1] - 752:12
**personal** [4] - 746:24, 752:18, 778:23, 791:6
**personally** [8] - 731:19, 735:14, 741:5, 741:7, 741:20, 753:1, 753:10, 776:11
**persons** [2] - 749:20, 756:12
**phased** [1] - 773:19
**phone** [10] - 789:3, 794:16, 812:5, 812:20, 815:13, 815:19, 816:12, 816:22, 816:23, 817:16
**physical** [1] - 722:5
**picking** [1] - 776:23
**piece** [3] - 745:9, 794:7, 797:1
**pitched** [1] - 785:8
**place** [4] - 699:20, 764:3, 764:6, 784:1
**placed** [2] - 738:2, 741:6, 741:18

**Plaintiff** [1] - 696:6
**PLAINTIFF** [1] - 697:3
**plan** [27] - 740:3, 742:5, 749:10, 749:14, 749:16, 749:21, 749:23, 750:15, 750:18, 751:23, 756:14, 756:17, 756:19, 756:20, 756:23, 756:24, 757:2, 757:4, 762:12, 774:4, 789:4, 794:21, 807:6, 816:10, 817:5
**planned** [1] - 749:9
**plans** [3] - 773:6, 773:13, 774:6
**plausible** [1] - 784:24, 789:18
**played** [2] - 740:2, 750:22
**pleaded** [3] - 747:10, 773:24, 780:3
**pleading** [1] - 777:17
**pled** [3] - 779:1, 779:4, 779:5
**plowing** [1] - 728:7
**pocket** [2] - 758:16, 758:17
**point** [16] - 704:6, 705:22, 712:12, 713:6, 717:3, 717:5, 721:8, 733:24, 744:12, 746:16, 760:14, 800:14, 802:21, 811:19, 811:21, 813:17
**Point** [1] - 711:3
**pointing** [2] - 757:13, 793:11
**points** [3] - 704:14, 762:15, 764:8
**polish** [1] - 764:18
**pool** [2] - 773:1, 773:18
**pooling** [4] - 755:20, 773:14, 776:19, 789:9
**popped** [1] - 805:2
**portion** [4] - 720:8, 724:15, 762:19, 763:16
**positive** [1] - 717:5
**possible** [6] - 717:10, 717:11, 717:12, 753:9, 765:1, 794:1
**possibly** [1] - 814:4
**post** [1] - 709:22
**poster** [1] - 786:22

**potential** [1] - 810:13
**pound** [1] - 725:11
**pounds** [1] - 725:13
**power** [4] - 766:11, 766:12, 766:13
**powers** [2] - 766:9, 788:1
**precise** [1] - 752:21
**preference** [3] - 813:13, 814:18, 814:22
**prejudice** [1] - 746:6
**preliminary** [1] - 792:9
**prepared** [2] - 793:8, 795:1
**presence** [5] - 699:4, 806:11, 807:5, 813:18, 815:7
**present** [4] - 735:20, 753:23, 776:16, 801:6
**presented** [3] - 744:17, 746:2, 746:12
**pressured** [1] - 807:10
**presumed** [2] - 744:3, 781:7
**presumes** [1] - 747:21
**presumption** [5] - 767:1, 767:2, 767:11, 781:7, 781:11
**pretenses** [6] - 751:15, 751:16, 751:25, 760:19, 761:14, 761:17
**pretty** [7] - 708:18, 711:18, 769:16, 775:25, 776:12, 776:22, 808:22
**previous** [1] - 712:4
**principles** [1] - 769:15
**print** [1] - 724:8
**printed** [1] - 714:9
**privilege** [1] - 735:7
**prizes** [2] - 726:10, 770:21
**problem** [5] - 723:7, 797:21, 804:10, 810:13, 814:6
**problems** [1] - 769:8
**procedural** [1] - 806:13
**proceed** [1] - 816:10
**proceedings** [2] - 718:11, 818:3
**process** [12] - 699:25, 702:23, 707:8, 707:19, 707:22, 707:24, 708:3,

734:18, 734:21, 766:6, 776:18, 787:14
**processing** [1] - 725:14
**produce** [1] - 747:23
**produced** [4] - 715:13, 719:25, 720:5, 720:14
**proffer** [1] - 786:24
**profit** [4] - 704:19, 704:21, 705:2, 727:10
**program** [1] - 772:2
**programs** [1] - 755:21
**promise** [1] - 772:22
**promises** [3] - 751:15, 751:17, 752:1
**promptly** [1] - 793:25
**pronounce** [1] - 773:4
**proof** [12] - 744:5, 744:7, 744:13, 745:4, 748:1, 748:2, 748:6, 748:7, 750:25, 753:21, 753:23, 756:11
**properly** [1] - 702:25
**property** [2] - 751:14, 751:25
**proposed** [2] - 743:7, 743:8
**protects** [1] - 767:23
**prove** [22] - 744:8, 744:10, 747:22, 747:23, 749:7, 749:9, 749:15, 752:20, 752:22, 753:2, 753:9, 754:5, 754:6, 754:24, 756:8, 757:16, 768:16, 768:17, 781:6, 781:11, 784:20
**proved** [5] - 744:14, 748:10, 750:11, 750:17, 751:14
**proven** [2] - 744:3, 765:11
**proves** [4] - 744:23, 744:25, 745:6, 749:18
**provided** [1] - 721:10
**provision** [1] - 806:21
**pull** [19] - 700:24, 702:7, 702:13, 702:17, 703:19, 705:9, 709:21, 709:23, 709:25, 710:7, 710:23, 710:24, 713:13,

719:12, 759:15,
780:14, 784:10,
790:7, 800:13
**pulled** [8] - 702:11,
702:14, 711:3,
717:18, 736:17,
789:24, 790:1, 790:6
**pulling** [2] - 710:18,
773:12
**pulls** [1] - 761:11
**purpose** [23] - 702:23,
703:8, 749:22,
750:3, 750:18,
751:3, 752:21,
754:16, 757:2,
757:3, 759:13,
759:17, 759:19,
760:1, 760:3, 760:5,
762:11, 766:17,
766:18, 772:21,
785:3, 785:21,
786:13
**purposely** [3] -
754:15, 757:15,
760:17
**purposes** [1] - 749:5
**push** [1] - 763:19
**pushed** [1] - 763:9
**put** [26] - 700:12,
714:14, 733:1,
733:20, 733:23,
737:20, 737:24,
740:18, 741:15,
757:24, 780:25,
795:5, 796:22,
797:12, 797:13,
797:14, 797:15,
801:13, 802:4,
802:5, 802:9,
802:10, 803:4,
803:22, 804:2, 805:8
**putting** [4] - 732:25,
779:16, 780:7, 799:7

## Q

**qualify** [1] - 724:2
**QUESTION** [1] -
698:10
**questioning** [2] -
718:19, 718:23
**questions** [13] - 704:4,
707:15, 718:15,
724:18, 724:21,
728:10, 729:21,
734:13, 736:21,
745:17, 745:18,
746:19, 747:4
**quick** [1] - 806:13
**quickly** [1] - 812:9

**quiet** [1] - 735:9
**quite** [2] - 765:17,
791:7

## R

**raced** [1] - 812:10
**radio** [2] - 751:7,
753:5
**raid** [2] - 712:19,
721:18
**rained** [1] - 745:4
**raining** [2] - 744:24,
744:25
**raise** [1] - 706:5
**ran** [1] - 727:5
**Randy** [18] - 704:25,
720:24, 731:7,
731:17, 735:15,
735:21, 735:24,
756:15, 756:20,
760:21, 760:22,
761:22, 771:11,
772:9, 772:11,
773:8, 773:23,
774:15
**ranks** [1] - 758:1
**rapists** [1] - 765:16
**RDR** [21] - 732:14,
737:25, 738:1,
738:18, 738:19,
740:4, 740:23,
741:21, 742:2,
742:15, 761:24,
763:7, 779:13,
779:15, 784:12,
797:13, 799:1,
803:5, 804:25,
805:1, 805:2
**RDR'd** [11] - 710:11,
730:15, 730:16,
738:11, 779:19,
789:3, 789:4, 789:7,
798:8, 804:7, 804:12
**RDR'ing** [6] - 730:9,
740:25, 775:23,
776:7, 776:25
**RDR's** [13] - 739:11,
739:14, 755:21,
776:13, 787:9,
797:17, 798:7,
803:15, 804:7,
804:12, 804:16,
804:23, 805:4
**reach** [11] - 746:4,
792:21, 813:18,
815:18, 816:3,
816:5, 816:6,
816:19, 816:22,
817:7, 817:10

**reaching** [1] - 816:24
**read** [10] - 713:21,
714:2, 714:7,
716:23, 716:25,
735:10, 735:11,
743:18, 772:18,
772:25
**reading** [1] - 729:9
**ready** [2] - 699:9,
700:19
**real** [3] - 748:4, 786:8,
793:5
**realize** [4] - 714:7,
715:4, 734:5, 788:13
**realized** [10] - 714:21,
715:3, 715:6,
715:10, 721:10,
721:23, 722:3,
722:23, 735:2, 782:7
**really** [21] - 700:21,
708:19, 722:20,
736:8, 755:14,
759:13, 768:9,
771:8, 776:12,
778:1, 780:7,
783:16, 783:20,
783:21, 783:23,
791:14, 791:18,
809:15, 811:20,
813:15, 815:4
**reason** [5] - 712:1,
746:22, 748:4,
774:10, 777:11
**reasonable** [25] -
744:11, 744:16,
747:24, 748:3,
748:4, 748:7,
748:10, 749:19,
750:11, 751:12,
752:10, 753:25,
754:6, 754:25,
764:5, 765:12,
766:15, 767:8,
767:12, 768:18,
781:6, 781:11,
784:20, 791:9,
791:21
**reasonably** [1] - 754:7
**reasoning** [1] - 746:3
**reasons** [2] - 801:2
**reassure** [2] - 717:9,
731:24
**rebates** [1] - 730:16
**rebuttal** [3] - 781:20,
783:11, 783:20
**recap** [3] - 706:8,
707:8, 707:20
**received** [2] - 727:11,
738:7
**recently** [1] - 720:14

**receptionist** [1] -
758:2
**recess** [4] - 743:5,
782:4, 782:17, 806:9
**reckless** [1] - 752:4
**recollection** [2] -
712:15, 792:13
**recommend** [1] -
780:4
**reconciled** [1] -
804:17
**record** [6] - 737:20,
738:2, 741:6,
741:19, 795:5,
806:14
**records** [6] - 720:1,
728:15, 729:11,
729:12, 787:9
**Recross** [1] - 698:4
**RECROSS** [1] -
734:15
**red** [4] - 764:16,
764:17, 781:22,
784:7
**REDIRECT** [1] -
724:24
**Redirect** [2] - 698:4
**redundancy** [1] -
718:25
**reexamine** [1] -
792:22
**refer** [1] - 748:14
**reference** [2] - 720:18,
720:20
**referral** [1] - 709:23
**referred** [2] - 721:21,
722:3
**referring** [4] - 712:11,
712:13, 713:2,
723:15, 723:16,
738:18
**refers** [2] - 719:23,
720:4
**refresh** [1] - 712:15
**refuse** [1] - 811:1
**regards** [1] - 726:8
**regular** [2] - 712:6,
712:25
**regularly** [3] - 711:19,
712:10, 712:23
**relating** [1] - 748:20
**relationship** [3] -
708:18, 708:20,
725:18
**relatively** [1] - 786:25
**relevant** [1] - 801:3
**reliable** [1] - 744:20
**relied** [2] - 752:13,
752:14
**rely** [2] - 748:8, 785:14

**remarks** [1] - 745:15
**remember** [36] -
702:15, 704:18,
705:17, 706:1,
706:16, 706:19,
712:4, 712:7, 712:9,
712:14, 713:21,
714:3, 714:12,
714:18, 721:7,
724:7, 724:9,
724:14, 727:7,
734:22, 735:15,
735:18, 735:21,
736:19, 747:15,
772:20, 775:9,
775:10, 776:2,
780:9, 785:12,
793:5, 802:8,
811:10, 817:18
**remembered** [3] -
731:3, 731:4, 775:16
**remembers** [1] -
747:14
**remind** [2] - 699:14,
778:14
**remitted** [1] - 739:1
**remotely** [1] - 805:4
**remove** [3] - 761:9,
789:22, 799:4
**removed** [1] - 806:21
**removing** [1] - 806:24
**render** [1] - 766:22
**renew** [1] - 737:12
**renowned** [1] - 786:1
**repeat** [3] - 714:25,
716:21, 723:24
**rephrase** [1] - 699:23
**replied** [1] - 731:9
**report** [9] - 701:18,
732:6, 732:14,
757:4, 757:5, 763:8,
779:12, 799:7
**reported** [2] - 701:6,
799:18
**Reporter** [2] - 696:23,
697:23
**reporting** [3] - 730:11,
761:24
**reports** [2] - 731:25,
732:14
**representation** [3] -
752:2, 752:6, 761:14
**representations** [6] -
751:15, 751:16,
752:1, 760:19,
761:14, 761:17
**representatives** [2] -
761:21, 763:14
**represented** [1] -
785:10

**representing** [1] - 777:5

**reputation** [1] - 778:18

**request** [3] - 703:19, 704:13, 717:18

**requested** [4] - 714:21, 720:15, 735:3, 735:16

**required** [4] - 744:13, 754:23, 768:16, 794:9

**requirement** [1] - 763:1

**requires** [5] - 750:10, 753:21, 754:23, 763:7, 768:14

**resembles** [1] - 724:15

**reserve** [1] - 742:18

**resolve** [2] - 810:23, 811:7

**resources** [2] - 773:14, 773:19

**respect** [7] - 737:18, 737:22, 748:23, 751:5, 759:24, 782:18, 795:9

**respond** [3] - 739:8, 793:25, 805:25

**response** [5] - 732:17, 739:14, 761:4, 799:3, 799:12

**responsibilities** [2] - 709:19, 809:12

**responsibility** [2] - 758:7, 787:3

**responsible** [10] - 710:14, 710:18, 738:9, 740:3, 753:16, 753:18, 753:20, 790:8, 799:5, 799:7

**rest** [5] - 737:10, 771:5, 774:16, 782:9, 786:25

**restroom** [2] - 781:23, 781:25

**rests** [2] - 739:23, 739:24

**result** [2] - 738:7, 739:10

**resume** [2] - 809:9, 814:7

**retained** [1] - 720:17

**retire** [2] - 794:5, 808:1

**retiring** [2] - 794:4, 807:14

**return** [4] - 705:4,

765:1, 793:22, 808:17

**returns** [2] - 703:4, 705:6

**review** [4] - 703:11, 713:19, 714:11, 742:23

**revisions** [1] - 699:7

**Reynolds** [18] - 700:11, 730:7, 731:12, 732:4, 795:16, 798:3, 798:23, 800:2, 800:3, 804:3

**ride** [1] - 780:10

**risk** [1] - 778:17

**RMR** [2] - 696:23, 697:23

**road** [1] - 806:6

**rob** [3] - 780:16, 780:19, 780:21

**robbed** [1] - 780:20

**role** [2] - 740:2, 764:10

**room** [11] - 774:4, 781:9, 789:15, 792:6, 792:15, 793:18, 794:5, 794:22, 795:1, 808:9, 809:20

**rooms** [1] - 771:17

**roughly** [2] - 706:5, 706:6

**rule** [1] - 754:20

**Rule** [2] - 739:7, 742:19

**rules** [5] - 743:20, 744:1, 772:1, 772:25

**ruling** [1] - 742:18

**run** [2] - 783:9, 789:14

**rush** [1] - 808:4

---

**S**

---

**sad** [1] - 791:14

**safe** [1] - 817:15

**safely** [1] - 817:17

**salary** [3] - 705:19, 705:24, 728:1

**sale** [8] - 710:14, 710:16, 710:19, 711:3, 711:8, 711:14, 795:23, 796:4

**sales** [26] - 700:13, 700:14, 706:7, 707:7, 707:19, 707:20, 707:22, 707:24, 708:3, 714:22, 715:5,

723:19, 730:24, 733:1, 733:10, 755:20, 755:22, 757:4, 758:7, 761:7, 773:1, 776:15, 779:25, 784:3, 789:9

**sarcastic** [1] - 771:17

**sat** [3] - 713:9, 737:24, 771:18

**satisfied** [3] - 762:19, 763:1, 763:16

**save** [1] - 779:20

**saved** [2] - 722:6, 722:9

**saw** [23] - 715:8, 717:19, 717:24, 721:9, 721:21, 724:5, 724:6, 724:7, 725:3, 725:6, 736:5, 736:13, 744:24, 745:2, 745:21, 745:23, 756:21, 774:9, 790:2, 790:16, 796:20, 797:1

**scared** [1] - 764:16

**scene** [1] - 753:24

**schedules** [1] - 703:14

**scheme** [29] - 738:7, 740:15, 740:20, 742:6, 751:8, 751:14, 751:22, 751:23, 752:22, 753:3, 753:8, 758:22, 760:6, 760:7, 760:8, 760:10, 760:18, 760:21, 760:22, 760:23, 761:12, 762:15, 763:20, 764:4, 764:9, 796:16

**SCHLAGER** [1] - 697:4

**schlepping** [1] - 785:1

**school** [4] - 757:25, 764:15, 769:5, 809:16

**scope** [2] - 701:23, 702:22

**scratches** [1] - 764:18

**screen** [1] - 757:13

**search** [3] - 706:17, 721:3, 721:13

**seats** [2] - 794:8, 794:10

**SEC** [1] - 710:4

**SEC+** [1] - 710:6

**second** [12] - 717:13, 718:18, 744:7,

749:22, 751:16, 757:1, 759:5, 767:15, 800:23, 802:13, 810:15, 810:22

**secret** [1] - 793:3

**Section** [2] - 748:24, 751:6

**section** [1] - 793:11

**security** [1] - 758:17

**Security+Plus** [1] - 710:13

**see** [23] - 713:24, 714:1, 719:23, 720:3, 720:20, 724:11, 754:3, 762:17, 768:2, 768:5, 770:16, 786:21, 787:23, 787:24, 790:16, 796:18, 796:23, 807:21, 807:25, 811:7, 815:19, 816:21, 818:1

**seedy** [1] - 755:22

**seeing** [3] - 731:4, 736:20, 817:13

**seek** [1] - 793:6

**seem** [1] - 747:1

**sell** [3] - 762:4, 775:11, 775:14

**send** [14] - 700:21, 701:1, 702:6, 709:21, 710:1, 710:7, 710:25, 741:7, 741:20, 775:24, 776:4, 781:16, 804:17, 804:21

**sending** [1] - 738:19

**sends** [2] - 789:8, 805:16

**sense** [9] - 746:4, 748:5, 758:20, 785:12, 785:16, 790:10, 790:22, 791:22, 803:2

**sensible** [1] - 758:20

**sent** [9] - 700:18, 710:9, 718:1, 753:5, 761:2, 789:21, 790:6, 795:23, 796:3

**sentence** [2] - 768:19, 780:4

**separate** [8] - 701:12, 717:22, 730:18, 748:19, 753:7, 753:8, 779:3, 797:17

**separately** [1] - 748:20

**serial** [1] - 729:4

**Serra** [39] - 705:15, 705:16, 705:20, 705:24, 706:5, 708:15, 713:15, 715:4, 715:21, 719:13, 720:1, 720:2, 720:11, 720:14, 720:18, 720:20, 720:25, 721:1, 728:11, 728:18, 729:6, 729:11, 729:14, 735:17, 740:5, 740:7, 741:21, 756:3, 761:15, 787:9, 787:10, 788:16, 804:5, 804:6

**Serra's** [1] - 800:10

**service** [3] - 775:11, 794:18, 817:14

**set** [3] - 713:23, 785:17, 789:23

**sets** [2] - 702:12, 786:8

**seven** [1] - 779:5

**several** [4] - 759:1, 766:4, 772:18, 778:12

**share** [3] - 774:8, 815:18, 816:22

**shared** [2] - 749:21, 756:13

**sheet** [4] - 706:8, 707:8, 707:20, 708:13

**shelf** [2] - 711:24, 713:11

**Shepard** [14] - 733:20, 738:19, 739:11, 739:14, 740:23, 741:9, 756:16, 761:22, 763:4, 772:9, 776:11, 779:4, 779:18, 780:2

**shift** [4] - 723:3, 769:19, 784:2, 802:17

**shifted** [11] - 701:5, 714:22, 715:5, 715:22, 716:10, 719:15, 719:16, 719:20, 719:21, 723:19, 735:3

**shifting** [4] - 726:1, 734:18, 757:4, 776:15

**shirt** [1] - 786:17

**short** [2] - 708:7, 755:6

**show** [2] - 793:9, 793:10
**showed** [2] - 739:4, 804:25
**shredder** [1] - 788:7
**sick** [2] - 760:13, 794:10
**side** [8] - 706:8, 707:19, 707:21, 709:14, 730:18, 777:13, 803:4, 817:15
**sign** [4] - 714:6, 714:19, 793:17, 793:20
**signatures** [2] - 713:23, 779:23
**signed** [7] - 714:2, 714:10, 715:7, 715:17, 715:20, 719:18, 786:14
**significance** [1] - 747:18
**signing** [3] - 714:4, 716:11, 735:4
**similarly** [2] - 755:2, 768:22
**simple** [4] - 747:12, 755:14, 756:1, 771:1
**simpler** [1] - 716:4
**simply** [5] - 740:11, 742:4, 745:5, 753:23, 792:25
**single** [3] - 712:13, 743:24, 787:12
**sink** [1] - 784:13
**Sinkfield** [2] - 696:23, 697:23
**sirens** [1] - 780:19
**sister** [2] - 745:21, 773:18
**sit** [3] - 711:25, 774:4, 803:7
**site** [3] - 703:17, 790:9, 804:25
**situation** [5] - 707:6, 769:16, 813:21, 815:22, 815:24
**six** [3] - 732:17, 734:4, 770:12
**Sixteen** [4] - 748:17, 751:5, 751:10, 760:12
**slate** [1] - 744:6
**sleeping** [3] - 772:14, 788:21, 788:22
**SMITH** [1] - 697:5
**smoke** [2] - 771:17, 774:4
**smoke-filled** [2] -

771:17, 774:4
**social** [1] - 816:20
**sold** [18] - 701:5, 701:6, 703:22, 704:1, 704:9, 721:22, 730:11, 756:2, 757:5, 757:7, 758:10, 761:15, 761:24, 763:8, 770:2, 770:3
**solely** [1] - 744:16
**solution** [1] - 811:22
**somebody-told-me-to-this** [1] - 787:11
**someone** [13] - 710:9, 713:6, 739:11, 739:15, 741:7, 748:25, 751:9, 751:24, 752:18, 752:19, 757:13, 763:23, 767:4
**sometimes** [2] - 745:5, 778:16
**son** [2] - 778:24, 810:16
**sorry** [16] - 699:20, 706:23, 716:19, 717:8, 717:10, 717:12, 718:23, 722:19, 724:23, 729:23, 734:24, 786:20, 796:2, 800:20, 805:21, 814:12
**sound** [1] - 769:22
**sounds** [3] - 769:21, 790:15, 811:24
**source** [1] - 816:18
s**OUTHERN** [1] - 696:4
**spaniel** [1] - 765:7
**speaker** [1] - 752:3
**speaks** [1] - 716:2
**specific** [5] - 744:15, 752:17, 752:25, 754:20, 762:23
**specifically** [1] - 803:19
**spectator** [1] - 754:1
**speculating** [1] - 806:5
**spelling** [1] - 779:8
**sports** [2] - 767:13, 778:10
**spreadsheet** [9] - 799:8, 800:13, 800:16, 803:9, 803:12, 804:19, 804:21, 805:16,

805:19
**St** [1] - 811:11
**stage** [4] - 700:8, 700:11, 737:1, 798:4
**stand** [7] - 699:13, 766:8, 781:25, 785:20, 786:10, 787:7, 788:21
**standing** [1] - 782:12
**stands** [2] - 705:10, 783:16
**staple** [1] - 721:10
**stapled** [1] - 789:20
**start** [7] - 771:24, 779:16, 804:16, 812:7, 813:23, 813:25, 815:8
**started** [8] - 699:9, 715:8, 757:21, 758:1, 764:18, 769:3, 811:4, 817:5
**starting** [2] - 768:11, 782:24
**starts** [3] - 710:3, 744:6, 780:18
**state** [6] - 710:25, 731:11, 770:15, 770:16, 775:19, 813:10
**statement** [10] - 705:9, 739:3, 747:11, 752:2, 752:5, 752:15, 755:25, 771:20, 805:7
**statements** [5] - 745:13, 745:14, 777:7, 777:10, 786:7
**STATES** [3] - 696:2, 696:6, 696:13
**States** [7] - 696:24, 697:24, 748:24, 751:6, 762:18, 763:15, 766:9
**stating** [1] - 813:13
**status** [4] - 701:9, 733:5, 733:6, 803:4
**stay** [2] - 712:2, 807:10
**steal** [5] - 727:22, 765:23, 778:15, 778:19, 787:20
**stealing** [2] - 727:23, 778:15
**step** [3] - 700:4, 791:11, 804:16
**stepping** [1] - 809:20
**steps** [2] - 733:22, 788:9
**still** [9] - 699:14, 700:25, 707:11,

708:15, 710:12, 722:9, 725:21, 755:25, 816:19
**stip** [1] - 706:24
**stips** [15] - 706:11, 706:13, 706:19, 706:22, 707:1, 707:2, 707:5, 707:8, 707:9, 707:21, 707:24, 708:2, 708:5, 708:7, 708:10
**stipulated** [3] - 738:10, 738:14, 744:19
**stipulating** [2] - 762:25, 763:1
**stipulation** [4] - 762:17, 762:21, 762:23, 763:16
**stipulations** [17] - 706:11, 706:14, 706:21, 706:22, 706:25, 707:1, 707:4, 707:8, 707:10, 707:22, 707:24, 708:1, 708:2, 708:6, 708:8, 744:19
**stock** [1] - 715:8
**stole** [1] - 778:20
**stomach** [1] - 783:17
**stood** [1] - 755:13
**stop** [3] - 719:7, 775:23, 776:25
**store** [8] - 709:7, 726:17, 728:13, 729:15, 732:24, 772:3, 804:5
**stores** [3] - 705:6, 726:8, 773:18
**story** [2] - 764:14, 769:4
**stressful** [1] - 769:16
**stretch** [2] - 781:25, 784:23
**Strickland** [3] - 727:5, 773:17, 773:21
**stuff** [2] - 763:12, 776:24
**stylistic** [1] - 699:7
**Subject** [1] - 720:10
**subject** [1] - 779:6
**submit** [6] - 739:6, 755:24, 763:15, 784:23, 791:19, 803:13
**submits** [2] - 756:10, 784:6
**submitted** [7] - 710:10, 710:11,

737:25, 738:25, 740:21, 740:24
**submitting** [1] - 740:20
**subpoena** [23] - 713:14, 714:21, 715:4, 715:21, 716:1, 716:2, 716:9, 718:24, 719:13, 719:14, 720:11, 720:24, 722:2, 722:3, 722:9, 722:18, 722:24, 728:11, 728:21, 735:3, 788:1, 788:12, 789:6
**subpoenas** [1] - 766:11
**subsequent** [1] - 740:6
**subsequently** [1] - 802:21
**substantive** [1] - 748:18
**succeeded** [2] - 749:16, 753:3
**sufficient** [3] - 739:6, 740:25, 750:20
**suggest** [2] - 745:20, 746:19
**suggestion** [1] - 813:3
**suggestions** [3] - 809:25, 810:9
**sum** [1] - 739:3
**superiors** [1] - 750:24
**supervisors** [1] - 750:24
**suppose** [1] - 817:8
**supposed** [2] - 773:15, 776:3
**supposedly** [1] - 717:20
**surprise** [1] - 816:2
**surprisingly** [1] - 788:8
**survive** [1] - 739:7
**sustained** [1] - 709:3
**swapped** [1] - 772:5
**swapping** [1] - 772:4
**switched** [1] - 725:2
**sympathy** [1] - 746:5
**system** [32] - 700:20, 709:10, 709:16, 710:13, 723:13, 730:3, 730:10, 732:25, 733:1, 733:21, 763:7, 763:9, 766:7, 766:19, 795:15, 795:16, 795:17,

795:19, 797:13,
797:14, 797:16,
797:17, 797:18,
798:5, 799:18,
800:11, 802:5,
802:6, 802:11,
803:23, 805:3, 805:8
**systems** [3] - 701:12,
730:12, 797:17

# T

**talks** [1] - 759:17
**Tammi** [11] - 699:5,
791:24, 793:21,
793:24, 793:25,
814:5, 815:9,
815:19, 816:23,
817:16
**target** [2] - 779:11,
786:24
**tax** [4] - 703:4, 705:4,
705:6, 777:17
**technical** [1] - 793:10
**telephone** [1] - 816:18
**television** [2] - 751:8,
753:6
**ten** [2] - 737:3, 801:21
**ten-minute** [1] - 737:3
**tend** [1] - 747:14
**tendency** [1] - 752:12
**Tennessee** [4] -
738:11, 738:20,
739:12, 763:14
**term** [4] - 751:23,
789:9, 789:10, 796:7
**terminology** [1] -
708:9
**terms** [6] - 700:1,
740:19, 754:2,
795:20, 797:21,
797:23
**terrible** [2] - 786:5,
790:15
**testified** [22] - 702:5,
727:5, 733:20,
738:5, 741:9,
741:12, 745:1,
747:3, 757:18,
774:14, 774:15,
786:10, 787:2,
787:12, 795:19,
796:6, 797:1, 797:6,
797:16, 800:6,
802:15, 802:24
**testify** [7] - 744:25,
761:23, 763:14,
780:5, 786:24,
788:11, 788:14
**testifying** [4] - 706:16,

746:16, 775:6,
797:20
**testimony** [15] - 712:4,
712:16, 718:14,
721:25, 739:2,
744:21, 745:3,
746:15, 747:6,
747:7, 771:11,
774:23, 781:10,
789:17, 792:13
**text** [1] - 788:18
**THE** [153] - 696:12,
697:3, 697:8, 699:5,
699:9, 699:11,
699:15, 704:6,
707:13, 709:3,
716:5, 716:19,
716:22, 718:10,
718:13, 718:18,
719:4, 719:7,
724:22, 734:13,
735:8, 735:12,
736:22, 736:24,
737:8, 737:11,
737:14, 737:18,
738:1, 738:12,
738:16, 738:21,
738:24, 739:9,
739:22, 740:11,
741:4, 741:14,
741:23, 742:3,
742:17, 743:2,
743:6, 743:10,
743:12, 743:15,
762:23, 765:3,
768:3, 768:5,
781:20, 781:24,
782:3, 782:8,
782:15, 782:18,
783:5, 791:23,
792:3, 795:4, 795:8,
795:12, 795:25,
796:9, 796:18,
796:22, 797:3,
797:5, 797:9,
797:11, 797:19,
798:1, 798:7,
798:13, 798:16,
798:18, 798:22,
798:25, 799:10,
799:13, 799:16,
799:20, 799:25,
800:2, 800:5, 800:8,
800:14, 800:18,
800:22, 801:6,
801:9, 801:12,
801:15, 801:19,
801:22, 801:25,
802:3, 802:8,
802:14, 802:19,
802:22, 803:14,

803:20, 804:14,
805:6, 805:20,
805:23, 806:1,
806:8, 806:12,
806:22, 807:3,
807:6, 807:18,
807:20, 808:8,
808:11, 808:16,
808:25, 809:4,
809:8, 809:19,
809:23, 810:16,
810:19, 811:3,
811:8, 811:14,
811:16, 811:18,
812:3, 812:17,
812:21, 812:24,
813:2, 813:5, 813:7,
813:13, 813:24,
814:5, 814:11,
814:13, 814:21,
815:5, 815:9,
815:11, 815:16,
815:22, 816:17,
816:21, 817:3,
817:22, 818:1
**theoretically** [2] -
815:1, 815:2
**theory** [8] - 739:18,
739:23, 739:24,
740:1, 740:2, 741:2,
742:4, 763:21
**therefore** [2] - 744:6,
760:13
**they've** [1] - 811:21
**thief** [1] - 778:19
**thinking** [2] - 770:6,
781:10
**third** [7] - 744:10,
749:24, 751:18,
758:23, 759:6,
760:3, 768:11
**thousands** [2] - 762:3,
772:18
**three** [7] - 744:1,
765:7, 767:14,
773:10, 791:19,
811:21, 814:2
**throughout** [3] -
766:5, 790:4, 814:1
**throw** [1] - 759:20
**Thursday** [1] - 712:19
**tiers** [2] - 700:2
**timing** [2] - 807:21,
811:17
**title** [15] - 710:15,
710:16, 710:17,
710:19, 710:21,
710:25, 711:1,
711:2, 711:4, 711:9,
711:15, 714:10,

795:24, 796:4
**Title** [2] - 748:23,
751:6
**today** [8] - 707:5,
724:7, 734:7,
758:15, 770:9,
783:9, 784:21, 812:5
**together** [6] - 717:11,
749:10, 755:15,
756:1, 773:19, 783:8
**tomorrow** [16] -
807:14, 808:6,
808:14, 808:18,
810:1, 810:5, 810:7,
813:11, 813:16,
814:4, 815:2, 815:8,
816:1, 816:4, 817:5,
817:13
**ton** [1] - 797:22
**tonight** [3] - 810:24,
812:6, 817:7
**took** [14] - 715:15,
721:12, 721:19,
722:5, 731:1,
742:10, 760:24,
763:5, 766:20,
771:7, 783:25,
792:10, 805:21,
816:13
**top** [3] - 713:22,
719:12, 720:8
**topic** [1] - 699:21
**totality** [1] - 816:9
**totally** [1] - 701:3
**touch** [2] - 812:8,
817:4
**toward** [1] - 699:13
**track** [3] - 705:8,
760:25, 761:7
**tracker** [4] - 802:6,
802:11, 803:22,
803:24
**tracks** [3] - 755:17,
757:10, 761:10
**traffic** [1] - 780:12
**tragic** [2] - 791:12,
791:14
**transaction** [1] - 750:5
**TRANSCRIPT** [1] -
696:12
**transfer** [1] - 769:18
**transferred** [1] - 738:8
**transferring** [3] -
760:6, 776:5, 777:3
**transfers** [2] - 762:25,
763:3
**transmission** [3] -
740:6, 741:8, 753:1
**transmissions** [5] -
738:18, 738:23,

740:16, 740:21,
762:25
**transmitted** [16] -
737:21, 739:5,
739:20, 739:21,
740:16, 740:17,
740:19, 742:16,
751:20, 751:21,
752:23, 762:13,
763:18, 763:20
**traveled** [2] - 738:3,
763:10
**trial** [9] - 744:19,
746:12, 766:13,
767:16, 785:4,
792:9, 794:8,
794:11, 810:14
**TRIAL** [1] - 696:12
**trick** [1] - 699:21
**tried** [2] - 772:12,
774:12
**trigger** [1] - 739:21
**trip** [1] - 776:21
**trips** [5] - 717:22,
718:1, 726:10,
785:21, 785:24
**Troy** [1] - 813:1
**true** [8] - 713:25,
719:25, 729:10,
736:15, 745:19,
746:13, 755:25,
761:16
**truly** [2] - 766:20,
791:9
**trust** [2] - 725:4,
769:10
**trusted** [1] - 771:10
**truth** [7] - 746:21,
746:23, 747:13,
752:5, 752:7, 787:4,
793:6
**try** [13] - 716:5,
718:21, 718:25,
741:16, 749:20,
756:13, 766:1,
766:20, 768:8,
783:16, 792:20,
817:6, 817:12
**trying** [17] - 699:20,
699:21, 717:9,
722:20, 727:1,
731:24, 732:10,
732:12, 732:13,
736:8, 739:22,
741:23, 741:24,
765:9, 769:14,
769:16, 812:7
**Tuesday** [1] - 725:6
**turn** [2] - 700:23,
768:9

turned [1] - 733:14
turquoise [1] - 711:10
Two [3] - 748:17,
751:5, 760:12
two [41] - 701:12,
702:12, 705:18,
707:4, 707:11,
712:12, 712:22,
713:9, 725:11,
726:8, 727:10,
727:11, 727:12,
727:19, 729:21,
735:15, 749:3,
749:20, 751:10,
756:12, 761:17,
765:7, 765:9,
767:14, 769:6,
771:1, 771:3,
771:14, 773:11,
779:10, 781:22,
786:10, 787:8,
794:13, 794:18,
794:22, 797:16,
809:24, 816:6
two-minute [1] -
781:22
type [2] - 804:19,
804:20
typed [1] - 756:22
typical [1] - 765:14
typically [5] - 705:7,
711:21, 712:2,
726:13, 767:20

U

U.S [3] - 697:3, 697:4,
766:10
umbrellas [1] - 745:3
unanimous [4] -
750:12, 793:2,
793:14, 813:25
unanimously [1] -
750:10
unclear [1] - 718:2
under [11] - 699:14,
706:19, 712:7,
713:24, 714:5,
715:20, 740:1,
749:2, 753:13,
769:17, 790:17
underbelly [1] -
755:22
understandable [1] -
814:20
understood [13] -
703:8, 706:21,
706:25, 713:17,
722:20, 731:11,
736:12, 738:17,

738:22, 773:15,
791:4, 796:7, 797:19
undisputed [7] -
795:12, 795:17,
796:19, 796:22,
797:3, 797:9, 802:8
undo [1] - 772:14
unfortunately [1] -
718:24
unimportant [1] -
747:20
UNITED [3] - 696:2,
696:6, 696:13
United [7] - 696:24,
697:24, 748:24,
751:6, 762:18,
763:15, 766:9
unlawful [11] - 749:3,
749:14, 749:21,
749:22, 750:15,
750:18, 756:13,
756:25, 757:1,
765:22, 766:17
unless [6] - 700:22,
712:1, 739:4,
745:23, 807:12,
813:25
unRDR'd [1] - 803:19
unsigned [1] - 806:19
untouched [2] -
711:25, 713:9
untrue [1] - 752:4
unusual [4] - 771:5,
780:16, 814:7,
815:22
unwind [2] - 788:23
up [45] - 700:25,
709:23, 713:13,
715:8, 716:7,
717:11, 718:3,
718:7, 718:10,
722:8, 724:11,
732:11, 739:19,
741:17, 756:18,
756:22, 757:25,
758:3, 763:5,
763:12, 764:21,
764:23, 764:24,
765:9, 765:25,
769:14, 776:23,
777:5, 777:8, 777:9,
777:18, 779:22,
779:25, 781:13,
782:22, 787:9,
788:9, 789:11,
792:23, 794:24,
802:12, 804:25,
805:2, 808:6, 814:13
upload [1] - 803:11
upset [1] - 776:21

utility [2] - 777:6,
786:6

V

various [2] - 744:22,
780:3
vast [2] - 766:9,
787:25
Vegas [1] - 776:21
vehicles [4] - 710:11,
730:11, 798:8,
801:25
verdict [16] - 743:7,
743:8, 748:22,
765:1, 766:22,
791:21, 793:1,
793:4, 793:8,
793:11, 793:17,
793:18, 793:19,
793:21, 793:22,
810:7
versus [1] - 724:1
via [2] - 739:2, 739:5
viewed [1] - 750:6
vin [1] - 729:18
violating [2] - 754:21,
757:17
Visser [57] - 705:20,
705:24, 716:14,
717:14, 720:2,
720:19, 720:20,
720:24, 721:1,
728:18, 729:6,
729:14, 731:8,
731:10, 732:21,
735:17, 756:15,
756:20, 760:21,
760:22, 761:2,
761:5, 761:22,
771:11, 772:9,
772:11, 772:13,
773:8, 773:23,
773:24, 773:25,
774:3, 774:12,
774:13, 774:15,
774:19, 775:3,
779:1, 780:2, 787:9,
788:11, 788:14,
788:20, 789:2,
789:19, 790:20,
795:22, 796:6,
796:17, 797:22,
798:1, 798:21,
798:22, 800:24,
804:5, 804:6
Visser's [5] - 731:17,
740:3, 742:5,
796:19, 799:11
Vissers [1] - 708:18

voice [1] - 785:8
VOLUME [2] - 696:12,
698:3
voluntarily [4] -
754:11, 754:15,
757:15, 763:25
voted [1] - 794:3
VW [2] - 705:16,
709:14

W

wait [3] - 790:15,
814:3, 814:19
waiting [1] - 814:24
walk [4] - 739:4,
765:8, 780:15,
780:16
walked [2] - 741:13,
786:8
walking [6] - 699:13,
745:2, 759:3, 765:6,
765:9, 786:15
wants [5] - 718:8,
786:7, 787:18,
811:25, 814:19
warehouse [1] -
776:23
warrant [1] - 706:17
warranties [6] -
709:23, 709:25,
714:23, 730:15,
776:13, 784:15
warranty [3] - 710:3,
710:4, 714:24
ways [2] - 725:17,
814:4
Wednesday [1] -
811:12
week [8] - 755:13,
756:15, 758:16,
810:14, 811:11,
811:25, 814:10
weekend [1] - 815:3
weeks [1] - 732:17
weight [4] - 725:10,
725:11, 745:10,
792:12
welcome [2] - 743:18,
809:25
wet [2] - 745:2, 745:3
whatsoever [1] -
745:22
wherein [1] - 787:3
whichever [1] - 761:8
whoa [1] - 790:15
whole [5] - 709:24,
759:14, 759:17,
773:9, 779:2
Wick [12] - 707:13,

718:20, 734:13,
755:13, 764:14,
766:25, 767:9,
767:25, 783:13,
799:10, 811:3,
811:10
WICK [109] - 697:4,
699:16, 699:18,
704:7, 707:7,
707:16, 707:17,
708:24, 709:4,
716:3, 716:6,
716:23, 718:7,
718:17, 718:23,
719:11, 724:18,
729:21, 729:23,
734:14, 734:16,
735:19, 736:21,
737:23, 738:4,
738:14, 738:17,
738:22, 738:25,
739:16, 740:8,
740:13, 741:9,
741:22, 741:24,
742:6, 742:24,
743:9, 781:21,
782:2, 782:5,
782:11, 782:16,
783:2, 783:14,
795:6, 795:11,
795:22, 796:2,
796:10, 796:21,
796:24, 797:4,
797:8, 797:10,
797:15, 797:20,
798:6, 798:11,
798:14, 798:17,
798:20, 798:24,
799:2, 799:12,
799:19, 799:24,
800:1, 800:4, 800:6,
800:12, 800:15,
800:20, 801:1,
801:8, 801:11,
801:14, 801:17,
801:21, 801:24,
802:2, 802:7,
802:12, 802:15,
802:20, 802:23,
803:17, 804:10,
804:15, 805:10,
805:21, 807:1,
807:15, 808:17,
810:11, 811:4,
811:12, 811:20,
812:10, 812:15,
812:18, 812:22,
813:3, 813:17,
814:2, 814:17,
814:25, 816:25,
817:24

**Wick's** [1] - 755:25
**WILL** [1] - 810:20
**willful** [2] - 754:1, 764:5
**willfully** [14] - 748:16, 749:23, 750:18, 753:18, 754:14, 754:19, 757:2, 757:10, 757:12, 757:13, 763:25, 764:3, 791:11
**WILLIAM** [1] - 697:8
**williams** [1] - 817:10
**Williams** [8] - 794:14, 812:15, 812:25, 815:20, 816:11, 816:14, 817:4, 817:7
**willing** [3] - 748:8, 815:18, 816:22
**Wilmer** [1] - 697:8
**win** [6] - 726:10, 726:20, 767:14, 767:16, 770:21, 775:15
**wire** [30] - 737:19, 737:21, 738:23, 739:5, 739:21, 739:24, 740:9, 740:12, 740:15, 741:7, 748:16, 748:18, 751:5, 751:7, 751:21, 752:23, 752:24, 753:2, 753:4, 753:5, 753:7, 754:9, 760:12, 760:15, 762:14, 762:25, 763:3, 772:5, 783:25, 806:4
**wired** [2] - 739:11, 740:5
**wires** [3] - 739:19, 740:19, 763:11
**wish** [1] - 793:23
**WITNESS** [2] - 698:6, 699:15
**witness** [21] - 707:9, 744:24, 745:1, 745:21, 745:23, 745:24, 746:14, 746:17, 746:18, 746:20, 746:22, 746:24, 747:1, 747:2, 747:4, 747:8, 747:9, 747:13, 747:15, 767:22
**witness's** [1] - 747:6
**witnesses** [6] - 738:4, 744:21, 746:15, 761:23, 791:20,

797:16
**witnesses'** [1] - 745:18
**woman** [2] - 709:5, 790:7
**wonderful** [1] - 791:3
**wondering** [1] - 816:17
**word** [7] - 754:10, 754:13, 754:14, 769:19, 770:11, 786:4
**words** [4] - 749:4, 753:24, 785:5, 793:2
**workers** [1] - 750:24
**works** [1] - 809:15
**world** [3] - 703:15, 765:15, 777:19
**worry** [1] - 761:6
**worth** [1] - 712:22
**wreck** [1] - 764:15
**write** [3] - 709:22, 790:13, 793:24
**writes** [1] - 720:13
**writing** [4] - 727:9, 727:20, 779:17, 794:1
**written** [2] - 726:7, 770:19
**wrote** [1] - 775:17

## Y

**Y'all** [1] - 699:9
**year** [4] - 703:7, 727:10, 728:1, 789:14
**yearly** [1] - 705:8
**years** [8] - 711:25, 712:22, 713:9, 757:23, 765:8, 773:18, 787:8, 813:21
**Yelverton** [6] - 775:22, 776:8, 776:24, 779:11, 786:23, 787:7
**yesterday** [16] - 699:12, 699:19, 699:24, 703:2, 709:5, 713:14, 714:20, 718:14, 718:21, 721:22, 723:23, 724:20, 733:20, 786:18, 807:6, 807:23
**Yolanda** [1] - 709:6
**young** [3] - 769:4, 781:15, 812:15
**yourself** [3] - 746:19,

789:17, 792:18

## Z

**zero** [1] - 779:6